# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GILEAD COMMUNITY SERVICES, INC.,
et al.,
      *Plaintiffs*,

      v.

TOWN OF CROMWELL, et al.,
      *Defendants*.

No. 3:17-cv-627 (VAB)

## RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Gilead Community Services, Inc. ("Gilead"), Rainbow Housing Corp. ("Rainbow Housing"), and the Connecticut Fair Housing Center, Inc. (collectively "Plaintiffs") sued the Town of Cromwell ("Town"), and Vincent "Enzo" Faienza, Anthony Salvatore, and Jillian Massey, individually and in their official capacities as town officials. Compl., ECF No. 1 (Apr. 17, 2017).

Plaintiffs allege that the Town of Cromwell and the named officials (collectively "Defendants") violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and its implementing regulations at 24 C.F.R. Part 100; the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), and its implementing regulations, 28 C.F.R. § Part 35; and the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and its implementing regulations, 24 C.F.R. Part 8, "by denying housing to Gilead's clients, who are people with disabilities." *Id.* ¶ 1. Plaintiffs later moved, and the Court granted them leave, to amend their Complaint to add retaliation claims under 42 USC §§ 3617 and 3604(f)(2).

Presently before the Court are Defendants' initial and supplemental motions for summary judgment, Mot. for Summ. J. ("Defs.' Mot."), ECF No. 75 (Dec. 7, 2018); Supp. Mot. for Summ.

J. ("Defs. Supp. Mot.") ECF No. 110 (July 8, 2019); and Plaintiffs' motion for partial summary judgment, Pls.' Partial Mot. for Summ. J. ("Pls.' Mot,"), ECF No. 76 (Dec. 7, 2018).

For the reasons discussed below, Defendants' motion for summary judgment, ECF No. 75, is **DENIED**, Defendant's supplemental motion for summary judgment, ECF No. 110, is **DENIED**, and Plaintiffs' motion for partial summary judgment, ECF No. 76, is **DENIED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

<u>Parties</u>

Gilead, a not-for-profit organization, seeks to provide housing and community-based services to individuals with disabilities in the state of Connecticut. Pls. Statement of Material Facts ("Pls. SOMF"), ECF No. 77 ¶ 1 (Dec. 7, 2018). "Since 1968, Gilead has offered residential housing services to thousands of individuals with mental illnesses and other disabilities in Middlesex County, Connecticut." *Id*. ¶ 9. Rainbow Housing Corporation is a "sister not-for-profit corporation that owns and manages Gilead's real estate assets." *Id*. ¶ 2. Connecticut Fair Housing Center is a "statewide not-for-profit corporation whose mission is to ensure that all people have access to the housing of their choice throughout the state of Connecticut free from discrimination." *Id.* ¶ 4.

Vincent "Enzo" Faienza is Mayor of the Town of Cromwell. *Id.* ¶ 6. Anthony Salvatore is Town Manager for the Town of Cromwell. Pls. SOMF Ex. 8, ECF No. 77-8 (Deposition of Anthony Salvatore at 20:1-4 (June 28, 2018)). Before becoming Town Manager, Mr. Salvatore served as the Town of Cromwell's Chief of Police. *Id.* at 41:7-14. From February until August 2015, Mr. Salvatore was both the Cromwell Chief of Police and Acting Town Manager. *Id.* He became Town Manager in August 2015. *Id.* Until July 31, 2015, Jillian Massey served as the

Zoning Enforcement Officer for the Town of Cromwell. Pls. SOMF in Opp. to Defs. SOMF ("Pls. Opp. SOMF"), Ex. 27, ECF No. 86-27 (Deposition of Jillian Massey at 139:6-15 (May 30, 2018)).

Gilead's Reiman Drive Residence over the Spring and Summer of 2015

On or around December 10, 2014, the Connecticut Department of Mental Health and Addiction Services ("DMHAS") approved an application from Gilead to operate a new community residence for men with disabilities. Pls. SOMF ¶ 10.

On March 25, 2015, Gilead, through Rainbow Housing, closed the purchase of a single-family house located at 5 Reiman Drive in Cromwell, Connecticut ("Reiman Drive residence") to use for the new home. *Id.* ¶ 11. Gilead purchased the house for $352,047.30. Pls. SOMF Ex. 14, ECF No. 77-14 (Closing Documents, 5 Reiman Drive (Mar. 25, 2015)). Gilead intended to use the Reiman Drive residence as a community residence under Connecticut General Statutes § 8-3, "to serve six or fewer men who would receive mental health services from Gilead staff," and under the DMHAS contract, Gilead would provide these services. Defs. Statement of Material Facts ("Defs. SOMF"), ECF No. 75-2 ¶ 2 (Dec. 7, 2018). "After purchasing the home, Gilead initiated renovations to prepare the home for occupancy by six of its clients, with initial occupancy to begin in May 2015." *Id.* ¶ 4, 10.

On March 30, 2015, Gilead's Chief Executive Officer ("CEO"), Daniel Osborne, reached out to the Town of Cromwell's Acting Town Manager, Anthony Salvatore, to inform him that Gilead had purchased the property and planned to operate a community residence there. Pls. SOMF ¶ 12. Cromwell residents had also begun reaching out to Town officials about Gilead's purchase of the Reiman Drive residence by March 30, 2015. *Id.*

On March 31, 2015, Mayor Faienza stated in an e-mail to Superintendent of Schools

Paula Talty, "There really is nothing we can do to stop this group home from coming to town . . . [T]hey are protected by state statute. All we can do is try to ease any concerns the residents may have." Defs. SOMF Ex. I-3, ECF No. 75-28 (emails between Enzo Faienza/Paula Talty re: "meeting" (Mar. 31, 2015)).

Also, on March 31, 2015, a meeting took place that included Gilead, state elected officials, and Acting Town Manager Salvatore and Mayor Faienza, to discuss Cromwell residents' concerns about Gilead's plans to open the Reiman Drive residence. Defs. SOMF ¶ 11. It is disputed whether this meeting also involved discussion of Town officials' concerns. Pls. SOMF in Opp. to Defs. SOMF ("Pls. Opp. SOMF"), ECF No. 86 at 52, response to ¶ 11 (Jan. 18, 2019).

At this meeting, it was decided that a public forum for Town residents to have an opportunity to learn about Gilead and the planned community residence on Reiman Drive would be held on April 20, 2015. Defs. SOMF ¶ 12. It is disputed whether Gilead or Town and state officials proposed this forum, but both Gilead and Town officials ultimately agreed to hold it. Pls. Opp. SOMF at 8 ¶ 31, 54 ¶ 12; Defs. SOMF in Opp. to Pls. SOMF ("Defs. Opp. SOMF"), ECF No. 84-2 at 10, response to ¶ 23 (Jan. 18, 2019).

The Town publicized the April 20 forum, including through an official press release "stat[ing] that representatives from Gilead and DMHAS would provide a presentation regarding the group home on Reiman." Pls. SOMF ¶ 24. A local newspaper, the Middletown Press, published statements by Mayor Faienza that "[i]t's important that all concerned residents come to the forum with their questions and concerns for Gilead and DMHAS. The goal of Monday night's forum is for Gilead to answer all the concerns of our residents." *Id.* ¶ 25 (quoting Mayor Faienza from *Cromwell to Hear Views on Group Home Proposed Near High School,*

Middletown Press News (Apr. 20, 2015), ECF No. 77-23).

On April 20, 2015, the planned forum was held. Defs. SOMF ¶ 15; Pls. Opp. SOMF at 9, response to ¶ 35. The forum was moderated by Ed Wenners, who at that time "was beginning his campaign to earn a seat on the Town Council." Pls. Opp. SOMF at 8 ¶ 32; *see also* Pls. Opp. SOMF Ex. 41, ECF No. 86-41 (E-mails between Ed Wenners/Enzo Faienza re: "FW: Cromwell Town Council" (Sept. 19, 2015)). Mayor Faienza asked Mr. Wenners to moderate it. Pls. Opp. SOMF at 8 ¶ 32; *see also* Pls. Opp. SOMF Ex. 34, ECF No. 86-34 (Deposition of Edward B. Wenners at 32:2-33:25 (Aug. 3, 2018)); Pls. Opp. SOMF Ex. 7, ECF No. 86-7 (Deposition of Vincent "Enzo" Faienza at 111:2-112:9 (June 27, 2018)).

The forum, which was held at the Town Hall gym, Pls. Opp. SOMF Ex. 28, ECF No. 86-28 (Press Release: "Gilead Group Home," Town of Cromwell (Apr. 20, 2015)), "lasted almost four hours. The gymnasium was at full capacity; the chairs and bleachers were all full, and people were standing on both sides of the room." Pls. SOMF ¶ 27.

Various Town officials were present, including Mayor Faienza, Mr. Salvatore, and other state and local officials. Pls. SOMF ¶ 33-38; Pls. Opp. SOMF at 8 ¶ 35 (citing Ex. 36, ECF No. 86-36 (Press Release, Town of Cromwell (Apr. 21, 2015))). "Representatives from Gilead and DMHAS provided some information about the group home and a general overview of the types of services it intended to offer to its residents." Pls. SOMF ¶ 28. "Over sixty audience members . . . spoke in opposition of the group home being located at" the Reiman drive address. *Id.* ¶ 29. "Two people spoke in support of the group home, but they were shouted over by the crowd." *Id.* ¶ 30.

Mayor Faienza spoke at the forum, stating that "the proposal is unfortunate and unfair, and we were caught totally off guard by it," *Id.* ¶ 33; that the idea of restricting group homes in a

town by census population, akin to the way package stores are regulated, might be "something that should be looked into," Pls. SOMF Ex. 7, E. Faienza Tr., ECF No. 77-7 at 156:14-24 (June 27, 2018); and "Where does it end?," Pls. SOMF ¶ 33. Mr. Salvatore also spoke at the forum, saying that "in my opinion, this is not the right location." Pls. SOMF ¶ 38. It is disputed whether any other Town officials spoke. The day after the forum, the Town issued a press release that read as follows:

> As a result of a Public Forum held on the evening of April 20th at the Cromwell Town Hall, regarding the placement of a group home at 5 Reiman Drive, Cromwell residents . . . were able to listen to a presentation by Gilead and [DMHAS] followed by a question and answer period that lasted from 7 p.m. until nearly 11 p.m.
>
> During [the forum] State and Local Officials as well as residents were also given the opportunity to express their concerns. The majority of the concerns centered around the close proximity of this residence to Cromwell Schools and the makeup of the neighborhood, which contains a number of children and teenagers.
>
> Because of the lack of information provided by Gilead and DEHMAS [sic] based on the concerns by those in attendance, Mayor Enzo Faienza is officially and publically [sic] requesting, on behalf of the citizens of the Town of Cromwell, that Gilead consider relocating to a more suitable location.

Pls. SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)).

In the days following the forum, the Middletown Press published two articles about the forum and the Reiman Drive residence plans. One article quoted statements by Mayor Faienza at the April 20 forum, Pls. SOMF Ex. 30, ECF No. 77-30 (Jeff Mill, *Cromwell Citizens, Officials Adamantly Object to Group Home*, Middletown Press (Apr. 21, 2015) ("The proposal 'is unfortunate and unfair, and we were caught totally off guard by it,' Faienza said")); and another quoted Mayor Faienza saying that "I feel I owe the residents of Reiman Drive that I stand up and ask Gilead to consider another alternative site," Pls. SOMF Ex. 34, ECF No. 77-34 (Jeff Mill, *Officials Fear Men's Transitional Home Will Affect Cromwell Families*, Middletown Press (Apr.

22, 2015)).

Mayor Faienza communicated with residents by e-mail about the forum and the Reiman

Drive residence. The day after the forum, April 21, 2015, the Mayor wrote:

> I wanted to have this forum so the members of Gilead and DMHAS could see the
> outrage and concern first hand from our residents. Everyone did a fantastic job . . .
> I'm hoping they reconsider completely and choose not to move forward with
> anything. . . Ideally I don't want anything in that neighborhood or in town at all[.]

Pls. SOMF Ex. 35, ECF No. 77-35 (E-mails between Tina Mendes/Enzo Faienza re: "FW:

Gilead Group Home").

After the forum, either Mayor Faienza or Mr. Salvatore (it is disputed which) "contacted

Town Attorney Kari Olson and requested that [she] research whether Gilead's plans for 5

Reiman Drive constituted a community residence and whether 5 Reiman Drive would be subject

to zoning regulations." Defs. SOMF ¶ 22. Ms. Olson sent an e-mail to Gilead Attorney Timothy

Hollister to ask for information regarding whether the Reiman Drive residence was exempt from

zoning regulations. Defs. SOMF Ex. L-1, ECF No. 75-34 (E-mails between Kari Olson/Timothy

Hollister re: "Fw: Gilead" (May 1, 2015)).

On May 5, 2015, a special executive session of the Town Council took place. In a May 4,

2015 e-mail responding to a resident who had sent a news article about an incident that had

occurred at another group home in Connecticut, Mayor Faienza said that he had called the

session himself, stating that "[t]he Salem issue really highlights all our concerns regarding this

group home. I have called a special executive session meeting of the Council for tomorrow night.

I'm also trying to get our town attorney there." Pls. SOMF Ex. 37, ECF No. 77-37 (E-mails

between Rob Latulippe/Enzo Faienza re: "Fwd: Safeguards" (May 4, 2015)). Ms. Olson did

attend that meeting. Defs. SOMF ¶ 23. The Town Council also approved filing a petition with

the Connecticut Department of Public Health ("DPH") at that meeting. *Id.*

"On May 6, 2015, Attorney Olson, on behalf of the Town, petitioned the Commissioner of the DPH to deny Gilead authority to install a community residence at 5 Reiman Drive on the basis that pursuant to General Statutes § 19a-507b(c), Gilead was required to apply for a license to operate a community residence." Defs. SOMF ¶ 24; Defs. SOMF Ex. L-3, ECF No. 75-36 (Anthony Salvatore and Kari Olson, Town of Cromwell, *Petition to Deny Proposed Community Residence* (May 6, 2015)). The Town also issued a press release that read as follows:

> As a result of Gilead Community Services attempting to install another community residence in the Town of Cromwell, Acting Town Manager Anthony Salvatore, with the support of Mayor Enzo Faienza and the Town Council, petitioned the Commissioner of Public Health to deny Gilead Community Services authority to install another community residence in the Town of Cromwell.

Pls. SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015). Mayor Faienza also was quoted, stating, "What we are against is the idea of having this group home in this particular neighborhood." Pls. SOMF Ex. 40, ECF No. 77-40 (*Cromwell Petitions State about Gilead Group Home Location*, Middletown Press (May 14, 2015)).

On May 15, 2015, Mayor Faienza wrote in an e-mail to a Town resident that "[w]e are pounding Gilead and DPH is spinning right now. We will keep [the] pressure on, let's keep our fingers crossed." Pls. SOMF Ex. 41, ECF No. 77-41 (E-mails between Rob Latulippe/Enzo Faienza re: "Fwd: Group Home Update" (May 15, 2015)). The individual responded, "Not to sound like an ass. But – awesome." *Id.*

On June 15, 2015, the Connecticut Department of Public Health issued a letter to the Town stating that it was not taking any action against Gilead in response to the Town's petition because Gilead did not require a license under Connecticut General Statutes § 19a-507b(c) to

operate the Reiman Drive residence. Pls. SOMF Ex. 42, ECF No. 77-42 (Antony Casagrande, General Counsel, Conn. Dep't of Health, Letter to Kari Olson Regarding Petition to Deny Proposed Community Residence (June 15, 2015) ("June 15, 2015 Casagrande Letter")).

On June 25, 2015, at 8:22 p.m., Ms. Olson sent an e-mail to Mayor Faienza, Mr. Salvatore, and Michael Zizka, attaching a memorandum dated June 22, 2015, and addressed to the Town Council. Pls. Opp. SOMF Ex. 61, ECF No. 86-61 (Mem. from Kari Olson to Town of Cromwell Town Council Regarding Gilead's Proposed Community Residence (June 22, 2015) ("June 22, 2015 Olson Memo")).

The memo, marked "CONFIDENTIAL," stated that "[t]he forgoing memorandum reflects that any success in litigating over Gilead's new group home is far from certain," and that by pursuing the petition further "the Town may be criticized for attempting to shut out those in need of rehabilitation." June 22, 2015 Olson Memo at 8. Ms. Olson also stated that "Notwithstanding all of these hurdles, it is my understanding that you wish to pursue this challenge vigorously and despite the knowledge that the challenge may fail." *Id.*

Ms. Olson also exchanged e-mails with Mayor Faienza and Mr. Salvatore on June 25, 2015, stating that she "would like to send a warning letter to Tim Hollister (Gilead's Attorney) regarding the anticipated zoning violations." Pls. Opp. SOMF Ex. 76, ECF No. 86-76 (Emails between Kari Olson/Enzo Faienza/Anthony Salvatore/Re Matus re: "RE: Remain [sic] Dr." (June 25, 2015, 1:28pm)).

Town Attorney Olson sent a letter to Gilead's attorney Hollister, attaching the June 15, 2015 Casagrande Letter and stating that the Town of Cromwell understood the Connecticut Department of Public Health's decision to mean that the Reiman Drive residence was not a community residence entitled to zoning exemptions under Connecticut General Statutes 8-3e.

Pls. Opp. SOMF Ex. 78, ECF No. 86-78 (Letter from Kari Olson to Tim Hollister, Re: "Gilead Community Services" (June 25, 2015)). Ms. Olson's letter stated that, as a result, the Town of Cromwell would be issuing a Cease and Desist Order to Gilead for operating a group facility at 5 Reiman Drive in violation of town zoning laws. *Id.*

On June 29, 2015, the Town filed a motion with the Connecticut Department of Public Health to reconsider their decision that Gilead did not require a license to operate the Reiman Drive residence. Pls. SOMF Ex. 43, ECF No. 77-43 (Anthony Salvatore, Town of Cromwell, Mot. for Reconsideration of Decision on Petition to Deny Proposed Comm. Residence (June 29, 2015) ("June 29, 2015 Town Mot. to Reconsider Petition")).

On July 1, 2015, the Town issued a "Notice of Violation/Cease & Desist Order" regarding 5 Reiman Drive ("Reiman Drive Cease & Desist Order") to Steve Bull, President of Rainbow. Pls. SOMF Ex. 44, ECF No. 77-44 (Reiman Drive Cease & Desist Order (July 1, 2015)). Jillian Massey, the Town Zoning Enforcement Officer, signed the Cease & Desist Order and copied Mr. Salvatore on the Order. Pls. SOMF ¶ 60.

The Order stated that Rainbow Housing "appear[ed] to be operating or allowing the operation of a rooming house / halfway house or similar venture at 5 Reiman Drive without first obtaining proper zoning permits," and that failure to comply would result in penalties including the accrual of fines of $150 per day. Pls. SOMF ¶ 61; Reiman Drive Cease & Desist Order.

The next day, on Gilead's behalf, Mr. Hollister sent Town Attorney Olson a letter in response to receipt of the Cease & Desist Order. Pls. SOMF Ex. 46; ECF No. 77-46 (Letter from Timothy Hollister to Kari Olson (July 2, 2015)). Mr. Hollister's letter stated that Gilead's intended disabled residents and staff were protected under state and federal Fair Housing Acts and requested rescission of the Cease & Desist Order. *Id.* at 3.

On July 7, 2015, Ms. Olson, Mr. Hollister, Mr. Osborne, Mr. Salvatore, and one other Town representative met at Town Hall to discuss issues regarding the Reiman Drive residence. Defs. SOMF ¶ 40.

On that same day, July 7, 2015, Gilead placed its first client at the Reiman Drive residence. *Id.* ¶ 41.

On July 8, 2015, Ms. Massey advised Mr. Bull that the Reiman Drive Cease & Desist Order was being rescinded, with the understanding that no more than two residents would be placed in the home. Defs. SOMF ¶ 42; Pls. SOMF Ex. 49, ECF No 77-49 (Letter from Jillian Massey to Steve Bull re: Notice of Violation/Cease and Desist Order for 5 Reiman Drive, Cromwell (July 8, 2015)). Ms. Olson also sent an e-mail to Mr. Hollister on July 8, stating that, "as you know, we are not waiving the right to issue a new cease and desist upon your notification that more than 2 persons have moved in or if the Town otherwise deems it is justified based upon the facts, the law and the Town's regulations." Pls. SOMF Ex. 48, ECF No. 77-48 (E-mails between Timothy Hollister and Kari Olson, re: "Checking in on the cease and desist" (July 8, 2015)). It is disputed whether the two-resident limit was Gilead's idea or a Town demand. Defs. Opp. SOMF at 27, response to ¶ 64; Pls. Opp. SOMF at 31-33 ¶123-126, at 72, response to ¶ 39, at 73, response to ¶ 42. The Reiman Drive Cease & Desist Order was the second Cease & Desist order the Town had issued from January 1, 2012, to present, the first being to another community residence for people with disabilities. Pls. SOMF ¶ 65; Pls. SOMF Ex. 50, ECF No. 77-50 (Cease & Desist Order for 9 Elm Street (Feb. 10, 2014)).

On July 14, 2015, Town Assessor Shawna Baron informed Town Manager Salvatore that she had "just received an exemption application from the Group Home," and asking, "We should meet to discuss this?" Pls. Supp. SOMF Ex. 38, ECF No. 114-38 (E-mails between Shawna

Baron/Anthony Salvatore re: "Group home" (July 14, 2015)). Mr. Salvatore requested that Ms. Baron send him a list of other group homes in Cromwell and whether they were tax exempt and taxable. *Id.*

On July 15, 2015, Gilead placed a second resident at the Reiman Drive residence. Defs. SOMF ¶ 49.

On July 16, 2015, the Connecticut Department of Public Health wrote a letter to Mr. Osborne advising him that DPH had found violations of Connecticut regulations and/or statutes at another Gilead property, informing Mr. Osborne that he could dispute the violations until July 21, 2015, and asking Mr. Osborne to "[p]lease address each violation with a prospective plan of correction . . ." Defs. SOMF Ex. D-1, ECF No. 75-15 (letter from DPH to Dan Osborne (July 16, 2015)).

Also, on July 16, 2015, the Town of Cromwell issued a letter to Rainbow Houisng, informing it that the Town needed additional documents, including the "estimated average length of stay of residents," before it could consider its exemption request. Defs. SOMF Ex. Q-1, ECF No. 75-52 (Letter from Shawna Baron to Rainbow Housing Requesting Additional Documentation for Tax Exemption (July 16, 2015)).

On July 19, 2015, one of the two residents of the Reiman Drive residents walked away from 5 Reiman Drive around 6:45 p.m. Defs. SOMF ¶ 51. The man was located at around 10:30 p.m. in Hartford. *Id.* Gilead prepared an internal review report on the incident, identifying action steps to ensure that [the] areas [of weakness in responding to the incident were] addressed fully and effectively going forward." Defs. SOMF Ex. C-1, ECF No. 75-12 (Phoenix Home Elopement Incident – ACTION PLAN (July 19, 2015)).

On July 21, 2015, the Middletown Press published an article in which the police were

quoted as stating that the client had "a history of substance abuse and . . . assaultive behaviors in the past," and disclosing the individual's medical diagnoses. Pls. Opp. SOMF Ex. 86, ECF No. 86-86 (Jeff Mill, *Gilead Client Who Walked Away Prompts New Interest in Cromwell Group Home*, Middletown Press (July 21, 2015)). Acting Town Manager Salvatore was also quoted as saying that "[t]he town has been and continues to be opposed to that residence being at that location as we did not feel that is an appropriate site. . . This incident only serves to underscore those concerns." *Id.*

Throughout July 2015, Town residents exchanged e-mails about the Reiman Drive residence and engaged in conversation on a Facebook group page entitled "Reiman Strong." Pls. Opp. SOMF Exs. 97, 98, 99, 100, ECF Nos. 86-97, 86-98, 86-99, 86-100 (E-mails discussing Gilead and discussing the content of planned posts on the "Reiman Strong" Facebook page about Gilead (July 21-28, 2015)). One resident forwarded these e-mails to Mayor Faienza immediately after they were sent. *See, e.g.*, Pls. Opp. SOMF Ex. 97, ECF No. 86-97 (E-mail from Rob Latulippe to Enzo Faienza, re: "Fwd: Re: Just for the nieghbors [sic] . . ." (July 27, 2015) (forwarding an email to Mayor Faienza four minutes after Diane Uccello had originally sent it to multiple individuals)). In one e-mail, the same resident states that he had "spoken with the Town" and "the [T]own agrees. It's time to make some noise… It's time to *not* remain quiet." Pls. Opp. SOMF Ex. 100, ECF No. 86-100 (E-mails forwarded to Mayor Faienza from Rob Latulippe re: "RE: Time to make some phone calls and send some emails" (July 20, 2015)).

On July 21, 2015, DMHAS sent a letter to "5 Reiman Drive Neighbors," in response to the emails from Cromwell residents living in proximity to 5 Reiman Drive,

> DMHAS is aware of the situation described in the correspondence received and is reviewing it with Gilead staff. Gilead adherence to established policies and protocols related to client safety will be included in the review. No new residents will be admitted

to this housing until the review is complete and any potential issues are addressed.

Defs. SOMF Ex. R-1, ECF No. 75-55 (letter from Miriam Delphin-Rittmon, Commissioner, DMHAS, to 5 Reiman Drive Neighbors, re: "Cromwell Supported Housing Concerns" (July 21, 2015)).

"On July 24, 2015, Mr. Osborne emailed the Gilead Board of Directors, indicating an intent to 'move forward with the implementation of [the program at 5 Reiman Drive] but advising the Board that DMHAS was conducting a "special review" of all Gilead programs and would be making unannounced visits.'" Defs. SOMF ¶ 62.

On July 25, 2015, Gilead Board Member Frances Ludwig sent an e-mail to Mr. Osborne, stating:

> I think we will want to take a hard look at whether or not [the walkaway] incident has made things so toxic that to persist with [the residence program] on Reiman Drive will just keep the entity alive and make it difficult to ever recover with lots of potential collateral damage to the brand and relationships.

Defs. SOMF ¶ 63.

On July 31, 2015, Gilead Director of Finance Kathy Townsend responded to an e-mail from Town Assessor Baron, regarding the Town's request for additional documentation for Gilead's tax exemption application, stating that the "estimated average length of resident stay is unknown." Pls. Supp. SOMF Ex. 27, ECF No. 114-27 (Letter from Kathy Townsend to Shawna Baron (July 31, 2015)).

On August 3, 2015, a Cromwell police incident report was filed stating that a "for sale" real estate yard sign had been placed in front of 5 Reiman Drive by an unknown person around 1:25 a.m. Defs. Opp. SOMF Ex. J, ECF No. 77-62 (Police Report (Aug. 3, 2015, 9:31 a.m.)). "By 9:31 AM, approximately one hour after being called to the incident, the officer had

determined that he was unable to obtain any other investigatory leads, returned to the police station, and closed the case." Pls. SOMF ¶ 81.

On August 7, 2015, Town Assessor Baron sent a letter to Gilead Director of Finance Townsend denying Gilead's tax exemption application. Pls. SOMF Ex. 52, ECF No. 77-52 (Letter from Shawna Baron to Kathy Townsend, re: "Property Tax Exemption Application" (Aug. 7, 2015) ("Based on the information you provided, it does not appear that you meet the criteria for tax exemption under [Connecticut General Statutes] § 12-81(7)").

On August 25, 2015, Mr. Osborne and Gilead Board President Ms. Ludwig wrote a letter to DMHAS Commissioner Miriam Delphin-Rittmon that read:

> After a significant amount of thoughtful consideration, Gilead and its Board of Directors have decided that it is in the best interest of the individuals we serve that we discontinue [the program at 5 Reiman Drive.]
>
> As a result, we are formally requesting that the specific portion of the contract between Gilead and DMHAS relating to the provision of services through the 'Phoenix Home Program' be discontinued at this time.

Defs. SOMF Ex. C-2, ECF No. 75-13 (letter from Dan Osborne and Fran Ludwig to Miriam Delphin-Rittmon (Aug. 25, 2015)).

On August 31, 2015, Mr. Osborne met with Mayor Faienza and Town Manager Salvatore and informed them of Gilead's decision to close the Reiman Drive residence. Defs. SOMF ¶ 69. On the same day, the Town issued a press release stating that the decision to close the Reiman Drive residence

> was made by Gilead after much discussion and meetings with Town Officials and residents of the Town who were concerned with the location of the Group Home because of the makeup of the neighborhood and the proximity to our schools. . . Town Manager Anthony Salvatore and Mayor Enzo Faienza applaud Gilead's decision to relocate the Group Home and thank them for listening to the concerns of Town Officials and the residents of Reiman Drive, that this was not the most favorable neighborhood for them to establish a community residence.

15

Pls. SOMF Ex. 65, 77-65 (Press Release, Town of Cromwell, "Closure of Home" (Aug. 31, 2015). Mayor Faienza posted the press release on his campaign website eight days later. Pls. SOMF Ex. 66, ECF No. 77-66 (website post, Enzo for Cromwell (Sept. 8, 2015)).

On August 31, Mayor Faienza also sent an e-mail to Town Council members, thanking them for "staying the course on this very difficult issue we were dealing with." Pls. SOMF ¶ 85; Pls. SOMF Ex. 67, ECF No. 77-67 (E-mail from Enzo Faienza to Town Council re: "Gilead Group Home" (Aug. 31, 2015)). Even though they "knew it was going to be a tough battle and we were in uncharted waters. . . In the end we prevailed for the greater good and safety of our residents." *Id.* One councilmember responded, "WHAT TERRIFIC NEWS!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" Pls. Opp. SOMF Ex. 108, ECF No. 86-108 (E-mail from Mertie Terry to Town Council re: "Gilead Group Home" (Aug. 31, 2015).

Mayor Faienza also exchanged e-mails with a constituent, stating, in part:

This was a long battle but it was a fight this Town Council was ready to fight to [the] very end for. . . We knew we were in uncharted waters but all we could do is keep the pressure on and pray for a positive outcome[,] and that is what happened.

Pls. SOMF Ex. 68, ECF No. 77-68 (E-mails between Larry Callahan/Enzo Faienza re: "Thank you from Reiman Drive" (Sept. 3, 2015)).

On September 9, 2015, the Town Council held a meeting where town resident Diane Uccello spoke: "We always knew that you stood behind us and were working very hard on our behalf. . . Thank you for giving our children their neighborhood back." Pls. SOMF Ex. 69, ECF No. 77-69 (Cromwell Town Council Meeting excerpt, Diane Uccello speech (Sept. 9, 2015)).

Gilead's Review of Cromwell's Denial of Tax Exempt Status to 5 Reiman Drive

On September 20, 2015, in response to e-mails from Gilead Financial Director Townsend, Town Assessor Baron reiterated that the property had been denied tax exempt status and that she would not reconsider the denial "[s]ince the length of stay [for residents wa]s unknown." Pls. SOMF Ex. 55, ECF No. 77-55 (E-mails between Shawna Baron/Dan Osborne and Kathy Townsend re: "Letter Requesting Additional Information" (Sept. 8-21, 2015)).

On February 22, 2016, Rainbow Housing received a Tax Collector's Demand Notice for $8,755.75 in taxes due on 5 Reiman Drive. Pls. Supp. SOMF Ex. 34, ECF No. 114-34 (Tax Collector's Demand Notice (Feb. 22, 2016)).

On April 29, 2016, Ms. Baron forwarded a letter she had sent Mr. Osborne on September 8, 2015, to Town Manager Salvatore. Pls. Opp. SOMF Ex. 95, ECF No. 86-95 (Email from Shawna Baron to Anthony Salvatore re: "FW: Letter requesting additional information" (Apr. 29, 2016)). A few minutes later, Ms. Baron forwarded the Reiman Drive tax exemption denial letter to Mr. Salvatore, stating in the body of the email:

> Let me know if you need anything additional[.] I would highly recommend that if the Council somehow waives their taxes that it is shown in a way that we did not set precedence for any taxpayer not to pay their taxes in the future. It would be best for them not to waive the taxes in my opinion.

Pls. Opp. SOMF Ex. 94, ECF No. 86-94 (E-mail from Shawna Baron to Anthony Salvatore re: "RE – Gilead Exemption Application Denied" (Apr. 29, 2016)).

The minutes from the Gilead Board Meeting Minutes held on May 2, 2016, indicated that Mr. Osborne had a meeting with Town of Cromwell officials about the denial of the tax exempt status of 5 Reiman Drive. Pls. Opp. SOMF Ex. 96, ECF No. 86-96 (Minutes, Gilead Board Meeting (May 2, 2016)).

On July 20, 2016, Gilead Attorney Beth Critton sent a letter to Town Assessor Baron

stating, in part, that "Gilead . . . has asked us to assist it in learning more about the Town's denial of Gilead's tax exemption application relating to 5 Reiman Road. I would like to meet with you in the near future to get a better understanding of your reasoning." Pls. Supp. SOMF Ex. 31, ECF No. 114-31 (Letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (July 20, 2016)). Ms. Critton sent Ms. Baron another letter on September 1, 2016, with Ms. Critton's analysis of the relevant tax exemption statute, Connecticut General Statutes § 12-81(7), offering for Gilead to provide any other information Ms. Baron needed, and asking Ms. Baron to reconsider Gilead's tax exemption application. Pls. Supp. SOMF Ex. 32, ECF No. 114-32 (Letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (Sept. 1, 2016)).

On September 26, 2016, Ms. Baron sent Ms. Critton an e-mail and wrote that "the Town Attorney reviewed all of [Gilead's] documentation and in her opinion Gilead does not meet the requirements to be exempt." Pls. Supp. SOMF Ex. 33, ECF No. 114-33 (Email from Shawna Baron to Beth Critton re: "5 Reiman Drive, Cromwell, Connecticut" (Sept. 20, 2016)). Ms. Critton responded to that e-mail, reiterating her analysis and offer for Gilead to provide more information, and stating that Gilead was paying "the outstanding real estate taxes under protest for the subject property at this time." Pls. Supp. SOMF Ex. 40, ECF No. 114-40 (Letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (July 20, 2016)).

On October 28, 2016, Gilead sold the house at 5 Reiman Drive for $280,000. Pls. SOMF Ex. 70, ECF No. 77-70 (Purchase and Sale Agreement, 5 Reiman Drive (Oct. 28, 2016)).

The Second Gilead Property: 461 Main Street

Gilead operated another program in a property owned by Rainbow Housing at 461 Main Street. Pls. Supp. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow

Housing Corp. (July 14, 2009, and June 13, 2013)). Letters from Shawna Baron in 2009 and 2013 showed that Gilead had filled out the same application for tax exempt status under Connecticut General Statutes § 12-81(7), which must be filled out anew every four years, for the 461 Main Street property in 2009 and 2013. *Id.*

On October 30, 2017, Gilead submitted the required application for renewal of its tax exempt status under Connecticut General Statutes § 12-81(7) for 461 Main Street. Pls. Supp. SOMF Ex. 42, ECF No. 114-42 (Gilead Tax Exemption App. (submitted Oct. 30, 2017; denied Jan. 2, 2018)). Town Assessor Baron denied the application on January 2, 2018, and stated that she was "unsure what is happening at this property." *Id.*; Defs. Supp. SOMF ¶ 9. She sent a letter to Gilead denying renewal of tax exempt status for 461 Main Street on January 5, 2018. Pls. Supp. SOMF Ex. 43, ECF No. 114-43 (Letter from Shawna Baron to Gilead (Jan. 5, 2018)).

On or about February 1, 2018, Gilead appealed the tax exemption denial for 461 Main Street to the Connecticut Board of Assessment Appeals ("Board"). Pls. Supp. SOMF Ex. 48, ECF No. 114-48 (Letter from Dan Osborne re: "461 Main Street, Cromwell, CT" (Feb. 1, 2018)).

On March 29, 2018, the Board denied the appeal. Pls. Supp. SOMF Ex. 49, ECF No. 114-49 (Town of Cromwell, CT Board of Assessment Appeals, re: Rainbow Housing Corporation, 461 Main Street (Mar. 29, 2018)).

On May 17, 2018, Gilead appealed the Board's decision New Britain Superior Court. Pls. Supp. SOMF Ex. 51, ECF No. 114-51 (Citation, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v. Town of Cromwell* (Conn. Super. Ct. May 17, 2018)).

Gilead was assessed a tax bill of $6,243.94 on 461 Main Street that was due on July 1, 2018. Pls. Supp. SOMF Ex. 50, ECF No. 114-50 (Real Estate Tax Bill 2018 (July 1, 2018)).

On June 7, 2019, the Connecticut Superior Court overturned the Board's decision, finding that "plaintiffs, as a matter of law, have fulfilled all of the requirements set forth in § 12-81(7)(B) and § 12-88." Pls. Supp. SOMF Ex. 52, ECF No. 114-52 (Memorandum of Decision, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v Town of Cromwell*, HHB-CV-186045100 (Conn. Super. Ct June 7, 2019)).

The Town appealed the Superior Court's decision on June 24, 2019. Pls. Supp. SOMF Ex. 53, ECF No. 114-53 (Appeal of Judgment in 6/7/2019 Memorandum of Decision, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v Town of Cromwell*, HHB-CV-18-6045100-S (June 24, 2019)).

### B. Procedural Background

On April 17, 2017, Gilead, Rainbow Housing, and the Connecticut Fair Housing Center sued the Town of Cromwell ("Town"), Vincent "Enzo" Faienza individually and in his official capacity as Mayor of the Town of Cromwell, Anthony Salvatore individually and in his official capacity as Town Manager, and Jillian Massey in her official capacity as the Zoning Enforcement Officer of the Town. Compl., ECF No. 1 (Apr. 29, 2017).

On June 29, 2017, the Town, Mayor Faienza, Town Manager Salvatore, and Zoning Enforcement Officer Massey (collectively, "Defendants") filed an Answer to the Complaint and largely denied Plaintiffs' allegations. Answer, ECF No. 27 (June 29, 2017).

On December 26, 2017, the Defendants moved to amend their Answer to add a fourth affirmative defense. Mot. to Amend Answer to Compl., ECF No. 44 (Dec. 26, 2017). Plaintiffs did not oppose.

On May 21, 2018, the Court granted Defendants' motion to amend their Answer. Order, ECF No. 54 (May 21, 2018).

The Town's Amended Answer raises four affirmative defenses: (1) the Complaint fails to state a claim upon which relief may be granted, (2) Plaintiffs' claims against individual Defendants are barred by qualified immunity, (3) Plaintiffs have failed to exhaust administrative remedies, and (4) Plaintiffs' claims are not ripe for adjudication under *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985). Am. Answer, ECF No. 44-1 at 12 (Dec. 26, 2017).

On June 22, 2018, Plaintiffs moved to amend their Complaint to add new facts that allegedly arose from events that took place after the original Complaint was filed. Pls. Mot. to Amend, ECF No. 57 (June 22, 2018).

On July 11, 2018, Defendants objected to Plaintiffs' motion to amend. Defs. Obj. to Pls. Mot. to Am., ECF No. 60 (July 11, 2018).

On July 20, 2018, Plaintiffs replied. Pls. Reply to Defs. Obj. to Pls. Mot. for Leave to Amend, ECF No. 61 (July 20, 2018).

On December 7, 2018, Defendants moved for summary judgment as to all of Plaintiffs' claims. Defs. Mot. Summ. J., ECF No. 75 (Dec. 7, 2018). Defendants submitted a memorandum of law, Defs. Mem. Summ. J., ECF No. 75-1 (Dec. 7, 2018); a Statement of Material Facts, Defs. Statement Mat. Facts ("Defs. SOMF"), ECF No. 75-2 (Dec. 7, 2018); and fifty-seven exhibits in support of their motion. Defendants' exhibits included depositions of Gilead leadership, Town of Cromwell officials, and Connecticut Department of Public Health officials; various official Town documents; and communications among and between representatives of Gilead, Town officials, state officials, and Town residents. *See id.*

On December 7, 2018, Plaintiffs moved for partial summary judgment, arguing that summary judgment should be granted against Defendants Town of Cromwell and Mayor Enzo

Faienza "because the undisputed evidence demonstrates that Defendants have made statements that indicate a preference, or an intention to make a preference, based on disability in violation of § 3604(c) of the Fair Housing act, 42 U.S.C. § 3601, *et seq.*" Pls. Mot. Summ. J., ECF No. 76 (Dec. 7, 2018). Plaintiffs submitted a memorandum of law, Pls. Mem. Summ. J., ECF No. 76-1 (Dec. 7, 2018); a Statement of Material Facts, Pls. Statement Mat. Facts ("Pls. SOMF"), ECF No. 75-2 (Dec. 7, 2018); and seventy exhibits in support of their motion. Plaintiffs' exhibits included depositions of Gilead leadership, Town of Cromwell officials, Connecticut Department of Public Health officials, and Town residents; purchase and sale documentation for 5 Reiman Drive; local newspaper articles; various official documents from the Town and the Connecticut Department of Health; and communications among and between representatives of Gilead, Town officials, state officials, and Town residents. *See id.*

On January 18, 2019, Defendants opposed Plaintiffs' motion for partial summary judgment. Defs. Opp. Pls. Mot. Summ. J. ("Defs. Opp."), ECF No. 84 (Jan. 18, 2019). Defendants submitted a memorandum of law, Defs. Mem. Opp. Pls. Mot. Summ. J. ("Defs. Mem. Opp."), ECF No. 84-1 (Jan. 18, 2019); a statement of material facts in opposition to Plaintiffs' motion, Statement Mat. Facts Opp. Pls. Mot. Summ. J. ("Defs. Opp. SOMF"), ECF No. 84-2 (Jan. 18, 2019), and thirty-one exhibits in support of its opposition to Plaintiffs' motion.

Many of these same exhibits are exhibits in the parties' motions for summary judgment, with some additional deposition excerpts. Some of Defendants' additional exhibits included an affidavit from the police officer who investigated the August 3, 2015 incident, an additional Town official affidavit, and additional communications between lawyers representing each side of this lawsuit. *See id.*

On January 18, 2019, Plaintiffs opposed Defendants' motion for summary judgment. Pls.

Opp. to Defs. Mot. Summ. J. ("Pls. Opp."), ECF No. 85 (Jan. 18, 2019). Plaintiffs submitted a statement of material facts in opposition to Defendants' motion, Statement Mat. Facts Opp. Defs. Mot. Summ. J. ("Pls. Opp. SOMF"), ECF No. 86 (Jan. 18, 2019), and one hundred and fifteen additional exhibits in support of its opposition to Defendants' motion.

Many of these same exhibits are in both parties' motions for summary judgment, with some additional deposition excerpts. Plaintiffs' additional exhibits included additional communications among and between Gilead leadership, Town officials, and Town residents; an additional news article; additional documents from Gilead and Fair Housing regarding the 5 Reiman Drive property; a 2013 memo from the Town's attorney and the Town Planner; and a 2009 Connecticut research report. *See id.*

On February 1, 2019, both Plaintiffs and Defendants submitted replies to each other's opposition. Defs. Reply to Pls. Opp. Defs. Mot. Summ. J. ("Defs. Reply Pls. Opp."), ECF No. 93 (Feb. 1, 2019); Pls. Reply to Defs. Opp. Pls. Mot. Summ. J. ("Pls. Reply Defs. Opp."), ECF No. 95 (Feb. 1, 2019).

On February 26, 2019, the Court granted Plaintiffs' June 22, 2018 motion to amend. Ruling and Order on Mot. to Amend Compl., ECF No. 98. Plaintiffs added a claim that Defendants had retaliated against them for exercising rights protected under the Fair Housing Act, because the Town denied tax exemption status in January 2018 to another Gilead property, even though the Town had previously granted tax exemption applications for the same property. Pls. Am. Compl., ECF No. 57-1 ¶ 80-81, 114.

On March 25, 2019, Defendants filed an Answer and Affirmative Defenses to the Amended Complaint, denying the new allegations in Plaintiffs' Amended Complaint. Defs. Ans. Am. Compl., ECF No. 100.

On July 8, 2019, Defendants filed a Supplemental Motion for Summary Judgment as to each and every claim in the Plaintiffs' Amended Complaint. Defs. Supp. Mot. Summ. J., ECF No. 110 (July 8, 2019). In support of their motion, Defendants submitted a supplemental statement of material facts, Defs. Supp. Statement Mat. Facts ("Defs. Supp. SOMF"), ECF No. 110-2 (July 8, 2019); a supplemental affidavit from Shawna Baron along with documentation relating to her decision to deny Gilead tax exempt status in January 2018, ECF No. 110-4; and an additional excerpt from Defendants' January 8, 2018 deposition of Shawna Baron, ECF No. 110-3.

On July 29, 2019, Plaintiffs filed a supplemental memorandum in opposition to defendants' motion for summary judgment, Pls. Supp. Mem. Opp. Defs. Supp. Mot. Summ. J. ("Pls. Supp. Mem. Opp."), ECF No. 113 (July 29, 2019); and a supplemental statement of material facts, Pls. Supp. Statement Mat. Facts ("Pls. Supp. SOMF"), ECF No. 114 (July 29, 2019). Plaintiffs submitted sixty additional exhibits in support of their opposition to Defendants' supplemental motion for summary judgment. Many of these same exhibits are exhibits in both parties' motions for summary judgment, with some additional deposition excerpts. Plaintiffs' additional exhibits included documentation regarding Gilead's applications for and Shawna Baron's denial of tax exempt status for both 5 Reiman Drive and 461 Main Street; communications between Shawna Baron and Town Manager Salvatore; communications between Shawna Baron and Gilead attorney Beth Critton; and documentation relating to Gilead's appeal of Ms. Baron's decision to deny tax exempt status to both the Connecticut Board of Assessment Appeals and Connecticut Superior Court. *See id.*

All three motions for summary judgment are now before the Court. Defs. Mot. Summ. J., ECF No. 75 (Dec. 7, 2018); Pls. Mot. Summ. J., ECF No. 76 (Dec. 7, 2018); Defs. Supp. Mot.

Summ. J., ECF No. 110 (July 8, 2019).

On September 26, 2019, the Court heard oral argument on the pending summary

judgment motions. Minute Entry, ECF No. 116 (Sept. 26, 2019).

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as

to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient specific facts to establish that there is a genuine issue

of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact." *Id.* at 247–48. The moving party may satisfy this burden by

pointing out to the district court an absence of evidence to support the nonmoving party's case.

*See PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn

affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving

party must do more than vaguely assert the existence of some unspecified disputed material facts

or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra*

*Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the

motion for summary judgment "must come forward with specific evidence demonstrating the

existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913

(DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must

present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment).

The court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). Conclusory allegations or denials will not be credited. *See Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor and the moving party is entitled to judgment as a matter of law, the court will grant the summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587–88 (1986).

## III.    DISCUSSION

This lawsuit involves three separate statutes: the Fair Housing Act, the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Because the parties essentially agree that the Court's analysis of the Fair Housing Act will inform the subsequent analysis under these other two claims, the Court will address the Fair Housing Act claim first.

First signed into law in 1968, the 1988 Amendments to the Fair Housing Act "extended the Fair Housing Act's protections against housing discrimination to disabled individuals." *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 52 (2d Cir. 2015).  This extension was "specifically aimed at rejecting [g]eneralized perceptions about disabilities and unfounded speculations about threats to safety . . . as grounds to justify exclusion." *Id.* at 50-51 (citing H.R. Rep. No. 100-711, at 18 (19880) *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179.

Several provisions of the Fair Housing Act are at issue: 42 U.S.C. § 3604(c), 42 U.S.C.§ 3604(f), and 42 U.S.C. § 3617.

### A. Fair Housing Act Claims

#### 1. 42 U.S.C. § 3604(c) Claims

Under 42 U.S.C.§ 3604(c) of the Fair Housing Act, it is unlawful

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

As the Second Circuit has made clear: "Nothing in this language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this language does not provide any specific exemptions or designate persons covered, but rather . . . applies on its face to anyone who makes prohibited statements." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (internal citations and quotation marks omitted); *see e.g., Babul v. Demty Assocs. Ltd. P'ship*, No. 17-CV-5993, 2018 WL 2121556, at *2 (E.D.N.Y. May 8, 2018) (denying a motion to dismiss by defendants who were board members of a housing owners association, stating that "there [wa]s no credible argument that the board's negative response to the proposed sale could not be at least influential, if not dispositive"); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 567 (E.D.N.Y. 2007) (denying summary judgment to landlords in a case involving a § 3604(c) claim).

The Second Circuit has rejected as "too narrow" efforts to limit the statute's reach to "expressions that result in the denial of housing." *Id.* As a result, 42 U.S.C.§ 3604(c) of the Fair Housing Act also "protect[s] against [the] psychic injury caused by discriminatory statements made in connection with the housing market." *Id.* (internal citations and quotation marks omitted); *Rodriguez*, 788 F.3d at 52 (affirming the same principle).

In determining whether § 3604(c) has been violated, an "ordinary listener test" is applied. Under this standard, "section 3604(c) can be violated by statements targeted at an individual that convey to an ordinary listener that the individual is disabled." *Rodriguez*, 788 F.3d at 52. As further explained by the Second Circuit in *Rodriguez*: "it is not determinative that the individual being addressed is or is not disabled under the [Fair Housing Act]; what matters is whether the ordinary listener would understand the statements as considering her as such and expressing discrimination or a preference against her on that basis." *Id.* (footnote omitted).

In the context of a housing discrimination case on the basis of disability, the Second Circuit has recognized that the "ordinary listener" standard likely "requires a fact intensive, case-by-case inquiry." *Id.* at n.21 (citation omitted). "[F]actfinders may examine [the speaker's] intent, not because a lack of design constitutes an affirmative defense to an [Fair Housing Act] violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it." *Id.* at 53 (quoting *Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 825 (2d Cir. 1992)). But "the speaker's subjective belief is not determinative." *Id.* at 53. Instead, "[w]hat matters is whether the challenged statements *convey* a prohibited preference or discrimination to the ordinary listener." *Id.* (italics in original).

Both parties seek summary judgment on Plaintiffs' 42 U.S.C. § 3604(c) claim.

Plaintiffs argue that there is no genuine issue of material fact regarding whether (1) the Defendants made, printed, or published discriminatory statements in connection to the housing market; (2) those statements were made with respect to the sale or rental of a dwelling; and (3) those statements indicated an impermissible preference based on the disability of the intended residents or an actual intention to make such a preference. 42 U.S.C. § 3604(c).

In their view, the undisputed evidence shows that Mayor Faienza and the Town of

Cromwell made, printed, and caused to be published statements with respect to the sale or rental of the Plaintiffs' Reiman Drive residence that indicated an impermissible preference based on the disability of the intended residents and an actual intention to make such a preference. Pls. Mem. Summ. J. at 9-15. Specifically, they refer to the press releases issued by the Town of Cromwell relating to 5 Reiman Drive; statements that Mayor Faienza made at the April 20, 2015 forum; statements Mayor Faienza made that were quoted in local newspaper articles; and e-mail messages from the Mayor to community members. *Id.* at 12. In the Plaintiffs' view, under the "ordinary listener" standard, these various statements violate § 3604(c).

Defendants argue that, even if these statements are discriminatory, they were not made "with respect to the sale or rental of a dwelling" and therefore cannot violate § 3604(c). They also argue that Defendants' statements are protected under the First Amendment, and, in any event, did not proximately cause Gilead's decision to leave the home located at 5 Reiman Drive. Defs. Mem. Opp. at 3. Finally, they argue that Mayor Faienza is entitled to qualified immunity. *Id.* As a result, in their view, while summary judgment cannot be granted in Plaintiff's favor, they argue that their constitutional argument as well as their entitlement to qualified immunity makes summary judgment appropriate on Plaintiffs' § 3604(c) in their favor.

The Court disagrees with both parties and will deny summary judgment to both parties on Plaintiffs' § 3604(c) claim.

Significantly, as the Second Circuit has recognized, the application of the ordinary listener standard is "fact intensive" and requires a "case-by-case inquiry." *See Rodriguez*, 788 F.3d at 52-53. Indeed, the Second Circuit there quoted from an earlier ruling in a different case referring to the "factfinder." *Id.* (quoting *Soules v. U.S.* 967 F.2d at 825: "[F]actfinders may examine [the speaker's] intent, not because a lack of design constitutes an affirmative defense to

an FHA violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it."). Because Plaintiffs have requested a jury trial, that factfinder is the jury, not this Court. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (internal citation and quotation marks omitted) (holding that a Court of Appeals should not have overturned a district court decision to submit an Age Discrimination in Employment Act case to a jury). Thus, whether the various statements at issue here—(1) official town press releases, (2) statements made by Mayor Faienza in interviews with local press, (3) verbal statements made by town officials at a public forum at the Town Hall, and (4) e-mail messages from the Mayor to community members—"*convey* a prohibited preference or discrimination to the ordinary listener," *Rodriguez*, 788 F.3d at 53 (italics in original), should be determined by a jury.

While Plaintiffs point to cases where summary judgment has been granted on this claim, these cases fall into one of three categories, none of which provide a basis for granting the summary judgment motion here.

First, there are the cases where the discriminatory language was enshrined in a statute. *See, e.g., Mont. Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 835, 839 (D. Mont. 2012) (finding that statements in a municipality's ordinance excluding "more than four handicapped people" from definition of household violated § 3604(c)); *Nev. Fair Hous. Ctr., Inc. v. Clark Cty.*, No. 02:05-cv-00948, 2007 WL 610640, at *8-9 (D. Nev. Feb. 23, 2007) (granting summary judgment for plaintiff when defendant's "group home ordinance" implemented spacing requirement that did not apply to similarly-situated non-disabled adults). No such statute, however, is at issue here.

Second, courts have granted summary judgment to plaintiffs on § 3604(c) claims where advertisements indicate to the ordinary reader a preference not to rent to people based on a protected characteristic, including sex and familial status. *See, e.g.*, *Fair Hous. Ctr. of Sw. Mich. v. Hunt*, No. 1:09-CV-593, 2012 WL 11789772, at *22 (W.D. Mich. Mar. 29, 2012) (finding that an ordinary reader would interpret advertisements stating that an apartment complex may decline to rent to a tenant "when more than one person or couple will reside in a unit with only one bedroom . . . as discouraging families from seeking to rent an apartment"); *Jancik v. Dep't of Hous. and Urban Dev.*, 44 F.3d 553, 556 (7th Cir.1995) (finding that an apartment advertisement stating a preference for a "mature person" violated § 3604(c)). But there is no such advertisement at issue here.

Third, there are cases where the statements of landlords or apartment managers have provided a basis for liability under § 3604(c) at the summary judgment stage. *See Smith v. Avanti*, 249 F. Supp. 3d 1194, 1201 (D. Colo. 2017) (finding that defendant property owners, "in referring to the [plaintiffs'] 'unique relationship' and their family's 'uniqueness," impermissibly relied on sex stereotypes to deny housing to a couple that comprised a transgender and a cisgender woman, and their two children, in violation of § 3604(a) and (c)); *United States v. Scott*, 788 F. Supp. 1555, 1556, 1562-63 (D. Kan. 1992) (finding that discriminatory statements made in letter opposing a group home in a neighborhood violated § 3604(c)).

While instructive, these cases are inapposite for many reasons, not the least of which is that both decisions involved uncontroverted facts. *See Scott*, 788 F. Supp. at 1560 ("In responding to the United States' motion for partial summary judgment, the defendants did not challenge the statement of uncontroverted facts presented by the United States."); *Smith*, 249 F.Supp.2d at 1198 ("Plaintiffs' Motion is unopposed.").

In any event, none of these decisions are in the Second Circuit, and none of these courts had to apply the Second Circuit's precedent faithfully, which suggests, if not expects, that the finder of fact—the jury—would be determining whether the ordinary listener standard has been satisfied, not this Court. *See Rodriguez*, 788 F.3d at 52.

Accordingly, Plaintiffs' motion for summary judgment on their § 3604(c) claim will be denied.

Defendants' motion for summary judgment on Plaintiffs' § 3604(c) claim also fails, but for different reasons.

First, Defendants' argument that even if these statements are discriminatory, they were not made "with respect to the sale or rental of a dwelling" and therefore cannot violate § 3604(c), lacks support in binding Second Circuit precedent. As noted above, this limited reading of § 3604(c) fails because its language "applies on its face to anyone who makes prohibited statements" and "protect[s] against [the] psychic injury caused by discriminatory statements made in connection with the housing market." *Space Housing*, 429 F.3d at 424.

As a result, leaving aside for now the issue of whether this determination is quintessentially factual, and more appropriate for resolution by a jury, Defendants' arguments that the "Town of Cromwell and Mayor Enzo Faienza were not capable of making the [P]laintiff, Gilead, close the group home and sell the property," and that they "did not have any authority to make housing decisions on their own without involving the [T]own council," Defs. Mem. Opp. at 7, fail. All of the relevant statements as to the § 3604(c) claim were "made in connection with the housing market." For the same reason, Defendants' argument that the Town of Cromwell's and the Mayor's statements cannot be held in violation of § 3604(c) because "the sale of the dwelling in question had already been successfully completed at the time of the defendants'

alleged statements" and "the sale of a dwelling was neither occurring nor potentially occurring,"

Defs. Opp. at 6, also fails.

And, as suggested above, whether these various statements did actually violate § 3604(c)

is an issue to be resolved by a jury, not this Court.

Defendants also argue that Plaintiffs' § 3604(c) claim fails because of the First

Amendment. Defs. Mem. Opp. at 13. In their view, the Defendants "do not surrender all of their

First Amendment Rights by reason of their employment. Rather, the First Amendment protects a

public employee's right, in certain circumstances, to speak as a citizen addressing matters of

public concern." *Id.* at 14 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). Defendants'

recitation of the law is right as far as it goes, but the law does not go far enough to vitiate

Plaintiffs' claim here.

Significantly, the Supreme Court's decision in *Garcetti* protected the First Amendment

rights of public employees to speak out as citizens, not as public officials, exercising their

official duties, as the Defendants were here. Indeed, the Supreme Court made clear that "[w]hen

a citizen enters government service, the citizen by necessity must accept certain limitations on

his or her freedom." *Garcetti*, 547 U.S. at 418 (citations omitted).  The Supreme Court then said:

"Government employers, like private employers, need a significant degree of control over their

employees' words and actions; without it, there would be little chance for the efficient provision

of public services." *Id.* at 418-419 (citations omitted). The Supreme Court did not provide a safe

harbor for public officials, acting as public officials, because: "When they speak out, they can

express views that contravene governmental policies or impair the proper performance of

governmental functions." *Id.* at 419.

The Supreme Court in *Garcetti* therefore stated: "We hold that when public employees

make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

Because all of the actions taken here were part of the Defendants' official duties, the First Amendment is no defense to Plaintiffs' § 3604(c) claim.

Finally, Defendants argue that the individual Defendants are entitled to qualified immunity. Qualified immunity protects public officials from liability for civil damages when either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F. 3d 196, 211 (2d Cir. 2007). Here, Defendants argue that "there was no precedent that was sufficiently clear that every reasonable official would have interpreted it to establish that the statements made in these particular circumstances, involving matters of public concern, would not be protected under the First Amendment." Defs. Mem. Opp. at 18.

This argument, however, fails for the same reason that their First Amendment argument fails: the law is clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Garcetti*, 547 U.S. at 421. As a result, qualified immunity for the individual Defendants is not appropriate here.

Accordingly, because there are genuine issues of material fact as to whether Defendants violated § 3604(c) of the Fair Housing Act, the summary judgment motions of both Plaintiff and the Defendants will be denied.

### 2. §3604(f) Claims

Under 42 U.S.C. § 3604(f) of the Fair Housing Act, it is unlawful

      (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-- (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter.

      (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of in the provision of services or facilities in connection with such dwelling, because of a handicap of-- (A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person.

42 U.S.C. § 3604(f)(1)-(2).

The phrase "otherwise make unavailable" language in 42 U.S.C. § 3604(f) is a "catchall phrase[]" that "look[s] to consequences, not intent," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc. ("Inclusive Communities Project")*, 135 S. Ct. 2507, 2519 (2015), and reaches "a wide variety of discriminatory housing practices." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016); *see Thurmond v. Bowman*, 211 F. Supp. 3d 554, 564 (W.D.N.Y. 2016) (stating that the "otherwise make available" provision "has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds"); *United States v. Youritan Const. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973), (stating that the phrase "otherwise make unavailable" "appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful"), *aff'd in part, remanded in part on other grounds*, 509 F.2d 623 (9th Cir. 1975).

Courts have found that a defendant "otherwise makes [housing] unavailable" under the Fair Housing Act when the defendant engages in a series of actions that imposes burdens on or constitutes harassment of a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the

members of the protected class are unwanted. For example, in *Housing Rights Center v. Sterling*, the court denied summary judgment to landlord defendants because

> the [c]ourt here cannot hold as a matter of law that the variety of ways in which [d]efendants catered to Korean tenants, coupled with Defendants' discriminatory statements [against tenants of other racial and ethnic backgrounds], taken as a whole, did not create a hostile environment sufficient to make [plaintiff's] apartment effectively unavailable to him.

404 F. Supp. 2d 1179, 1192 (C.D. Cal. 2004); *see also Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013) (stating that "by imposing more burdensome application procedures and generally discouraging the . . . application" of a woman and her brother who lived with autism, the landlord defendant " 'otherwise ma[de] [the property] unavailable' to the [applicants] because of a disability, in violation of § 3604(f)(1)") (citing *Youritan*, 370 F. Supp. at 648); *United States v. Hadlock*, No. CV 08-3074-CL, 2010 WL 331772, at *7 (D. Or. Jan. 27, 2010) (granting plaintiffs' summary judgment motion because, given evidence that the defendant landlord had "made statements to discourage families from renting. . . . no reasonable juror could find in favor of [d]efendant").

In *Youritan Construction Company*, "delaying tactics" and "various forms of discouragement" on the part of resident managers, rental agents, top management, and owners "otherwise made housing unavailable" under § 3604(a) of the FHA. 370 F. Supp at 648 (internal citations omitted). Indeed, the failure of top management and owners "to set forth objective and reviewable procedures for apartment application and rental" amounted to discouragement and delay in violation of § 3604(a). *Id.*; *see also Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir.1974) (stating that § 3604 "prohibit[s] all forms of discrimination, sophisticated as well as simpleminded . . . and tactics of delay, hindrance, and special treatment must receive short shrift from the courts").

Significantly, the Fair Housing Act's scope extends beyond private actors and reaches governmental actors, including municipal officials. In *South Middlesex Opportunity Council, Inc. v. Town of Framingham*, two organizations that operated residential substance abuse treatment programs in Massachusetts sued the Town of Framingham in addition to several Town officials and residents for violating 42 U.S.C. § 3604(f)(1) and § 3617. 752 F. Supp. 2d 85, 95 (D. Mass. 2010). In that case, three residences operated by the plaintiffs were at issue. *Id.* at 91.

Plaintiffs there alleged that the Town had effectively made housing unavailable to intended residents based on their disability (substance use) by delaying or blocking various license and zoning applications, passing a new law that subjected the plaintiffs to a new review process with the goal of deterring plaintiffs from operating their residential programs, and otherwise treating the plaintiffs differently from other similarly situated organizations/individuals based on the disabilities of the plaintiffs' clients. *Id.* at 97-103. The court stated that "[d]iscrimination under the FHA . . . includes delays in issuing permits that are caused in part by discriminatory intent, even if the permits are ultimately granted." *Id.* at 97.

Under 42 U.S.C. § 3604(f), proof of discrimination can be established "by showing that animus against the protected group 'was a significant factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (quoting *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir.1987)). As a result, discriminatory intent may be inferred from the totality of the circumstances, including

> the historical background of the decision . . . ; the specific sequence of events leading up to the challenged decision, . . . ; contemporary statements by members of the decisionmaking body . . . ; . . . and substantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached . . .

*Id.* at 425 (quoting *Yonkers*, 837 F.2d at 1221 (internal citations and quotation marks omitted)).

Indeed, "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 243 (S.D.N.Y. 1996) ("[I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."), *aff'd by* 117 F.3d 37, 49 (2d Cir. 1997); *see also United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir.1974) (racist statements by "leaders of the incorporation movement" and fact that "[r]acial criticism was made and cheered at public meetings" could be considered evidence of improper purpose).

Defendants seek summary judgment on Plaintiffs' § 3604(f) claim on several grounds.

Defendants first argue that Plaintiffs' § 3604(f) claim is not ripe because Plaintiffs never sought a zoning permit or reasonable accommodation on zoning regulations, thus never providing Defendants an opportunity to accommodate them. Defs. Mem. Summ. J. at 3-4.

Next, Defendants claim that there is no genuine issue of material fact which would permit a reasonable jury to find that the Defendants did not make housing available based on the disability of the intended residents at 5 Reiman Drive. Defs. Mem. Summ. J. at 4-16.

Defendants also argue that, under the *Noerr-Pennington* doctrine, the Town of Cromwell's petition to the Connecticut Department of Public Health constitutes speech and an effort to influence governmental activity and therefore cannot be used as evidence that Defendants acted to make housing unavailable to individuals with disabilities in violation of § 3604(f) and "be the basis of legal penalties." Defs. Mem. Summ. J. at 9.

Defendants' first two arguments raise distinctions without a real difference. Both are predicated on the notion that Plaintiffs have failed to demonstrate unavailability within the meaning of the § 3604(f) of the Fair Housing Act.[1] This very limited reading of the Fair Housing Act's scope fares no better under § 3604(f) than it did with § 3604(c). Defendants' efforts to narrow the reach of § 3604(f) to an express denial of a housing opportunity or the unavailability of a specific housing opportunity are just not sustainable.

Plaintiffs have submitted considerable evidence on which a reasonable jury could find that Defendants' discriminatory intent was at least a motivating factor behind their actions that made housing unavailable, based on the disability of intended residents. In addition to the press releases, Pls. Opp. SOMF Ex. 28, ECF No. 86-28 (Press Release: "Gilead Group Home," Town of Cromwell (Apr. 20, 2015)); Pls. SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of

---

[1] Defendants' ripeness argument also is predicated on their reading of a portion of a Second Circuit's decision. *See Tsombanidis v. W. Haven Fire Department*, 352 F.3d 565, 578-79 (2d Cir. 2003) *superseded by regulation on other grounds as stated in Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ("To prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question . . .").
But this argument ignores that "Plaintiffs who allege violations under the [Americans with Disabilities Act ("ADA")], the FHA, and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48 (2d Cir. 2002); *see also Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir.1998) (noting the possible application of these three theories under the ADA and the Rehabilitation Act); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir.1996) (stating that FHA permits all three theories). Under Plaintiff's legal theory—disparate treatment—Plaintiffs did not have to request an accommodation for the Town to deny in order to make a claim under the FHA. Plaintiffs' claims under the FHA therefore are ripe. *See Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 522 (W.D. Pa. 2007) (rejecting defendants' ripeness claim in a similar FHA case because the plaintiffs' case was, at its core, a challenge to the very process to which defendants claimed plaintiffs needed to submit)*; cf. RECAP*, 294 F.3d at 48-53 (finding that plaintiffs had raised a triable issue of fact under disparate treatment theory even though they had not stated a claim under reasonable accommodation theory)).

Cromwell (Apr. 21, 2015)); Pls. SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of

Cromwell (May 13, 2015); Pls. SOMF Ex. 65, 77-65 (Press Release, Town of Cromwell,

"Closure of Home" (Aug. 31, 2015); the Town of Cromwell's petition to the Connecticut

Department of Public Health, Defs. SOMF Ex. L-3, ECF No. 75-36 (Anthony Salvatore and Kari

Olson, Town of Cromwell, *Petition to Deny Proposed Community Residence* (May 6, 2015));

and the Town of Cromwell's July 2, 2015 Cease & Desist Order, Pls. SOMF Ex. 44, ECF No.

77-44 (Reiman Drive Cease & Desist Order (July 1, 2015)); there is record evidence regarding

the response of Town officials to community opposition to the Reiman Drive residence, based on

the disabilities of its intended residents, *see, e.g.*, Pls. SOMF Ex. 17, ECF No. 77-17 (E-mails

between Enzo Faienza/Re Matus re: "Reiman Road Residents" (Mar. 30, 2015)); Pls. SOMF Ex.

20, ECF No. 77-20 (E-mails between Rob Latulippe/Enzo Faienza re: "Fwd: Group Home" (Apr.

21, 2015)); Pls. SOMF Ex. 68, ECF No. 77-68 (E-mails between Larry Callahan/Enzo Faienza

re: "Thank you from Reiman Drive" (Sept. 3, 2015)); Pls. SOMF Ex. 19, ECF No. 77-19

(Deposition of Rob Latulippe at 78:16-25 (Jan. 8, 2018)); Pls. SOMF Ex. 18, ECF No. 77-18

(Deposition of Diane Uccello at 122:9-18 (May 29, 2018)); Pls. SOMF Ex. 15, ECF No. 77-15

(Deposition of Re Matus at 22:6-23:13, 27:16-28:22, 33:14-24 (Jan. 9, 2018)); Pls. SOMF Ex.

16, ECF No. 77-16 (Deposition of Mertie Terry at 23:24-24:7 (Aug. 2, 2018)).

　　Based on this record, a reasonable jury could find that the Defendants acted with

discriminatory intent towards individuals with disabilities, because "a decision made in the

context of strong, discriminatory opposition becomes tainted with discriminatory intent even if

the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc.

v. City of White Plains*, 931 F. Supp. 222, 243 (S.D.N.Y. 1996) ("[I]f an official act is performed

simply in order to appease the discriminatory viewpoints of private parties, that act itself

becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."), *aff'd by* 117 F.3d 37, 49 (2d Cir. 1997); *cf. United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir.1974) (racist statements by "leaders of the incorporation movement" and fact that "[r]acial criticism was made and cheered at public meetings" could be considered evidence of improper purpose).

Defendants' *Noerr-Pennington* doctrine argument also fails for several reasons.

First, this Seventh Circuit decision, even if instructive, is not binding on this Court. *Cf. Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir. 1993) ("If a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job.") (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1175 (D.C. Cir. 1987)).

Second, as even the Seventh Circuit's interpretation of the doctrine and its applicability to the Fair Housing Act makes clear, the doctrine is focused on "speech and other efforts to influence governmental activity . . . ." *Tri-Corp. Housing Inc v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016). In other words, the doctrine involves speech and actions taken by one set of governmental officials to influence the actions of other governmental officials, not the speech and related actions taken by the governmental officials themselves. *See id.* (recognizing that another Seventh Circuit decision, *New West, L/P. v. Joliet*, 491 F.3d 717, 722 (7th Cir. 2007), "holds that the *Noerr-Pennington* doctrine applies to claims under the Fair Housing Act- and in *New* West, just as in this case, officials of one governmental body tried to persuade officials of a different public body to act in a particular way"). Thus, even if this Court found the doctrine applicable here, it would only eliminate as a basis for liability the Town of Cromwell's petition to the Connecticut Department of Public Health to deny Gilead a license, and to reconsider their

decision not to take action against Gilead, but would allow Plaintiffs' claims to go forward with the rest of the record evidence here in support of this claim.

Third, and in any event, even if the Defendants could not be liable for their petitions to the Connecticut Department of Public Health, these actions could still be considered as evidence of their intent to discriminate more generally. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (stating that "contemporary statements by members of the decisionmaking body" are "highly relevant" to determining whether discriminatory intent existed); *Pathways Psychosocial v. Town of Leonardtown, MD.*, 223 F. Supp. 2d 699, 710 (D. Md. 2002) ("[The council member] has a right not to be held liable for his speech, but is not free from having his speech be considered as evidence of his actions; here as evidence of his intent in casting the vote against the council's resolution. Accordingly, it was not error for the court to deny Defendants' proposed First Amendment instruction.").

Indeed, in *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85 (D. Mass. 2010), the court rejected a similar First Amendment defense. "First of all," the court reasoned, "the focus of the evidence presented for summary judgment purposes is on those actions taken by individuals while acting as government officials of the Planning Board, Board of Selectmen, and Town Meeting—not action taken as private citizens." *Id.* at 112. Here, as in *Middlesex Opportunity Council*, much of the evidence presented is in the form of official Town statements and statements made by Town Officials in their official capacities.

Additionally, the *Middlesex Opportunity* court stated that while "[i]t is true that public employees do not check all of their First Amendment Rights at the door upon accepting public employment[,] the [p]laintiffs' evidence suggest[ed] that the [d]efendants used their positions of authority to manipulate the treatment of [plaintiffs'] permit applications. . . [T]he First

Amendment does not shield the Defendants' conduct here [because] the FHA allegations do not involve expressions of opinion or the petition of local government, but rather the manipulation of procedural devices in order to target SMOC's residents for discriminatory treatment." *Id.* at 113.

As a result, a reasonable jury could conclude that Defendants' statements were not merely political speech but were rather part of a concerted campaign intended to use various municipal tools (including a Cease & Desist Order, Town press releases articulating the Town's position in opposition to the Reiman Drive residence, tax exemption denials, and a petition attempting to influence the DPH to use its tools to push Gilead out) to force Gilead and its clients to leave the Reiman Drive residence.

Indeed, even the Seventh Circuit's decision in *Tri-Corp Housing Inc.* recognized that the *Noerr-Pennington* doctrine provides no safe harbor if "the proposal to the governmental body is a sham and the speech itself imposes costs independent of what the governmental body does . . ." 826 F.3d at 450.

In short, even if this doctrine has some applicability to this case, it is not a matter that can and should be decided at the summary judgment stage. *Cf. Reeves*, 530 U.S. at 153 (2000) (finding that the district court was correct to send the question of whether a defendant employer's explanation for firing the plaintiff employee was pretext for discrimination to a jury).

Accordingly, for all of these reasons, Defendants' motion for summary judgment on Plaintiffs' § 3604(f) claim will be denied.

**B.      42 U.S.C. § 3617 Claims**

42 U.S.C. § 3617 provides as follows:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or

43

enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the Fair Housing Act].

42 U.S.C. § 3617.

To establish a prima facie case under § 3617, Plaintiffs must show (1) that they were "engaged in a protected activity;" (2) "that [Defendants were] aware of this activity;" (3) "that [Defendants] took adverse action against the [P]laintiff;" and (4) that "a causal connection exists between the protected activity and the adverse action." *Joseph's House and Shelter, Inc. v. City of Troy*, 641 F. Supp. 2d 154, 158 (N.D.N.Y. 2009) (quoting *RECAP*, 294 F.3d at 53-54).

The Second Circuit has permitted a § 3617 claim to proceed where a municipality withdrew plaintiff's funding for another project, after the plaintiff filed a fair housing complaint against the municipality. *See RECAP*, 294 F.3d at 35, 54 ("RECAP suffered an adverse action [under § 3617] in losing funding that had been committed to it . . ."). A variety of housing-related activities also have constituted viable claims under § 3617, including attempted evictions, *Robbins v. Conn. Inst. for the Blind*, No. 3:10-CV-1712 (JBA), 2012 WL 3940133, at *7 (D. Conn. Sept. 10, 201)); manipulation of municipal processes to delay plaintiffs' ability to obtain needed permits, *Middlesex Opportunity Council*, 752 F. Supp. 2d at 85; and discriminatory application of zoning laws, *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1197 (D. Conn. 1992). Additionally, as some courts have held, "[i]t is sufficient to state that 'interference' under [§ 3617] can encompass a 'pattern of harassment, invidiously motivated.'" *Middlesex Opportunity Council*, 752 F. Supp. 2d at 85, 104 (quoting *Halprin v. Prairie Single Family Homes*, 388 F. 3d 327, 330 (7th Cir. 2004)).

Additionally, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the

adverse action." *RECAP*, 294 F.3d at 54 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).

Defendants do not dispute the first two elements of Plaintiffs' § 3617 claim. Rather, they argue that they are entitled to summary judgment on this claim because (a) "[t]here is no evidence that that the Defendants were motivated by an intent to discriminate or that they coerced, threatened, intimidated, or interfered with Gilead on account of activity protected by the Fair Housing Act," Defs. Mem. Summ. J. at 26; and (b) "the Defendants' actions were not the proximate cause of the closure of the program." *Id.* at 30.

Plaintiffs argue that substantial evidence in the record could permit a reasonably jury to find that Defendants were motived by an intent to discriminate and that they "coerced, threatened, intimidated, or interfered" with Gilead based on activity protected by the FHA. Pls. Mem. Opp. at 20-24. Plaintiffs argue further that substantial evidence exists in the record that could enable a reasonable jury to find that Defendants proximately caused Gilead's injuries. *Id.* at 24-26.

The Court agrees.

There is more than enough record evidence for a reasonable jury to find that Defendants have taken adverse actions in the form of holding and publicizing a public forum with the intent of amplifying community opposition to the Reiman Drive residence, *see, e.g.*, Pls. SOMF Ex. 21, ECF No. 77-21 (Press Release, Town of Cromwell, (Apr. 20, 2015); Pls. SOMF Ex. 7, ECF No. 77-7 (Deposition of Vincent "Enzo" Faienza at 96:8-17 (June 27, 2018)); Pls. SOMF Ex. 15, ECF No. 77-15 (Deposition of Re Matus at 58:7-15 (Jan. 9, 2018)); Pls. SOMF Ex. 4, ECF No.

77-4 (Deposition of Dan Osborne at 255:11-17 (Feb. 21, 2018)); stoking opposition by publishing statements and giving interviews expressing a preference that Gilead leave, *see, e.g.*, Pls. SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)); Pls. SOMF Ex. 30, ECF No. 77-30 (Jeff Mill, *Cromwell Citizens, Officials Adamantly Object to Group Home*, Middletown Press (Apr. 21, 2015)); Pls. SOMF Ex. 34, ECF No. 77-34 (Jeff Mill, *Officials Fear Men's Transitional Home Will Affect Cromwell Families*, Middletown Press (Apr. 22, 2015)); Pls. SOMF Ex. 4, ECF No. 77-4 (Deposition of Dan Osborne at 116:9-117-7 (Feb. 21, 2018)); Pls. SOMF Ex. 7, ECF No. 77-7 (Deposition of Vincent "Enzo" Faienza at 167:11-17, 163:4-23, 164:15-17 (June 27, 2018)); SOMF Ex. 8, ECF No. 77-8 (Deposition of Anthony Salvatore at 102:11-18 (June 28, 2018)); pursuing a petition to the Connecticut Department of Public Health in order to deny Gilead a license, *see, e.g.*, Pls. SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015)); Pls. SOMF Ex. 40, ECF No. 77-40 (*Cromwell Petitions State about Gilead Group Home Location*, Middletown Press (May 14, 2015)); Pls. SOMF Ex. 41, ECF No. 77-41 (E-mails between Rob Latulippe/Enzo Faienza re: "Fwd: Group Home Update" (May 15, 2015)); Pls. Opp. SOMF Ex. 61, ECF No. 86-61 (June 22, 2015 Olson Memo); issuing a Cease & Desist order regarding the property, *see, e.g.*, Pls. Opp. SOMF Ex. 76, ECF No. 86-76 (Emails between Kari Olson/Enzo Faienza/Anthony Salvatore/Re Matus re: "RE: Remain [sic] Dr." (June 25, 2015, 1:28pm)); Pls. SOMF Ex. 45, ECF No. 77-45 (Deposition of Jillian Massey (May 30, 2018)); and denying tax exempt status to 5 Reiman Drive, despite having granted tax exempt status to similarly situated properties before. *See, e.g.*, Pls. Supp. SOMF Ex. 38, ECF No. 114-38 (E-mails between Shawna Baron/Anthony Salvatore re: "Group home" (July 14, 2015)); Pls. Supp. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow Housing Corp. (July 14, 2009, and June 13, 2013)); Pls. Supp.

SOMF Ex. 24, ECF No. 114-24 (Deposition of Shawna Baron at 9:13-16, 33:22-34:2, 58:2-5 (Jan. 8, 2018)).

Additionally, and as already discussed with respect to the Fair Housing Act claims above, a genuine issue of material fact exists as to whether the Defendants' actions caused Plaintiffs' injuries—Gilead's having to close its program at 5 Reiman Drive and to sell the house at a loss, as well as the damage to Gilead's reputation and to the livelihood of Gilead's clients; and the Connecticut Fair Housing Center's having to expend additional resources to re-educate the public and policymakers about housing discrimination against individuals with disabilities as a result of the Town of Cromwell's opposition to Gilead's operation of a program at 5 Reiman Drive. Plaintiffs also present evidence creating a genuine issue of material fact regarding whether the Town of Cromwell retaliated against them for filing this lawsuit to enforce their rights under the Fair Housing Act, by denying tax exempt status to a property that had previously been granted tax exempt status. *See, e.g.*, Pls. Supp. SOMF Ex. 38, ECF No. 114-38 (E-mails between Shawna Baron/Anthony Salvatore re: "Group home" (July 14, 2015)); Pls. Supp. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow Housing Corp. (July 14, 2009, and June 13, 2013)); Pls. Supp. SOMF Ex. 24, ECF No. 114-24 (Deposition of Shawna Baron at 9:13-16, 33:22-34:2, 58:2-5 (Jan. 8, 2018)).

Finally, to the extent that Defendants argue that qualified immunity should apply, this argument fails, too.

Qualified immunity protects public officials from liability for civil damages when either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F. 3d 196, 211 (2d Cir. 2007).

Years ago, the Supreme Court held "that it is a violation of equal protection for government officials to take action against people with disabilities based on prejudice that the citizenry may harbor against them." *Pathways Psychosocial*, 223 F. Supp. 2d at 714 (citing *City of Cleburne*, 473 U.S. at 448). Furthermore, the Supreme Court has held that it is unnecessary for "the very action in question [to have] previously been held unlawful" in order to find a right clearly established. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741.

As to whether it was objectively reasonable for the Defendant to believe that his action did not violate the law, a genuine issue of material fact exists. And "[w]hile the qualified immunity inquiry is generally an objective one, 'a defendant's subjective intent is indeed relevant . . . Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." *Hous. Works, Inc. v. Turner*, No. 00CIV.1122 (LAK) (JCF), 2004 WL 2101900, at *26 (S.D.N.Y. Sept. 15, 2004) (quoting *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003), *report and recommendation adopted as modified*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005)). As the Second Circuit has stated: "Indeed, it is difficult for us to see how conduct that is irrational (if so found by a jury) could nevertheless be objectively reasonable." *Cobb v. Pozzi*, 363 F.3d 89, 112 (2d Cir. 2004).

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' § 3617 claim will be denied.

C.      **Americans with Disabilities Act and Section 504 of the Rehabilitation Act Claims**

As noted above, the legal analysis under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act is not substantially different from the analysis under the Fair

Housing Act. *See Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) ("Because of similarities in the three statutes, intentional discrimination claims under the ADA, Rehabilitation Act, and FHA are considered in tandem"); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573–74 (2d Cir. 2003)(analyzing plaintiffs' FHA and ADA claims together, and stating that "[t]o establish discrimination under either the FHAA or the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation")); *RECAP*, 294 F.3d at 48 (analyzing disparate treatment theories of discrimination under the FHA, the ADA, and the Rehabilitation Act together)).

Indeed, Defendants argue that plaintiffs' claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act fail because the claims under the Fair Housing Act fail. Def. Mot. Summ. J. at 2; Defs. Mem. Summ. J. at 31-32. Defendants also argue that "the individual defendants are entitled to summary judgment for the additional reason that both Acts provide only for claims against public entities, not for individual capacity suits against individuals." Defs. Mem. Summ. J. at 32.

In response, Plaintiffs argue that for the same reasons Defendants are not entitled to summary judgment on Plaintiffs' Fair Housing Act claims, they are also not entitled to summary judgment on Plaintiffs' Americans with Disabilities Act or Rehabilitation Act claims. Pls. Mem. Opp. at 8-9 n.9. Plaintiffs also clarify in their opposition memo that they do not seek liability against Defendants in their individual capacities under the Americans with Disabilities Act. *Id.*

Accordingly, because the Court has already found that genuine issues of material fact exist as to Plaintiffs' Fair Housing Act claims for the reasons discussed above, Defendants' motion for summary judgment as to Plaintiffs' Americans with Disabilities Act and

Rehabilitation Act claims also will be denied.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, ECF No.

75, is **DENIED**, Defendant's supplemental motion for summary judgment, ECF No. 110, is

**DENIED**, and Plaintiffs' motion for partial summary judgment, ECF No. 76, is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September, 2019.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE