# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| GILEAD COMMUNITY SERVICES, INC., et al.,<br>        *Plaintiffs*,<br><br>        v.<br><br>TOWN OF CROMWELL, et al.,<br>        *Defendants*. | No. 3:17-cv-627 (VAB) |

## RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Gilead Community Services, Inc. ("Gilead"), Rainbow Housing Corp. ("Rainbow Housing"), and the Connecticut Fair Housing Center, Inc. (collectively "Plaintiffs") sued the Town of Cromwell ("Town"); Vincent "Enzo" Faienza and Anthony Salvatore individually and in their official capacities; and Jillian Massey in her official capacity. Compl., ECF No. 1 (Apr. 17, 2017).

Plaintiffs brought claims that the Town of Cromwell and the named officials (collectively "Defendants") violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), and its implementing regulations, 24 C.F.R. Part 100; the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), and its implementing regulations, 28 C.F.R. Part 35; and the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and its implementing regulations, 24 C.F.R. Part 8. *Id.* ¶ 1. Plaintiffs later moved, and the Court granted them leave, to amend their Complaint to add retaliation claims under 42 USC §§ 3617 and 3604(f)(2). Am. Compl., ECF No. 57-1 (June 22, 2018). Plaintiffs allege that the Defendants' actions "resulted in the denial of housing to Gilead's clients, who are people with disabilities, injured Gilead's reputation, finances and ability to assist its clients. . . caused [the Connecticut Fair Housing Center] to divert

scarce resources to address this discrimination and frustrated [the Connecticut Fair Housing Center]'s mission of ensuring equal access to housing for all." *Id.* ¶ 1.

Presently before the Court are Defendants' initial and supplemental motions for summary judgment, Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 75 (Dec. 7, 2018); Defs.' Suppl. Mot. for Summ. J. ("Defs.' Suppl. Mot."), ECF No. 110 (July 8, 2019); and Plaintiffs' motion for partial summary judgment, Pls.' Partial Mot. for Summ. J. ("Pls.' Mot,"), ECF No. 76 (Dec. 7, 2018), following this Court's Order *sua sponte* reconsidering and vacating its earlier ruling and order, Order, ECF No. 129 (Oct. 15, 2019).

For the reasons discussed below, Defendants' motion for summary judgment, ECF No. 75, is **DENIED**, Defendant's supplemental motion for summary judgment, ECF No. 110, is **DENIED**, and Plaintiffs' motion for partial summary judgment, ECF No. 76, is **DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Parties

Gilead, a not-for-profit organization, seeks to provide housing and community-based services to individuals with disabilities in the state of Connecticut. Pls.' Statement of Material Facts ¶ 1 ("Pls.' SOMF"), ECF No. 77 (Dec. 7, 2018). "Since 1968, Gilead has offered residential housing services to thousands of individuals with mental illnesses and other disabilities in Middlesex County, Connecticut." *Id.* ¶ 9. Rainbow Housing Corporation is a "sister not-for-profit corporation that owns and manages Gilead's real estate assets." *Id.* ¶ 2. Connecticut Fair Housing Center is a "statewide not-for-profit corporation whose mission is to ensure that all people have access to the housing of their choice throughout the state of Connecticut free from discrimination." *Id.* ¶ 4.

Vincent "Enzo" Faienza is Mayor of the Town of Cromwell. *Id.* ¶ 6. Anthony Salvatore is Town Manager for the Town of Cromwell. Pls.' SOMF Ex. 8, ECF No. 77-8 (Salvatore Dep. at 20:1-4). Before becoming Town Manager, Mr. Salvatore served as the Town of Cromwell's Chief of Police. *Id.* 41:7-14. From February until August 2015, Mr. Salvatore served as both the Cromwell Chief of Police and Acting Town Manager. *Id.* He became Town Manager in August 2015. *Id.* Until July 31, 2015, Jillian Massey served as the Zoning Enforcement Officer for the Town of Cromwell. Pls.' SOMF in Opp. to Defs.' SOMF ("Pls.' Opp. SOMF"), Ex. 27, ECF No. 86-27 (Massey Dep. at 139:6-15).

Gilead's Reiman Drive Residence over the Spring and Summer of 2015

On or around December 10, 2014, the Connecticut Department of Mental Health and Addiction Services (or "DMHAS") approved an application from Gilead to operate a new community residence for men with disabilities. Pls.' SOMF ¶ 10.

On March 25, 2015, Gilead, through Rainbow Housing, purchased a single-family house located at 5 Reiman Drive in Cromwell, Connecticut ("Reiman Drive residence") for $352,047.30. *Id.* ¶ 11; Pls.' SOMF Ex. 14, ECF No. 77-14 (Closing Documents, 5 Reiman Drive (Mar. 25, 2015)). Gilead intended to use the Reiman Drive residence as a community residence under Connecticut General Statutes § 8-3, "to serve six or fewer men who would receive mental health services from Gilead staff," and under the Connecticut Department of Mental Health and Addiction Services contract, Gilead would provide these services. Defs.' Statement of Material Facts ¶ 2 ("Defs.' SOMF"), ECF No. 75-2 (Dec. 7, 2018). "After purchasing the home, Gilead initiated renovations to prepare the home for occupancy by six of its clients, with initial occupancy to begin in May 2015." *Id.* ¶¶ 4, 10.

On March 30, 2015, Gilead's Chief Executive Officer ("CEO"), Daniel Osborne, reached out to the Town of Cromwell's Acting Town Manager, Anthony Salvatore, to inform him that Gilead had purchased the property and planned to operate a community residence there. Pls.' SOMF ¶ 12. Cromwell residents had also begun reaching out to Town officials about Gilead's purchase of the Reiman Drive residence by March 30, 2015. *Id.*

On March 31, 2015, Mayor Faienza stated in an e-mail to Superintendent of Schools Paula Talty, "There really is nothing we can do to stop this group home from coming to town . . . [T]hey are protected by state statute. All we can do is try to ease any concerns the residents may have." Defs.' SOMF Ex. I-3, ECF No. 75-28 (E-mails between Enzo Faienza and Paula Talty re: "meeting" (Mar. 31, 2015)).

Also, on March 31, 2015, a meeting took place that included Gilead, state elected officials, and Acting Town Manager Salvatore and Mayor Faienza, to discuss Cromwell residents' concerns about Gilead's plans to open the Reiman Drive residence. Defs.' SOMF ¶ 11. It is disputed whether this meeting also involved discussion of Town officials' concerns. Pls.' Opp. SOMF at 52, response to ¶ 11, ECF No. 86 (Jan. 18, 2019).

At this meeting, they discussed holding a public forum on April 20, 2015, for Town residents to learn about Gilead and the planned community residence on Reiman Drive. Defs.' SOMF ¶ 12. It is disputed whether Gilead or Town and state officials proposed this forum, but both Gilead and Town officials ultimately agreed to hold it. Pls.' Opp. SOMF at 8 ¶ 31, 54 ¶ 12; Defs.' SOMF in Opp. to Pls.' SOMF at 10, response to ¶ 23 ("Defs.' Opp. SOMF"), ECF No. 84-2 (Jan. 18, 2019).

The Town publicized the April 20 forum, including through an official press release "stat[ing] that representatives from Gilead and DMHAS would provide a presentation regarding

the group home on Reiman." Pls.' SOMF ¶ 24. A local newspaper, the Middletown Press, published statements by Mayor Faienza that "[i]t's important that all concerned residents come to the forum with their questions and concerns for Gilead and DMHAS. The goal of Monday night's forum is for Gilead to answer all the concerns of our residents." *Id.* ¶ 25; Pls.' SOMF Ex. 23, ECF No. 77-23 (*Cromwell to Hear Views on Group Home Proposed Near High School,* Middletown Press News (Apr. 20, 2015)).

On April 20, 2015, the planned forum was held. Defs.' SOMF ¶ 15; Pls.' Opp. SOMF at 9, response to ¶ 35. Ed Wenners, who at that time "was beginning his campaign to earn a seat on the Town Council," moderated the forum. Pls.' Opp. SOMF at 8 ¶ 32; *see also* Pls.' Opp. SOMF Ex. 41, ECF No. 86-41 (E-mails between Ed Wenners and Enzo Faienza re: "FW: Cromwell Town Council" (Sept. 19, 2015)). Mayor Faienza had asked Mr. Wenners to moderate it. Pls.' Opp. SOMF at 8 ¶ 32; Pls.' Opp. SOMF Ex. 34, ECF No. 86-34 (Wenners Dep. at 32:2-33:25)); Pls.' Opp. SOMF Ex. 7, ECF No. 86-7 (Faienza Dep. at 111:2-112:9).

The forum, held at the Town Hall gym, Pls.' Opp. SOMF Ex. 28, ECF No. 86-28 (Press Release: "Gilead Group Home," Town of Cromwell (Apr. 20, 2015)), "lasted almost four hours. The gymnasium was at full capacity; the chairs and bleachers were all full, and people were standing on both sides of the room." Pls.' SOMF ¶ 27.

Various Town officials were present, including Mayor Faienza, Acting Town Manager Salvatore, and other state and local officials. Pls.' SOMF ¶ 33-38; Pls.' Opp. SOMF at 8 ¶ 35; Pls.' Opp. SOMF Ex. 36, ECF No. 86-36 (Press Release, Town of Cromwell (Apr. 21, 2015)). "Representatives from Gilead and DMHAS provided some information about the group home and a general overview of the types of services it intended to offer to its residents." Pls.' SOMF ¶ 28. "Over sixty audience members . . . spoke in opposition of the group home being located at"

the Reiman drive address. *Id.* ¶ 29. "Two people spoke in support of the group home, but they were shouted over by the crowd." *Id.* ¶ 30.

Mayor Faienza spoke at the forum, stating that "the proposal is unfortunate and unfair, and we were caught totally off guard by it," *id.* ¶ 33; that the idea of restricting group homes in a town by census population, as package stores are regulated, might be "something that should be looked into," Pls.' SOMF Ex. 7, ECF No. 77-7 (Faienza Dep. at 156:14-24); and "Where does it end?," Pls.' SOMF ¶ 33. Acting Town Manager Salvatore also spoke at the forum, saying that "in my opinion, this is not the right location." Pls.' SOMF ¶ 38. It is disputed whether any other Town officials spoke. The day after the forum, the Town issued a press release that read as follows:

> As a result of a Public Forum held on the evening of April 20th at the Cromwell Town Hall, regarding the placement of a group home at 5 Reiman Drive, Cromwell residents . . . were able to listen to a presentation by Gilead and [DMHAS] followed by a question and answer period that lasted from 7 p.m. until nearly 11 p.m.
>
> During [the forum] State and Local Officials as well as residents were also given the opportunity to express their concerns. The majority of the concerns centered around the close proximity of this residence to Cromwell Schools and the makeup of the neighborhood, which contains a number of children and teenagers.
>
> Because of the lack of information provided by Gilead and DEHMAS [sic] based on the concerns by those in attendance, Mayor Enzo Faienza is officially and publically [sic] requesting, on behalf of the citizens of the Town of Cromwell, that Gilead consider relocating to a more suitable location.

Pls.' SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)).

In the days following the forum, the Middletown Press published two articles about the forum and the Reiman Drive residence plans. One article quoted Mayor Faienza from the April 20 forum, Pls.' SOMF Ex. 30, ECF No. 77-30 (Jeff Mill, *Cromwell Citizens, Officials Adamantly*

*Object to Group Home*, Middletown Press (Apr. 21, 2015) ("The proposal 'is unfortunate and unfair, and we were caught totally off guard by it,' Faienza said")); and another quoted Mayor Faienza later saying that "I feel I owe the residents of Reiman Drive that I stand up and ask Gilead to consider another alternative site," Pls.' SOMF Ex. 34, ECF No. 77-34 (Jeff Mill, *Officials Fear Men's Transitional Home Will Affect Cromwell Families*, Middletown Press (Apr. 22, 2015)).

The day after the forum, April 21, 2015, Mayor Faienza sent an email to a resident, writing:

> I wanted to have this forum so the members of Gilead and DMHAS could see the outrage and concern first hand from our residents. Everyone did a fantastic job . . . I'm hoping they reconsider completely and choose not to move forward with anything. . . Ideally I don't want anything in that neighborhood or in town at all[.]

Pls.' SOMF Ex. 35, ECF No. 77-35 (E-mails between Tina Mendes and Enzo Faienza re: "FW: Gilead Group Home" (Apr. 21, 2015)).

After the forum, either Mayor Faienza or Acting Town Manager Salvatore (it is disputed which) "contacted Town Attorney Kari Olson and requested that [she] research whether Gilead's plans for 5 Reiman Drive constituted a community residence and whether 5 Reiman Drive would be subject to zoning regulations." Defs.' SOMF ¶ 22. Town Attorney Olson sent an e-mail to Gilead Attorney Timothy Hollister asking for information regarding whether the Reiman Drive residence was exempt from zoning regulations. Defs.' SOMF Ex. L-1, ECF No. 75-34 (E-mails between Kari Olson and Timothy Hollister re: "Fw: Gilead" (May 1, 2015)).

On May 5, 2015, a special executive session of the Town Council took place. In a May 4, 2015 e-mail responding to a resident who had sent a news article about an incident that had occurred at another group home in Connecticut, Mayor Faienza said that he had called the

session himself, stating that "[t]he Salem issue really highlights all our concerns regarding this group home. I have called a special executive session meeting of the Council for tomorrow night. I'm also trying to get our town attorney there." Pls.' SOMF Ex. 37, ECF No. 77-37 (E-mails between Rob Latulippe and Enzo Faienza re: "Fwd: Safeguards" (May 4, 2015)). Town Attorney Olson did attend that meeting. Defs.' SOMF ¶ 23. The Town Council also approved filing a petition with the Connecticut Department of Public Health ("DPH") at that meeting. *Id.*

On May 6, 2015, Attorney Olson, on behalf of the Town, petitioned the Commissioner of the DPH to deny Gilead authority to install a community residence at 5 Reiman Drive on the basis that pursuant to General Statutes § 19a-507b(c), Gilead was required to apply for a license to operate a community residence. Defs.' SOMF ¶ 24; Defs.' SOMF Ex. L-3, ECF No. 75-36 (Anthony Salvatore and Kari Olson, Town of Cromwell, *Petition to Deny Proposed Community Residence* (May 6, 2015)). The Town also issued a press release:

> As a result of Gilead Community Services attempting to install another community residence in the Town of Cromwell, Acting Town Manager Anthony Salvatore, with the support of Mayor Enzo Faienza and the Town Council, petitioned the Commissioner of Public Health to deny Gilead Community Services authority to install another community residence in the Town of Cromwell.

Pls.' SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015)). Mayor Faienza reportedly said, "What we are against is the idea of having this group home in this particular neighborhood." Pls.' SOMF Ex. 40, ECF No. 77-40 (*Cromwell Petitions State about Gilead Group Home Location*, Middletown Press (May 14, 2015)).

On May 15, 2015, Mayor Faienza sent an e-mail to a Town resident stating that "[w]e are pounding Gilead and DPH is spinning right now. We will keep [the] pressure on, let's keep our fingers crossed." Pls.' SOMF Ex. 41, ECF No. 77-41 (E-mails between Rob Latulippe and Enzo

Faienza re: "Fwd: Group Home Update" (May 15, 2015)). The individual responded, "Not to sound like an ass. But – awesome." *Id.*

On June 15, 2015, the Connecticut Department of Public Health issued a letter to the Town stating that it was not taking any action against Gilead in response to the Town's petition because Gilead did not require a license under Connecticut General Statutes § 19a-507b(c) to operate the Reiman Drive residence. Pls.' SOMF Ex. 42, ECF No. 77-42 (Letter from Antony Casagrande, General Counsel, Conn. Dep't of Health to Kari Olson Regarding Petition to Deny Proposed Community Residence (June 15, 2015) ("June 15, 2015 Casagrande Letter")).

On June 25, 2015, at 8:22 p.m., Town Attorney Olson sent an e-mail to Mayor Faienza, Acting Town Manager Salvatore, and Michael Zizka, attaching a memorandum dated June 22, 2015, and addressed to the Town Council. Pls.' Opp. SOMF Ex. 61, ECF No. 86-61 (Mem. from Kari Olson to Town of Cromwell Town Council Regarding Gilead's Proposed Community Residence (June 22, 2015) ("June 22, 2015 Olson Memo")).

The memo stated that "[t]he forgoing memorandum reflects that any success in litigating over Gilead's new group home is far from certain," and that by pursuing the petition further "the Town may be criticized for attempting to shut out those in need of rehabilitation." June 22, 2015 Olson Memo at 8. Town Attorney Olson also stated that "[n]otwithstanding all of these hurdles, it is my understanding that you wish to pursue this challenge vigorously and despite the knowledge that the challenge may fail." *Id.*

Town Attorney Olson also exchanged e-mails with Mayor Faienza and Acting Town Manager Salvatore on June 25, 2015, stating that she "would like to send a warning letter to Tim Hollister (Gilead's Attorney) regarding the anticipated zoning violations." Pls.' Opp. SOMF Ex.

76, ECF No. 86-76 (E-mails among Kari Olson, Enzo Faienza, Anthony Salvatore, and Re Matus re: "RE: Remain [sic] Dr." (June 25, 2015, 1:28pm)).

Town Attorney Olson sent a letter to Gilead's attorney Hollister, attaching the June 15, 2015 Casagrande Letter and stating that the Town of Cromwell understood the Connecticut Department of Public Health's decision to mean that the Reiman Drive residence was not a community residence entitled to zoning exemptions under Connecticut General Statutes 8-3e. Pls.' Opp. SOMF Ex. 78, ECF No. 86-78 (letter from Kari Olson to Tim Hollister, Re: "Gilead Community Services" (June 25, 2015)). Ms. Olson's letter stated that, as a result, the Town of Cromwell would be issuing a Cease and Desist Order to Gilead for operating a group facility at 5 Reiman Drive in violation of town zoning laws. *Id.*

On June 29, 2015, the Town filed a motion with the Connecticut Department of Public Health to reconsider their decision that Gilead did not require a license to operate the Reiman Drive residence. Pls.' SOMF Ex. 43, ECF No. 77-43 (Anthony Salvatore, Town of Cromwell, Mot. for Reconsideration of Decision on Petition to Deny Proposed Comm. Residence (June 29, 2015) ("Town Mot. to Reconsider Petition")).

On July 1, 2015, the Town issued a "Notice of Violation/Cease & Desist Order" regarding 5 Reiman Drive ("Reiman Drive Cease & Desist Order") to Steve Bull, President of Rainbow. Pls.' SOMF Ex. 44, ECF No. 77-44 (Reiman Drive Cease & Desist Order (July 1, 2015)). Jillian Massey, the Town Zoning Enforcement Officer, signed the Cease & Desist Order and copied Mr. Salvatore on the Order. Pls.' SOMF ¶ 60.

The Order stated that Rainbow Housing "appear[ed] to be operating or allowing the operation of a rooming house / halfway house or similar venture at 5 Reiman Drive without first

obtaining proper zoning permits," and that failure to comply would result in penalties including the accrual of fines of $150 per day. Pls.' SOMF ¶ 61; Reiman Drive Cease & Desist Order.

The next day, on Gilead's behalf, Mr. Hollister sent Town Attorney Olson a letter in response to receipt of the Cease & Desist Order. Pls.' SOMF Ex. 46; ECF No. 77-46 (Letter from Timothy Hollister to Kari Olson (July 2, 2015)). Mr. Hollister's letter stated that Gilead's intended disabled residents and staff were protected under state and federal Fair Housing Acts and requested rescission of the Cease & Desist Order. *Id.* at 3.

On July 7, 2015, Mr. Hollister, Mr. Osborne, Town Attorney Olson, Acting Town Manager Salvatore, and one other Town representative met at Town Hall to discuss issues regarding the Reiman Drive residence. Defs.' SOMF ¶ 40.

On that same day, July 7, 2015, Gilead placed its first client at the Reiman Drive residence. *Id.* ¶ 41.

On July 8, 2015, Ms. Massey advised Mr. Bull that the Reiman Drive Cease & Desist Order was being rescinded, with the understanding that no more than two residents would be placed in the home. Defs.' SOMF ¶ 42; Pls.' SOMF Ex. 49, ECF No 77-49 (Letter from Jillian Massey to Steve Bull re: Notice of Violation/Cease and Desist Order for 5 Reiman Drive, Cromwell (July 8, 2015)). On July 8, Town Attorney Olson also sent an e-mail to Mr. Hollister, stating that, "as you know, we are not waiving the right to issue a new cease and desist upon your notification that more than 2 persons have moved in or if the Town otherwise deems it is justified based upon the facts, the law and the Town's regulations." Pls.' SOMF Ex. 48, ECF No. 77-48 (E-mails between Timothy Hollister and Kari Olson, re: "Checking in on the cease and desist" (July 8, 2015)).

It is disputed whether the two-resident limit was Gilead's idea or a Town demand. Defs.' Opp. SOMF at 27, response to ¶ 64; Pls.' Opp. SOMF at 31-33 ¶¶123-126, at 72, response to ¶ 39, at 73, response to ¶ 42. The Reiman Drive Cease & Desist Order was the second Cease & Desist order the Town had issued since January 1, 2012, the first being to another community residence for people with disabilities. Pls.' SOMF ¶ 65; Pls.' SOMF Ex. 50, ECF No. 77-50 (Cease & Desist Order for 9 Elm Street (Feb. 10, 2014)).

On July 14, 2015, Town Assessor Shawna Baron informed Acting Town Manager Salvatore that she had "just received an exemption application from the Group Home," and asking, "We should meet to discuss this?" Pls.' Suppl. Statement Mat. Facts ("Pls.' Suppl. SOMF") Ex. 38, ECF No. 114-38 (E-mails between Shawna Baron and Anthony Salvatore re: "Group home" (July 14, 2015)). Mr. Salvatore requested that Ms. Baron send him a list of other group homes in Cromwell and whether they were tax exempt and taxable. *Id.*

On July 15, 2015, Gilead placed a second resident at the Reiman Drive residence. Defs.' SOMF ¶ 49.

On July 16, 2015, the Connecticut Department of Public Health wrote a letter to Mr. Osborne advising him that the department had found violations of Connecticut regulations and/or statutes at another Gilead property, informing Mr. Osborne that he could dispute the violations until July 21, 2015, and asking Mr. Osborne to "[p]lease address each violation with a prospective plan of correction . . ." Defs.' SOMF Ex. D-1, ECF No. 75-15 (letter from DPH to Dan Osborne (July 16, 2015)).

Also, on July 16, 2015, the Town of Cromwell issued a letter to Rainbow Houisng, informing it that the Town needed additional documents, including the "estimated average length of stay of residents," before it could consider its exemption request. Defs.' SOMF Ex. Q-1, ECF

No. 75-52 (Letter from Shawna Baron to Rainbow Housing Requesting Additional Documentation for Tax Exemption (July 16, 2015)).

On July 19, 2015, one of the two residents of the Reiman Drive residents walked away from 5 Reiman Drive around 6:45 p.m., Defs.' SOMF ¶ 51, and later found in Hartford around 10:30 p.m. *Id.* Gilead prepared an internal review report on the incident, identifying action steps to ensure that [the] areas [of weakness in responding to the incident were] addressed fully and effectively going forward." Defs.' SOMF Ex. C-1, ECF No. 75-12 (Phoenix Home Elopement Incident – ACTION PLAN (July 19, 2015)).

On July 21, 2015, the Middletown Press published an article which quoted the police as stating that the client had "a history of substance abuse and . . . assaultive behaviors in the past," and disclosing the individual's medical diagnoses. Pls.' Opp. SOMF Ex. 86, ECF No. 86-86 (Jeff Mill, *Gilead Client Who Walked Away Prompts New Interest in Cromwell Group Home*, Middletown Press (July 21, 2015)). Acting Town Manager Salvatore was also quoted as saying that "[t]he town has been and continues to be opposed to that residence being at that location as we did not feel that is an appropriate site. . . This incident only serves to underscore those concerns." *Id.*

Throughout July 2015, Town residents exchanged e-mails about the Reiman Drive residence and engaged in conversation on a Facebook group page entitled "Reiman Strong." Pls.' Opp. SOMF Exs. 97, 98, 99, 100, ECF Nos. 86-97, 86-98, 86-99, 86-100 (E-mails discussing Gilead and discussing the content of planned posts on the "Reiman Strong" Facebook page about Gilead (July 21-28, 2015)). One resident forwarded these e-mails to Mayor Faienza immediately after they were sent. *See, e.g.*, Pls.' Opp. SOMF Ex. 97, ECF No. 86-97 (E-mail from Rob Latulippe to Enzo Faienza, re: "Fwd: Re: Just for the nieghbors [sic] . . ." (July 27, 2015)

(forwarding an email to Mayor Faienza four minutes after Diane Uccello had originally sent it to multiple individuals)). In one e-mail, the same resident states that he had "spoken with the Town" and "the [T]own agrees. It's time to make some noise… It's time to *not* remain quiet." Pls.' Opp. SOMF Ex. 100, ECF No. 86-100 (E-mails forwarded to Enzo Faienza from Rob Latulippe re: "RE: Time to make some phone calls and send some emails" (July 20, 2015)).

On July 21, 2015, the Connecticut Department of Mental Health and Addiction Services sent a letter to "5 Reiman Drive Neighbors," in response to the e-mails from Cromwell residents living in proximity to 5 Reiman Drive,

> DMHAS is aware of the situation described in the correspondence received and is reviewing it with Gilead staff. Gilead adherence to established policies and protocols related to client safety will be included in the review. No new residents will be admitted to this housing until the review is complete and any potential issues are addressed.

Defs.' SOMF Ex. R-1, ECF No. 75-55 (letter from Miriam Delphin-Rittmon, Commissioner, DMHAS, to 5 Reiman Drive Neighbors, re: "Cromwell Supported Housing Concerns" (July 21, 2015)).

"On July 24, 2015, Mr. Osborne emailed the Gilead Board of Directors, indicating an intent to 'move forward with the implementation of [the program at 5 Reiman Drive] but advising the Board that DMHAS was conducting a "special review" of all Gilead programs and would be making unannounced visits.'" Defs.' SOMF ¶ 62.

On July 25, 2015, Gilead Board Member Frances Ludwig sent an e-mail to Mr. Osborne, stating:

> I think we will want to take a hard look at whether or not [the walkaway] incident has made things so toxic that to persist with [the residence program] on Reiman Drive will just keep the entity alive

and make it difficult to ever recover with lots of potential collateral
damage to the brand and relationships.

Defs.' SOMF ¶ 63.

On July 31, 2015, Gilead Director of Finance Kathy Townsend responded to an e-mail

from Town Assessor Baron, regarding the Town's request for additional documentation for

Gilead's tax exemption application, stating that the "estimated average length of resident stay is

unknown." Pls.' Suppl. SOMF Ex. 27, ECF No. 114-27 (Letter from Kathy Townsend to Shawna

Baron (July 31, 2015)).

On August 3, 2015, a Cromwell police incident report was filed stating that a "for sale"

real estate yard sign had been placed in front of 5 Reiman Drive by an unknown person around

1:25 a.m. Defs.' Opp. SOMF Ex. J, ECF No. 77-62 (Police Report (Aug. 3, 2015, 9:31 a.m.)).

"By 9:31 AM, approximately one hour after being called to the incident, the officer had

determined that he was unable to obtain any other investigatory leads, returned to the police

station, and closed the case." Pls.' SOMF ¶ 81.

On August 7, 2015, Town Assessor Baron sent a letter to Gilead Director of Finance

Townsend denying Gilead's tax exemption application. Pls.' SOMF Ex. 52, ECF No. 77-52

(Letter from Shawna Baron to Kathy Townsend, re: "Property Tax Exemption Application"

(Aug. 7, 2015) ("Based on the information you provided, it does not appear that you meet the

criteria for tax exemption under [Connecticut General Statutes] § 12-81(7)").

On August 25, 2015, Mr. Osborne and Gilead Board President Ms. Ludwig wrote a letter

to Connecticut Department of Mental Health and Addiction Services Commissioner Miriam

Delphin-Rittmon:

> After a significant amount of thoughtful consideration, Gilead and
> its Board of Directors have decided that it is in the best interest of

> the individuals we serve that we discontinue [the program at 5
> Reiman Drive.]
>
> As a result, we are formally requesting that the specific portion of
> the contract between Gilead and DMHAS relating to the provision
> of services through the 'Phoenix Home Program' be discontinued at
> this time.

Defs.' SOMF Ex. C-2, ECF No. 75-13 (Letter from Dan Osborne and Fran Ludwig to Miriam

Delphin-Rittmon (Aug. 25, 2015)).

On August 31, 2015, Mr. Osborne met with Mayor Faienza and Town Manager Salvatore

and informed them of Gilead's decision to close the Reiman Drive residence. Defs.' SOMF ¶ 69.

On the same day, the Town issued a press release stating that the decision to close the Reiman

Drive residence

> was made by Gilead after much discussion and meetings with Town
> Officials and residents of the Town who were concerned with the
> location of the Group Home because of the makeup of the
> neighborhood and the proximity to our schools. . . Town Manager
> Anthony Salvatore and Mayor Enzo Faienza applaud Gilead's
> decision to relocate the Group Home and thank them for listening to
> the concerns of Town Officials and the residents of Reiman Drive,
> that this was not the most favorable neighborhood for them to
> establish a community residence.

Pls.' SOMF Ex. 65, 77-65 (Press Release, Town of Cromwell, "Closure of Home" (Aug.

31, 2015). Mayor Faienza posted the press release on his campaign website eight days

later. Pls.' SOMF Ex. 66, ECF No. 77-66 (Website Post, Enzo for Cromwell (Sept. 8,

2015)).

On August 31, Mayor Faienza also sent an e-mail to Town Council members, thanking

them for "staying the course on this very difficult issue we were dealing with." Pls.' SOMF ¶ 85;

Pls.' SOMF Ex. 67, ECF No. 77-67 (E-mail from Enzo Faienza to Town Council re: "Gilead

Group Home" (Aug. 31, 2015)). Even though they "knew it was going to be a tough battle and

we were in uncharted waters. . . In the end we prevailed for the greater good and safety of our

residents." *Id.* One council member responded, "WHAT TERRIFIC

NEWS!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" Pls.' Opp. SOMF Ex. 108, ECF No. 86-108 (E-

mail from Mertie Terry to Town Council re: "Gilead Group Home" (Aug. 31, 2015).

Mayor Faienza also exchanged e-mails with a constituent, stating, in part:

> This was a long battle but it was a fight this Town Council was ready
> to fight to [the] very end for. . . . We knew we were in uncharted
> waters but all we could do is keep the pressure on and pray for a
> positive outcome[,] and that is what happened.

Pls.' SOMF Ex. 68, ECF No. 77-68 (E-mails between Larry Callahan and Enzo Faienza re:

"Thank you from Reiman Drive" (Sept. 3, 2015)).

On September 9, 2015, the Town Council held a meeting where town resident Diane

Uccello spoke: "We always knew that you stood behind us and were working very hard on our

behalf. . . Thank you for giving our children their neighborhood back." Pls.' SOMF Ex. 69, ECF

No. 77-69 (Cromwell Town Council Meeting excerpt, Diane Uccello speech (Sept. 9, 2015)).

<u>Gilead's Review of Cromwell's Denial of Tax Exempt Status to 5 Reiman Drive</u>

On September 20, 2015, in response to e-mails from Gilead Financial Director

Townsend, Town Assessor Baron reiterated that the property had been denied tax exempt status

and that she would not reconsider the denial "[s]ince the length of stay [for residents wa]s

unknown." Pls.' SOMF Ex. 55, ECF No. 77-55 (E-mails between Shawna Baron and Dan

Osborne and Kathy Townsend re: "Letter Requesting Additional Information" (Sept. 8-21,

2015)).

On February 22, 2016, Rainbow Housing received a Tax Collector's Demand Notice for $8,755.75 in taxes due on 5 Reiman Drive. Pls.' Suppl. SOMF Ex. 34, ECF No. 114-34 (Tax Collector's Demand Notice (Feb. 22, 2016)).

On April 29, 2016, Town Assessor Baron forwarded a letter she had sent Mr. Osborne on September 8, 2015, to Town Manager Salvatore. Pls.' Opp. SOMF Ex. 95, ECF No. 86-95 (Email from Shawna Baron to Anthony Salvatore re: "FW: Letter requesting additional information" (Apr. 29, 2016)). A few minutes later, Ms. Baron forwarded the Reiman Drive tax exemption denial letter to Mr. Salvatore, stating:

> Let me know if you need anything additional[.] I would highly recommend that if the Council somehow waives their taxes that it is shown in a way that we did not set precedence for any taxpayer not to pay their taxes in the future. It would be best for them not to waive the taxes in my opinion.

Pls.' Opp. SOMF Ex. 94, ECF No. 86-94 (E-mail from Shawna Baron to Anthony Salvatore re: "RE – Gilead Exemption Application Denied" (Apr. 29, 2016)).

The minutes from the Gilead Board Meeting Minutes held on May 2, 2016, indicated that Mr. Osborne had a meeting with Town of Cromwell officials about the denial of the tax exempt status of 5 Reiman Drive. Pls.' Opp. SOMF Ex. 96, ECF No. 86-96 (minutes, Gilead Board Meeting (May 2, 2016)).

On July 20, 2016, Gilead Attorney Beth Critton sent a letter to Town Assessor Baron stating, in part, that "Gilead . . . has asked us to assist it in learning more about the Town's denial of Gilead's tax exemption application relating to 5 Reiman Road. I would like to meet with you in the near future to get a better understanding of your reasoning." Pls.' Suppl. SOMF Ex. 31, ECF No. 114-31 (letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (July 20, 2016)). Ms. Critton sent Ms. Baron another letter on September 1, 2016,

with her analysis of the relevant tax exemption statute, Connecticut General Statutes § 12-81(7), offering to provide any other information Ms. Baron needed, and asking Ms. Baron to reconsider Gilead's tax exemption application. Pls.' Suppl. SOMF Ex. 32, ECF No. 114-32 (letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (Sept. 1, 2016)).

On September 26, 2016, Town Assessor Baron sent Ms. Critton an e-mail and wrote that "the Town Attorney reviewed all of [Gilead's] documentation and in her opinion Gilead does not meet the requirements to be exempt." Pls.' Suppl. SOMF Ex. 33, ECF No. 114-33 (E-mail from Shawna Baron to Beth Critton re: "5 Reiman Drive, Cromwell, Connecticut" (Sept. 20, 2016)). Ms. Critton responded, reiterated her analysis, offered to provide more information, and stated that Gilead was paying "the outstanding real estate taxes under protest for the subject property at this time." Pls.' Suppl. SOMF Ex. 40, ECF No. 114-40 (Letter from Beth Critton to Shawna Baron re: "5 Reiman Drive, Cromwell, Connecticut" (July 20, 2016)).

On October 28, 2016, Gilead sold the house at 5 Reiman Drive for $280,000. Pls.' SOMF Ex. 70, ECF No. 77-70 (Purchase and Sale Agreement, 5 Reiman Drive (Oct. 28, 2016)).

The Second Gilead Property: 461 Main Street

Gilead operated another program in a property owned by Rainbow Housing at 461 Main Street. Pls.' Suppl. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow Housing Corp. (July 14, 2009, and June 13, 2013)). Letters from Shawna Baron in 2009 and 2013 showed that Gilead had completed the same application for tax exempt status under Connecticut General Statutes § 12-81(7), which must be completed every four years, for the 461 Main Street property in 2009 and 2013. *Id.*

On October 30, 2017, Gilead submitted the required application for renewal of its tax exempt status under Connecticut General Statutes § 12-81(7) for 461 Main Street. Pls.' Suppl.

SOMF Ex. 42, ECF No. 114-42 (Gilead Tax Exemption App. (submitted Oct. 30, 2017; denied Jan. 2, 2018)). Town Assessor Baron denied the application on January 2, 2018, and stated that she was "unsure what is happening at this property." *Id.*; Defs.' Suppl. SOMF ¶ 9. She sent a letter to Gilead denying renewal of tax exempt status for 461 Main Street on January 5, 2018. Pls.' Suppl. SOMF Ex. 43, ECF No. 114-43 (letter from Shawna Baron to Gilead (Jan. 5, 2018)).

On or about February 1, 2018, Gilead appealed the tax exemption denial for 461 Main Street to the Connecticut Board of Assessment Appeals ("Board"). Pls.' Suppl. SOMF Ex. 48, ECF No. 114-48 (Letter from Dan Osborne re: "461 Main Street, Cromwell, CT" (Feb. 1, 2018)).

On March 29, 2018, the Board denied the appeal. Pls.' Suppl. SOMF Ex. 49, ECF No. 114-49 (Town of Cromwell, CT Board of Assessment Appeals, re: Rainbow Housing Corporation, 461 Main Street (Mar. 29, 2018)).

On May 17, 2018, Gilead appealed the Board's decision New Britain Superior Court. Pls.' Suppl. SOMF Ex. 51, ECF No. 114-51 (Citation, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v. Town of Cromwell* (Conn. Super. Ct. May 17, 2018)).

Gilead received a tax bill of $6,243.94 on 461 Main Street, due on July 1, 2018. Pls.' Suppl. SOMF Ex. 50, ECF No. 114-50 (Real Estate Tax Bill 2018 (July 1, 2018)).

On June 7, 2019, the Connecticut Superior Court overturned the Board's decision, finding that "plaintiffs, as a matter of law, have fulfilled all of the requirements set forth in § 12-81(7)(B) and § 12-88." Pls.' Suppl. SOMF Ex. 52, ECF No. 114-52 (Memorandum of Decision, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v Town of Cromwell*, HHB-CV-186045100 (Conn. Super. Ct June 7, 2019)).

The Town appealed the Superior Court's decision on June 24, 2019. Pls.' Suppl. SOMF Ex. 53, ECF No. 114-53 (Appeal of Judgment in 6/7/2019 Memorandum of Decision, *Rainbow Hous. Corp. and Gilead Cmty. Servs., Inc. v Town of Cromwell*, HHB-CV-18-6045100-S (June 24, 2019)).

### B. Procedural Background

On April 17, 2017, Gilead, Rainbow Housing, and the Connecticut Fair Housing Center sued the Town of Cromwell, Vincent "Enzo" Faienza individually and in his official capacity as Mayor of the Town of Cromwell, Anthony Salvatore individually and in his official capacity as Town Manager, and Jillian Massey in her official capacity as the Zoning Enforcement Officer of the Town. Compl., ECF No. 1 (Apr. 29, 2017).

On June 29, 2017, the Town, Mayor Faienza, Town Manager Salvatore, and Zoning Enforcement Officer Massey (collectively, "Defendants") filed an Answer to the Complaint. Answer, ECF No. 27 (June 29, 2017).

On December 26, 2017, the Defendants moved to amend their Answer to add a fourth affirmative defense. Mot. to Amend Answer to Compl., ECF No. 44 (Dec. 26, 2017). Plaintiffs did not oppose.

On May 21, 2018, the Court granted Defendants' motion to amend their Answer. Order, ECF No. 54 (May 21, 2018).

The Town's Amended Answer raises four affirmative defenses: (1) the Complaint fails to state a claim upon which relief may be granted, (2) Plaintiffs' claims against individual Defendants are barred by qualified immunity, (3) Plaintiffs have failed to exhaust administrative remedies, and (4) Plaintiffs' claims are not ripe for adjudication under *Williamson County*

*Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985). Am. Answer, ECF No. 44-1 at 12 (Dec. 26, 2017).

On June 22, 2018, Plaintiffs moved to amend their Complaint to add new facts that allegedly arose from events that took place after the original Complaint was filed. Pls.' Mot. to Amend, ECF No. 57 (June 22, 2018).

On July 11, 2018, Defendants objected to Plaintiffs' motion to amend. Defs.' Obj. to Pls.' Mot. to Am., ECF No. 60 (July 11, 2018).

On July 20, 2018, Plaintiffs replied. Pls.' Reply to Defs.' Obj. to Pls.' Mot. for Leave to Amend, ECF No. 61 (July 20, 2018).

On December 7, 2018, Defendants moved for summary judgment as to all of Plaintiffs' claims. Defs.' Mot. Summ. J., ECF No. 75 (Dec. 7, 2018). Defendants submitted a memorandum of law, Defs.' Mem. Summ. J., ECF No. 75-1 (Dec. 7, 2018); a statement of material facts, Defs.' SOMF, ECF No. 75-2 (Dec. 7, 2018); and fifty-seven exhibits in support of their motion. Defendants' exhibits included depositions of Gilead leadership, Town of Cromwell officials, and Connecticut Department of Public Health officials; various official Town documents; and communications among and between representatives of Gilead, Town officials, state officials, as well as Town residents. *See id.*

On December 7, 2018, Plaintiffs moved for partial summary judgment, arguing that summary judgment should be granted against Defendants Town of Cromwell and Mayor Enzo Faienza "because the undisputed evidence demonstrates that Defendants have made statements that indicate a preference, or an intention to make a preference, based on disability in violation of § 3604(c) of the Fair Housing act, 42 U.S.C. § 3601, *et seq.*" Pls.' Mot. Summ. J., ECF No. 76 (Dec. 7, 2018). Plaintiffs submitted a memorandum of law, Pls.' Mem. Summ. J., ECF No. 76-1

(Dec. 7, 2018); a statement of material facts, Pls.' SOMF, ECF No. 75-2 (Dec. 7, 2018); and

seventy exhibits in support of their motion. Plaintiffs' exhibits included depositions of Gilead

leadership, Town of Cromwell officials, Connecticut Department of Public Health officials, and

Town residents; purchase and sale documentation for 5 Reiman Drive; local newspaper articles;

various official documents from the Town and the Connecticut Department of Health; and

communications among and between representatives of Gilead, Town officials, state officials,

and Town residents. *See id.*

On January 18, 2019, Defendants opposed Plaintiffs' motion for partial summary

judgment. Defs.' Opp. Pls.' Mot. Summ. J. ("Defs.' Opp."), ECF No. 84 (Jan. 18, 2019).

Defendants submitted a memorandum of law, Defs.' Mem. Opp. Pls.' Mot. Summ. J. ("Defs.'

Mem. Opp."), ECF No. 84-1 (Jan. 18, 2019); a statement of material facts in opposition to

Plaintiffs' motion, Defs.' Opp. SOMF, ECF No. 84-2 (Jan. 18, 2019), and thirty-one exhibits in

support of its opposition to Plaintiffs' motion.

Many of these same exhibits are exhibits in the parties' motions for summary judgment,

with some additional deposition excerpts. Some of Defendants' additional exhibits included an

affidavit from the police officer who investigated the August 3, 2015 incident, an additional

Town official affidavit, and additional communications between lawyers representing each side

of this lawsuit. *See id.*

On January 18, 2019, Plaintiffs opposed Defendants' motion for summary judgment.

Pls.' Opp. to Defs.' Mot. Summ. J. ("Pls.' Opp."), ECF No. 85 (Jan. 18, 2019). Plaintiffs

submitted a statement of material facts in opposition to Defendants' motion, Pls.' Opp. SOMF,

ECF No. 86 (Jan. 18, 2019), and one hundred and fifteen additional exhibits in support of its

opposition to Defendants' motion.

Many of these same exhibits are in both parties' motions for summary judgment, with some additional deposition excerpts. Plaintiffs' additional exhibits included additional communications among and between Gilead leadership, Town officials, and Town residents; an additional news article; additional documents from Gilead and Fair Housing regarding the 5 Reiman Drive property; a 2013 memo from the Town's attorney and the Town Planner; and a 2009 Connecticut research report. *See id.*

On February 1, 2019, both Plaintiffs and Defendants submitted replies to each other's opposition. Defs.' Reply to Pls.' Opp. Defs.' Mot. Summ. J. ("Defs.' Reply Pls.' Opp."), ECF No. 93 (Feb. 1, 2019); Pls.' Reply to Defs.' Opp. Pls.' Mot. Summ. J. ("Pls.' Reply Defs.' Opp."), ECF No. 95 (Feb. 1, 2019).

On February 26, 2019, the Court granted Plaintiffs' June 22, 2018 motion to amend. Ruling and Order on Mot. to Amend Compl., ECF No. 98. Plaintiffs added a claim that Defendants had retaliated against them for exercising rights protected under the Fair Housing Act, because the Town denied tax exemption status in January 2018 to another Gilead property, even though the Town had previously granted tax exemption applications for the same property. Pls.' Am. Compl., ECF No. 57-1 ¶ 80-81, 114.

On March 25, 2019, Defendants filed an Answer and Affirmative Defenses to the Amended Complaint, denying the new allegations in Plaintiffs' Amended Complaint. Defs.' Ans. Am. Compl., ECF No. 100.

On July 8, 2019, Defendants filed a Supplemental Motion for Summary Judgment as to each and every claim in the Plaintiffs' Amended Complaint. Defs.' Suppl. Mot. Summ. J., ECF No. 110 (July 8, 2019). In support of their motion, Defendants submitted a supplemental statement of material facts, Defs.' Suppl. SOMF, ECF No. 110-2 (July 8, 2019); a supplemental

affidavit from Shawna Baron along with documentation relating to her decision to deny Gilead tax exempt status in January 2018, ECF No. 110-4; and an additional excerpt from Defendants' January 8, 2018 deposition of Shawna Baron, ECF No. 110-3.

On July 29, 2019, Plaintiffs filed a supplemental memorandum in opposition to defendants' motion for summary judgment, Pls.' Suppl. Mem. Opp. Defs.' Suppl. Mot. Summ. J. ("Pls.' Suppl. Mem. Opp."), ECF No. 113 (July 29, 2019); and a supplemental statement of material facts, Pls.' Suppl. SOMF, ECF No. 114 (July 29, 2019). Plaintiffs submitted sixty additional exhibits in support of their opposition to Defendants' supplemental motion for summary judgment. Many of these same exhibits are exhibits in both parties' motions for summary judgment, with some additional deposition excerpts. Plaintiffs' additional exhibits included documentation regarding Gilead's applications for and Shawna Baron's denial of tax exempt status for both 5 Reiman Drive and 461 Main Street; communications between Shawna Baron and Town Manager Salvatore; communications between Shawna Baron and Gilead attorney Beth Critton; and documentation relating to Gilead's appeal of Ms. Baron's decision to deny tax exempt status to both the Connecticut Board of Assessment Appeals and Connecticut Superior Court. *See id.*

On September 26, 2019, the Court heard oral argument on the pending summary judgment motions. Minute Entry, ECF No. 116 (Sept. 26, 2019).

On September 30, 2019, the Court issued a ruling and order denying all pending summary judgment motions. Order, ECF No. 118 (Sept. 30, 2019).

On October 15, 2019, after a telephonic status conference with the parties, Minute Entry, ECF No. 128 (Oct. 15, 2019), the Court *sua sponte* reconsidered and vacated its September 30 ruling in order to issue a new decision more specifically addressing whether two individual

Defendants, Enzo Faienza and Anthony Salvatore, may be liable for compensatory and punitive damages under the Fair Housing Act; and whether the Town of Cromwell may be liable for punitive damages under the Fair Housing Act. Order, ECF No. 129 (Oct. 15, 2019). The Court permitted the parties to

> supplement any briefing already submitted on these issues, including whether (1) Mr. Faienza and Mr. Salvatore may be liable for damages under the Fair Housing Act separate and apart from any alleged damages against the Town of Cromwell, given the Supreme Court's decision in *Meyer v. Holley*, 537 U.S. 280 (2003); and (2) whether the Town of Cromwell may be liable for punitive damages.

*Id.*

On November 1, 2019, the parties submitted supplemental briefing on the scope of damages in response to the Court's October 15, 2019, Order. Defs.' Suppl. Response, ECF No 130 (Nov. 1, 2019); Pls.' Suppl. Response, ECF No 131 (Nov. 1, 2019).

In support of their supplemental response, the Plaintiffs submitted the Town of Cromwell's responses to Gilead's First Set of Interrogatories, Pls.' Suppl. Response Ex. 1, ECF No. 131-1 (Nov. 1, 2019) ("Town's Responses to Pls.' Interrogs."); excerpts of two deposition transcripts, Pls.' Suppl. Response Ex. 2, ECF No. 131-2 (Waters Dep.); Pls.' Suppl. Response Ex. 1, ECF No. 131-3 (Newton Dep.); a letter regarding the appeal of the Cease and Desist Order issued as to Gilead's residence at 9 Elm Road, Pls.' Suppl. Response Ex. 4, ECF No. 131-4 (Letter re: Appeal of Zoning Officer's Notice of Violation and Cease and Desist Order, undated) ("9 Elm Road Letter"); a number of Facebook posts from the "Reiman Strong" Facebook group, Pls.' Suppl. Response Ex. 5, ECF No. 131-5 (Reiman Strong Posts, Mar. 29 through Aug. 31, 2015); and the Town of Cromwell's April 21, 2015 Press Release, Pls.' Suppl. Response Ex. 6, ECF No. 131-6 (Press Release, Apr. 21, 2015).

On November 8, 2019, the parties submitted responses to each other's supplemental briefing. Defs.' Mem. in Opp. to Pls.' Suppl. Briefing, ECF No. 133 (Nov. 8, 2019) ("Defs.' Suppl. Opp."); Pls.' Mem. in Opp. to Defs.' Suppl. Briefing, ECF No. 134 (Nov. 8, 2019) ("Pls.' Suppl. Opp."). In support of their response, Plaintiffs submitted an excerpt of Town Manager Salvatore's deposition transcript, a police incident report, and an e-mail regarding the Cease and Desist issued to Gilead. Pls.' Suppl. Opp. Ex. 1, ECF No. 134-1 (Salvatore Dep.; and Cromwell Police Dep't Case/Incident Report, Aug. 3, 2015) ("Aug. 3, 2015 Police Incident Report"); Pls.' Suppl. Opp. Ex. 2, ECF No. 134-2 (Emails among Kari Olson, Enzo Faienza, and Anthony Salvatore, June 25, 2015).

All three motions for summary judgment are now before the Court. Defs.' Mot. Summ. J., ECF No. 75 (Dec. 7, 2018); Pls.' Mot. Summ. J., ECF No. 76 (Dec. 7, 2018); Defs.' Suppl. Mot. Summ. J., ECF No. 110 (July 8, 2019).

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. The moving party may satisfy this burden by

pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc*., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*.; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment).

The court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). Conclusory allegations or denials will not be credited. *See Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor and the moving party is entitled to judgment as a matter of law, the court will grant the summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587–88 (1986).

## III.    DISCUSSION

This lawsuit involves three separate statutes: the Fair Housing Act, the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Because the parties

essentially agree that the Court's analysis of the Fair Housing Act will inform the subsequent

analysis under these other two claims, the Court will address the Fair Housing Act claim first.

First signed into law in 1968, the 1988 Amendments to the Fair Housing Act "extended

the Fair Housing Act's protections against housing discrimination to disabled individuals."

*Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 52 (2d Cir. 2015). This extension was

"specifically aimed at rejecting '[g]eneralized perceptions about disabilities and unfounded

speculations about threats to safety . . . as grounds to justify exclusion.'" *Id.* at 50-51 (quoting

H.R. Rep. No. 100-711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179).

Several provisions of the Fair Housing Act are at issue: 42 U.S.C. § 3604(c), 42 U.S.C.§

3604(f), and 42 U.S.C. § 3617.

### A.      Fair Housing Act Claims

#### 1.   42 U.S.C. § 3604(c) Claims

Under 42 U.S.C.§ 3604(c) of the Fair Housing Act, it is unlawful

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

As the Second Circuit has made clear, "[n]othing in this language limits the statute's

reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this

language does not provide any specific exemptions or designate persons covered, but rather . . .

applies on its face to anyone who makes prohibited statements." *United States v. Space Hunters*,

429 F.3d 416, 424 (2d Cir. 2005) (internal citations and quotation marks omitted); *see, e.g.,*

*Babul v. Demty Assocs. Ltd. P'ship*, No. 17-cv-5993, 2018 WL 2121556, at *2 (E.D.N.Y. May 8,

2018) (denying a motion to dismiss by defendants who were board members of a housing owners association, stating that "there [wa]s no credible argument that the board's negative response to the proposed sale could not be at least influential, if not dispositive"); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 567 (E.D.N.Y. 2007) (denying summary judgment to landlords in a case involving a § 3604(c) claim).

The Second Circuit has rejected as "too narrow" efforts to limit the statute's reach to "expressions that result in the denial of housing." *Id.* (citing *Space Hunters*, 429 F.3d at 424). As a result, 42 U.S.C.§ 3604(c) of the Fair Housing Act also "protects against the psychic injury caused by discriminatory statements made in connection with the housing market." *Space Hunters*, 429 F.3d at 424 (internal alterations, citations, and quotation marks omitted); *Rodriguez*, 788 F.3d at 52 (affirming the same principle).

In determining whether § 3604(c) has been violated, an "ordinary listener test" is applied. Under this standard, "section 3604(c) can be violated by statements targeted at an individual that convey to an ordinary listener that the individual is disabled." *Rodriguez*, 788 F.3d at 52. As further explained by the Second Circuit in *Rodriguez*: "it is not determinative that the individual being addressed is or is not disabled under the [Fair Housing Act]; what matters is whether the ordinary listener would understand the statements as considering her as such and expressing discrimination or a preference against her on that basis." *Id.* (footnote omitted).

The "ordinary listener" standard "requires a fact intensive, case-by-case inquiry." *Id.* at n.21 (citation omitted). "Factfinders may examine the speaker's intent, not because a lack of design constitutes an affirmative defense to an FHA violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it." *Id.* at 53 (quoting *Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 825 (2d Cir.

1992) (internal alterations omitted)). But "the speaker's subjective belief is not determinative." *Id.* at 53. Instead, "[w]hat matters is whether the challenged statements *convey* a prohibited preference or discrimination to the ordinary listener." *Id.* (emphasis in original).

Both parties seek summary judgment on Plaintiffs' 42 U.S.C.§ 3604(c) claim.

Plaintiffs argue that there is no genuine issue of material fact regarding whether (1) the Defendants made, printed, or published discriminatory statements in connection to the housing market; (2) those statements were made with respect to the sale or rental of a dwelling; and (3) those statements indicated an impermissible preference based on the disability of the intended residents or an actual intention to make such a preference. Pls.' Mem. Summ. J.

In their view, the undisputed evidence shows that Mayor Faienza and the Town of Cromwell made, printed, and caused to be published statements with respect to the sale or rental of the Plaintiffs' Reiman Drive residence that indicated an impermissible preference based on the disability of the intended residents and an actual intention to make such a preference. Pls.' Mem. Summ. J. at 9-15. Specifically, Plaintiffs refer to the press releases issued by the Town of Cromwell relating to 5 Reiman Drive; statements that Mayor Faienza made at the April 20, 2015 forum; statements Mayor Faienza made that were quoted in local newspaper articles; and e-mail messages from the Mayor to community members. *Id.* at 12. In the Plaintiffs' view, under the "ordinary listener" standard, these various statements violate § 3604(c).

Defendants argue that, even if these statements are discriminatory, they were not made "with respect to the sale or rental of a dwelling" and therefore cannot violate § 3604(c). They also argue that Defendants' statements are protected under the First Amendment, and, in any event, did not proximately cause Gilead's decision to leave the home located at 5 Reiman Drive. Defs.' Mem. Opp. at 3. Finally, they argue that Mayor Faienza is entitled to qualified immunity.

31

*Id.* As a result, in the Defendants' view, while summary judgment cannot be granted in Plaintiff's favor, Defendants argue that their constitutional argument as well as their entitlement to qualified immunity makes summary judgment in their favor appropriate on Plaintiffs' § 3604(c) claim.

The Court disagrees with both parties and will deny summary judgment to both on Plaintiffs' § 3604(c) claim.

Significantly, as the Second Circuit has recognized, the application of the ordinary listener standard is "fact intensive" and requires a "case-by-case inquiry." *Rodriguez*, 788 F.3d at 52-53. Indeed, the Second Circuit there quoted from an earlier ruling in a different case referring to the "factfinder." *Id.* (quoting *Soules v. U.S.* 967 F.2d at 825: "Factfinders may examine the speaker's intent, not because a lack of design constitutes an affirmative defense to an FHA violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it." (internal alterations omitted)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (internal citation and quotation marks omitted) (holding that a Court of Appeals should not have overturned a district court decision to submit an Age Discrimination in Employment Act case to a jury). Thus, whether the various statements at issue here—(1) official town press releases, (2) statements made by Mayor Faienza in interviews with local press, (3) verbal statements made by town officials at a public forum at the Town Hall, and (4) e-mail messages from the Mayor to community members—"*convey* a prohibited preference or discrimination to the ordinary listener," *Rodriguez*, 788 F.3d at 53 (emphasis in original), should be determined by the jury.

Plaintiffs point to cases where summary judgment has been granted on a § 3604(c) claim. These cases largely fall into three categories, none of which are applicable here.

First, courts have granted summary judgment in cases where the discriminatory language was enshrined in a statute. *See, e.g., Mont. Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 835, 839 (D. Mont. 2012) (finding that statements in a municipality's ordinance excluding "more than four handicapped people" from definition of household violated § 3604(c)); *Nev. Fair Hous. Ctr., Inc. v. Clark Cty.*, No. 02:05-cv-00948, 2007 WL 610640, at *8-9 (D. Nev. Feb. 23, 2007) (granting summary judgment for plaintiff when defendant's "group home ordinance" implemented spacing requirement that did not apply to similarly-situated non-disabled adults). No such statute, however, is at issue here.

Second, courts have granted summary judgment to plaintiffs on § 3604(c) claims where advertisements indicate to the ordinary reader a preference not to rent to people based on a protected characteristic, including sex and familial status. *See, e.g.*, *Fair Hous. Ctr. of Sw. Mich. v. Hunt*, No. 1:09-cv-593, 2012 WL 11789772, at *22 (W.D. Mich. Mar. 29, 2012) (finding that an ordinary reader would interpret advertisements stating that an apartment complex may decline to rent to a tenant "when more than one person or couple will reside in a unit with only one bedroom . . . as discouraging families from seeking to rent an apartment"); *Jancik v. Dep't of Hous. & Urban Dev.*, 44 F.3d 553, 556 (7th Cir. 1995) (finding that an apartment advertisement stating a preference for a "mature person" violated § 3604(c)). But there is no such advertisement at issue here.

Third, courts have found that statements of landlords or apartment managers provided a basis for liability under § 3604(c) at the summary judgment stage. *See, e.g., Thurmond v. Bowman*, 211 F. Supp. 3d 554, 566 (W.D.N.Y. 2016) (granting summary judgment on a §

3604(c) claim against a property manager based on his statement to the plaintiff that he would "not be able to rent to [her] because of [her] two small children"); *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1201 (D. Colo. 2017) (finding that defendant property owners, "in referring to the [plaintiffs'] 'unique relationship' and their family's 'uniqueness,'" impermissibly relied on sex stereotypes to deny housing to a couple that comprised a transgender woman, a cisgender woman, and their two children, in violation of § 3604(a) and (c)). Those cases, unlike this one, involved statements by individuals who had direct control over the plaintiffs' ability to live in a particular home. Moreover, *Smith* involved uncontroverted facts.

Plaintiffs point to another case where a court granted summary judgment to plaintiffs on a § 3604(c) claim, finding that discriminatory statements made by residents in a letter opposing a group home in their neighborhood violated § 3604(c). *United States v. Scott*, 788 F. Supp. 1555, 1556, 1562-63 (D. Kan. 1992). But this case also involved uncontroverted facts. *Id.* at 1560 ("In responding to the United States' motion for partial summary judgment, the defendants did not challenge the statement of uncontroverted facts presented by the United States.").

In any event, only one of the decisions cited by Plaintiffs is from within the Second Circuit, *Thurmond*, 211 F. Supp. 3d 554, and that decision falls in a category which this Court has already found inapplicable to this case. The finder of fact—in this case, the jury—must determine the facts underlying whether the ordinary listener standard has been satisfied, not this Court. *See Rodriguez*, 788 F.3d at 52.

Accordingly, Plaintiffs' motion for summary judgment on their § 3604(c) claim will be denied.

Defendants' motion for summary judgment on Plaintiffs' § 3604(c) claim also fails, but for different reasons.

First, Defendants' argument that these statements, even if discriminatory, were not made "with respect to the sale or rental of a dwelling" and therefore cannot violate § 3604(c), fails. Section 3604(c) "applies on its face to anyone who makes prohibited statements" and "protect[s] against [the] psychic injury caused by discriminatory statements made in connection with the housing market." *Space Hunters*, 429 F.3d at 424.

As a result—leaving aside for now the issue of whether this determination is quintessentially factual and thus more appropriate for resolution by a jury—Defendants' arguments that the "Town of Cromwell and Mayor Enzo Faienza were not capable of making the [P]laintiff, Gilead, close the group home and sell the property," and that they "did not have any authority to make housing decisions on their own without involving the [T]own council," Defs.' Mem. Opp. at 7, fail. All of the relevant statements as to the § 3604(c) claim were "made in connection with the housing market." For the same reason, Defendants' argument that the Town of Cromwell's and the Mayor's statements cannot be held in violation of § 3604(c) because "the sale of the dwelling in question had already been successfully completed at the time of the [D]efendants' alleged statements" and "the sale of a dwelling was neither occurring nor potentially occurring," Defs.' Opp. at 6, also fails.

And, as suggested above, whether these various statements did actually violate § 3604(c) is an issue to be resolved by a jury, not this Court.

Defendants also argue that Plaintiffs' § 3604(c) claim fails because the First Amendment protects the Defendants' statements. Defs.' Mem. Opp. at 13. They argue that the Defendants "do not surrender all of their First Amendment Rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 14 (quoting *Garcetti v. Ceballos*, 547 U.S.

410, 417 (2006)). Defendants' recitation of the law is right as far as it goes, but the law does not go far enough to vitiate Plaintiffs' claim here.

Significantly, the Supreme Court's decision in *Garcetti* protected the First Amendment rights of public employees to speak out as private citizens, not as public officials exercising their official duties, as the Defendants were here. Indeed, the Supreme Court made clear that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S. at 418 (citations omitted). The Supreme Court then said: "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418-419 (citations omitted). The Supreme Court did not provide a safe harbor for public officials acting as public officials, because "[w]hen they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419.

The Supreme Court in *Garcetti* therefore stated: "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

As a result, the First Amendment is no defense to Plaintiffs' § 3604(c) claim. Of course, to the extent that Mayor Faienza and Town Manager Salvatore are arguing that these statements were not made in the course of their official duties, then that factual issue needs to be resolved by a jury, and not at this stage of the case. *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (internal citation and quotation marks omitted)).

36

Finally, Defendants argue that Mayor Faienza and Town Manager Salvatore are entitled to qualified immunity. Qualified immunity protects public officials from liability for civil damages when either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F. 3d 196, 211 (2d Cir. 2007). Here, Defendants argue that "there was no precedent that was sufficiently clear that every reasonable official would have interpreted it to establish that the statements made in these particular circumstances, involving matters of public concern, would not be protected under the First Amendment." Defs.' Mem. Opp. at 18.

But the law is clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Garcetti*, 547 U.S. at 421. As a result, qualified immunity for the individual Defendants is not appropriate here.

To the extent that Mayor Faienza and Town Manager Salvatore are arguing that they were not making these statements as part of their official duties and there are factual disputes to be resolved, the jury should be given special interrogatories at trial to determine that issue. The Court then can determine whether qualified immunity applies at that time. *See Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories . . . . [Q]uestions as to what situation confronted [the city's corporation counsel], what acts he performed, and his motivation in performing those acts were questions of fact; they were to be– and were–answered by the factfinder." (citations and internal quotation marks omitted)); *Outlaw*

*v. City of Hartford*, 884 F.3d 351, 368 (2d Cir. 2018) ("The jury may be asked to make its findings by answering special interrogatories.").

Accordingly, because there are genuine issues of material fact as to whether Defendants violated § 3604(c) of the Fair Housing Act, the summary judgment motions of both Plaintiffs and Defendants will be denied.

### 2. § 3604(f) Claims

Under 42 U.S.C. § 3604(f) of the Fair Housing Act, it is unlawful

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-- (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of in the provision of services or facilities in connection with such dwelling, because of a handicap of-- (A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person.

42 U.S.C. § 3604(f)(1)-(2).

The phrase "otherwise make unavailable" language in 42 U.S.C. § 3604(f) is a "catchall phrase[ ]" that "look[s] to consequences, not intent," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc. ("Inclusive Communities Project")*, 135 S. Ct. 2507, 2519 (2015), and reaches "a wide variety of discriminatory housing practices," *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016). *See Thurmond*, 211 F. Supp. 3d at 564 (stating that the "otherwise make available" provision "has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds"); *United States v. Youritan Const. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973) (stating that the phrase "otherwise make unavailable" "appears to be as broad as Congress could have made it, and all

practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful"), *aff'd in part, remanded in part on other grounds*, 509 F.2d 623 (9th Cir. 1975).

Courts have found that a defendant "otherwise makes [housing] unavailable" under the Fair Housing Act when the defendant engages in a series of actions that imposes burdens on or constitutes harassment of a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted. For example, in *Housing Rights Center v. Sterling*, the court denied summary judgment to landlord defendants because

> the [c]ourt here cannot hold as a matter of law that the variety of ways in which [d]efendants catered to Korean tenants, coupled with [d]efendants' discriminatory statements [against tenants of other racial and ethnic backgrounds], taken as a whole, did not create a hostile environment sufficient to make [plaintiff's] apartment effectively unavailable to him.

404 F. Supp. 2d 1179, 1192 (C.D. Cal. 2004); *see also Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013) (stating that "by imposing more burdensome application procedures and generally discouraging the . . . application" of a woman and her brother who lived with autism, the landlord defendant "'otherwise ma[de] [the property] unavailable' to the [applicants] because of a disability, in violation of § 3604(f)(1) . . . ." (citing *Youritan*, 370 F. Supp. at 648)); *United States v. Hadlock*, No. CV 08-3074-CL, 2010 WL 331772, at *7 (D. Or. Jan. 27, 2010) (granting plaintiffs' summary judgment motion because, given evidence that the defendant landlord had "made statements to discourage families from renting. . . . no reasonable juror could find in favor of [d]efendant").

In *Youritan Construction Co.*, "delaying tactics" and "various forms of discouragement" on the part of resident managers, rental agents, top management, and owners "otherwise made housing unavailable" under § 3604(a) of the Fair Housing Act. 370 F. Supp at 648 (internal

citations omitted). Indeed, the failure of top management and owners "to set forth objective and reviewable procedures for apartment application and rental" amounted to discouragement and delay in violation of § 3604(a). *Id.*; *see also Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974) (stating that § 3604 "prohibit[s] all forms of discrimination, sophisticated as well as simpleminded . . . and tactics of delay, hindrance, and special treatment must receiv e short shrift from the courts").

Significantly, the Fair Housing Act's scope extends beyond private actors and reaches governmental actors, including municipal officials. In *South Middlesex Opportunity Council, Inc. v. Town of Framingham*, two organizations that operated residential substance abuse treatment programs in Massachusetts sued the Town of Framingham in addition to several Town officials and residents for violating 42 U.S.C. § 3604(f)(1) and § 3617. 752 F. Supp. 2d 85, 95 (D. Mass. 2010). In that case, three residences operated by the plaintiffs were at issue. *Id.* at 91.

In *South Middlesex Opportunity Council*, the Town allegedly made housing unavailable to intended residents based on their disability (substance use) by delaying or blocking various license and zoning applications, passing a new law that subjected the plaintiffs to a new review process with the goal of deterring plaintiffs from operating their residential programs, and otherwise treating the plaintiffs differently from other similarly situated organizations/individuals based on the disabilities of the plaintiffs' clients. *Id.* at 97-103. The court stated that "[d]iscrimination under the FHA . . . includes delays in issuing permits that are caused in part by discriminatory intent, even if the permits are ultimately granted." *Id.* at 97.

Under 42 U.S.C. § 3604(f), proof of discrimination can be established "by showing that animus against the protected group 'was a significant factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly

responsive." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (quoting *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir. 1987)). As a result, discriminatory intent may be inferred from the totality of the circumstances, including

> the historical background of the decision . . . ; the specific sequence of events leading up to the challenged decision, . . . ; contemporary statements by members of the decisionmaking body . . . ; . . . and substantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

*Id.* at 425 (quoting *Yonkers*, 837 F.2d at 1221 (internal citations and quotation marks omitted)).

Indeed, "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 243 (S.D.N.Y. 1996) ("[I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."), *aff'd by* 117 F.3d 37, 49 (2d Cir. 1997); *see also United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974) (finding, in the Title VII context, that racist statements by "leaders of the incorporation movement" and the fact that "[r]acial criticism [of a racially integrated housing development] was made and cheered at public meetings" could be considered evidence that the municipality acted with improper purpose).

Defendants seek summary judgment on Plaintiffs' § 3604(f) claim on several grounds.

Defendants first argue that Plaintiffs' § 3604(f) claim is not ripe because Plaintiffs never sought a zoning permit or reasonable accommodation on zoning regulations, thus never providing Defendants an opportunity to accommodate them. Defs.' Mem. Summ. J. at 3-4.

Next, Defendants claim that there is no genuine issue of material fact which would permit a reasonable jury to find that the Defendants made housing unavailable based on the disability of the intended residents at 5 Reiman Drive. Defs.' Mem. Summ. J. at 4-16.

Defendants also argue that, under the *Noerr-Pennington* doctrine, the Town of Cromwell's petition to the Connecticut Department of Public Health constitutes speech and an effort to influence governmental activity and therefore cannot "be the basis of legal penalties" or used as evidence that Defendants acted to make housing unavailable to individuals with disabilities in violation of § 3604(f). Defs.' Mem. Summ. J. at 9.

Defendants' first two arguments raise distinctions without a real difference. Both are arguments that Plaintiffs have failed to demonstrate unavailability within the meaning of § 3604(f) of the Fair Housing Act.[1] Their very limited reading of the Fair Housing Act's scope fares no better under § 3604(f) than it did with § 3604(c). Defendants' efforts to narrow the scope of § 3604(f) to an express denial of a housing opportunity or the unavailability of a specific housing opportunity are just not sustainable.

---

[1]     Defendants' ripeness argument is also based on their reading of a portion of a Second Circuit decision: "To prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question . . . ." *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578-79 (2d Cir. 2003) *superseded by regulation on other grounds as stated in Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016).

But their argument ignores that "[p]laintiffs who allege violations under the [Americans with Disabilities Act ("ADA")], the Fair Housing Act, and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation." *Reg'l Econ. Cmty. Action Prog., Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48 (2d Cir. 2002); *see also Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (noting the possible application of these three theories under the ADA and the Rehabilitation Act); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996) (stating that Fair Housing Act permits all three theories). Under Plaintiffs' legal theory—disparate treatment—Plaintiffs did not have to request an accommodation for the Town to deny in order to make a claim under the Fair Housing Act. Plaintiffs' claims under the Fair Housing Act therefore are ripe. *See Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 522 (W.D. Pa. 2007) (rejecting defendants' ripeness claim in a similar Fair Housing Act case because the plaintiffs' case was, at its core, a challenge to the very process to which defendants claimed plaintiffs needed to submit); *cf. RECAP*, 294 F.3d at 48-53 (finding that plaintiffs had raised a triable issue of fact under disparate treatment theory even though they had not stated a claim under reasonable accommodation theory).

Plaintiffs have submitted considerable evidence on which a reasonable jury could find that Defendants' discriminatory intent was at least a motivating factor behind their actions that made housing unavailable, based on the disability of intended residents. In addition to the press releases,[2] the Town of Cromwell's petition to the Connecticut Department of Public Health,[3] and the Town of Cromwell's July 2, 2015 Cease & Desist Order,[4] there is record evidence, including e-mails and deposition testimony, regarding the response of Town officials to community opposition to the Reiman Drive residence, based on the disabilities of its intended residents.[5]

Based on this record, a reasonable jury could find that the Defendants acted with discriminatory intent towards individuals with disabilities, because "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys.*, 931 F. Supp. at 243 ("[I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."), *aff'd by* 117 F.3d 37, 49 (2d Cir. 1997); *cf. City of Black Jack*, 508 F.2d at 1185 n.3 (racist statements by "leaders of the

---

[2] Pls.' Opp. SOMF Ex. 28, ECF No. 86-28 (Press Release: "Gilead Group Home," Town of Cromwell (Apr. 20, 2015)); Pls.' SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)); Pls.' SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015); Pls.' SOMF Ex. 65, 77-65 (Press Release, Town of Cromwell, "Closure of Home" (Aug. 31, 2015)).

[3] Defs.' SOMF Ex. L-3, ECF No. 75-34 (Anthony Salvatore and Kari Olson, Town of Cromwell, *Petition to Deny Proposed Community Residence* (May 6, 2015)).

[4] Pls.' SOMF Ex. 44, ECF No. 77-44 (Reiman Drive Cease & Desist Order (July 1, 2015)).

[5] *See, e.g.*, Pls.' SOMF Ex. 17, ECF No. 77-17 (E-mails between Enzo Faienza/Re Matus re: "Reiman Road Residents" (Mar. 30, 2015)); Pls.' SOMF Ex. 20, ECF No. 77-20 (E-mails between Rob Latulippe and Enzo Faienza re: "Fwd: Group Home" (Apr. 21, 2015)); Pls.' SOMF Ex. 68, ECF No. 77-68 (E-mails between Larry Callahan and Enzo Faienza re: "Thank you from Reiman Drive" (Sept. 3, 2015)); Pls.' SOMF Ex. 19, ECF No. 77-19 (Latulippe Dep. at 78:16-25); Pls.' SOMF Ex. 18, ECF No. 77-18 (Uccello Dep. at 122:9-18); Pls.' SOMF Ex. 15, ECF No. 77-15 (Matus Dep. at 22:6-23:13, 27:16-28:22, 33:14-24); Pls.' SOMF Ex. 16, ECF No. 77-16 (Terry Dep. at 23:24-24:7).

incorporation movement" and fact that "[r]acial criticism was made and cheered at public meetings" could be considered evidence of improper purpose).

Defendants' *Noerr-Pennington* doctrine argument also fails for several reasons.

First, the Seventh Circuit decision on which Defendants principally rely for the proposition that their petition to the DPH constitutes protected speech—*Tri-Corp. Hous. Inc v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016)—even if instructive, is not binding on this Court. *Cf. Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir. 1993) ("If a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job.") (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987)).

Second, the Seventh Circuit's decision only recognized that the *Noerr-Pennington* doctrine shields the specific speech and efforts taken by "officials of one governmental body tr[ying] to persuade officials of a different public body to act in a particular way." *Tri-Corp. Hous. Inc.*, 826 F.3d at 450 (citing *New West, L/P. v. Joliet*, 491 F.3d 717, 722 (7th Cir. 2007)). The Seventh Circuit did not hold that the *Noerr-Pennington* doctrine shielded speech or related actions taken by governmental officials that were not specifically taken to influence the actions of another governmental body. Thus, even if this Court found the doctrine applicable here, it would only eliminate as a basis for liability the Town of Cromwell's petition to the Connecticut Department of Public Health to deny Gilead a license and the petition to reconsider their decision not to take action against Gilead; but it would allow Plaintiffs' claims to go forward with the rest of the record evidence here in support of their claims.

Third, and in any event, even if the Defendants could not be liable for their petitions to the Connecticut Department of Public Health, these actions could still be considered as evidence

of their intent to discriminate more generally. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (stating that "contemporary statements by members of the decisionmaking body" are "highly relevant" to determining whether discriminatory intent existed); *Pathways Psychosocial v. Town of Leonardtown, MD.*, 223 F. Supp. 2d 699, 710 (D. Md. 2002) ("[The council member] has a right not to be held liable for his speech, but is not free from having his speech be considered as evidence of his actions; here as evidence of his intent in casting the vote against the council's resolution. Accordingly, it was not error for the court to deny Defendants' proposed First Amendment instruction.").

Indeed, in *South Middlesex Opportunity Council*, the court rejected a similar First Amendment defense. 752 F. Supp. 2d 85. "First of all," the court reasoned, "the focus of the evidence presented for summary judgment purposes is on those actions taken by individuals while acting as government officials of the Planning Board, Board of Selectmen, and Town Meeting—not action taken as private citizens." *Id.* at 112. Here, as in *South Middlesex Opportunity Council*, much of the evidence presented is in the form of official Town statements and statements made by Town Officials in their official capacities.

Additionally, the *South Middlesex Opportunity Council* court stated that

> [While i]t is true that public employees do not check all of their First Amendment Rights at the door upon accepting public employment. . . . the [p]laintiffs' evidence suggests that the [d]efendants used their positions of authority to manipulate the treatment of [plaintiffs'] permit applications. . . .
>
> [T]he First Amendment does not shield the Defendants' conduct here [because] the FHA allegations do not involve expressions of opinion or the petition of local government, but rather the manipulation of procedural devices in order to target SMOC's residents for discriminatory treatment.

*Id.* at 113 (internal citations and quotation marks omitted).

Notably, even the Seventh Circuit's decision in *Tri-Corp. Housing Inc.* recognized that the *Noerr-Pennington* doctrine provides no safe harbor if "the proposal to the governmental body is a sham and the speech itself imposes costs independent of what the governmental body does." 826 F.3d at 450; *see also S. Middlesex Opportunity Council*, 752 F. Supp. 2d at 113 ("[E]ven if the conduct alleged here qualified as a form of petitioning, the *Noerr-Pennington* doctrine would not protect the activity if it were conducted with fraudulent or unlawful purposes" (citing *Wright v. DeArmond*, 977 F.2d 339, 347 (7th Cir. 1992) (internal quotation marks omitted)); "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' . . . which the legislature has the power to control. . . . First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute" (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972))).

As in *South Middlesex Opportunity Council*, a reasonable jury in this case could conclude that Defendants' statements were not merely political speech but were rather part of a concerted campaign intended to use various municipal tools (including calling a special executive session of the Town Council to address "concerns regarding th[e] group home,"[6] a Cease & Desist Order,[7] Town press releases articulating the Town's position in opposition to the Reiman Drive residence,[8] tax exemption denials,[9] a petition attempting to influence the Connecticut

---

[6] *See* Pls.' SOMF Ex. 37, ECF No. 77-37 (E-mails between Rob Latulippe and Enzo Faienza re: "Fwd: Safeguards" (May 4, 2015)).

[7] Pls.' SOMF Ex. 44, ECF No. 77-44 (Reiman Drive Cease & Desist Order (July 1, 2015)).

[8] Pls.' SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)); Pls.' SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015).

[9] Pls.' SOMF Ex. 52, ECF No. 77-52 (Letter from Shawna Baron to Kathy Townsend, re: "Property Tax Exemption Application" (Aug. 7, 2015)); Pls.' Suppl. SOMF Ex. 42, ECF No. 114-42 (Gilead Tax Exemption App. (submitted Oct. 30, 2017; denied Jan. 2, 2018)).

Department of Public Health to use its tools to exclude Gilead from the Reiman drive residence,[10] and an appeal of the Department's decision not to take action against Gilead[11]) to force Gilead and its clients to leave the Reiman Drive residence. Thus, even if the *Noerr-Pennington* doctrine has some applicability to this case, it is not a matter that can or should be decided at the summary judgment stage. *Cf. Reeves*, 530 U.S. at 153 (finding that the district court was correct to send the question of whether a defendant employer's explanation for firing the plaintiff employee was pretext for discrimination to a jury).

Accordingly, for all of these reasons, Defendants' motion for summary judgment on Plaintiffs' § 3604(f) claim will be denied.

### 3. 42 U.S.C. § 3617 Claims

42 U.S.C. § 3617 provides as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the Fair Housing Act].

42 U.S.C. § 3617.

To establish a prima facie case under § 3617, Plaintiffs must show (1) that they were "engaged in a protected activity;" (2) "that [Defendants were] aware of this activity;" (3) "that [Defendants] took adverse action against the [P]laintiff;" and (4) that "a causal connection exists between the protected activity and the adverse action." *Joseph's House and Shelter, Inc. v. City of Troy*, 641 F. Supp. 2d 154, 158 (N.D.N.Y. 2009) (quoting *RECAP*, 294 F.3d at 53-54).

---

[10] Defs.' SOMF ¶ 24; Defs.' SOMF Ex. L-3, ECF No. 75-36 (Anthony Salvatore and Kari Olson, Town of Cromwell, *Petition to Deny Proposed Community Residence* (May 6, 2015)).

[11] Pls.' SOMF Ex. 43, ECF No. 77-43 (Town Mot. to Reconsider Petition (June 29, 2015)).

The Second Circuit has permitted a § 3617 claim to proceed where a municipality withdrew plaintiff's funding for another project, after the plaintiff filed a fair housing complaint against the municipality. *See RECAP*, 294 F.3d at 35, 54 ("RECAP suffered an adverse action [under § 3617] in losing funding that had been committed to it . . ."). A variety of housing-related activities also have constituted viable claims under § 3617, including attempted evictions, *Robbins v. Conn. Inst. for the Blind*, No. 3:10-cv-1712 (JBA), 2012 WL 3940133, at *7 (D. Conn. Sept. 10, 2012)); manipulation of municipal processes to delay plaintiffs' ability to obtain needed permits*, S. Middlesex Opportunity Council*, 752 F. Supp. 2d at 85; and discriminatory application of zoning laws, *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1197 (D. Conn. 1992). Additionally, as some courts have held, "[i]t is sufficient to state that 'interference' under [§ 3617] can encompass a 'pattern of harassment, invidiously motivated.'" *S. Middlesex Opportunity Council*, 752 F. Supp. 2d at 85, 104 (quoting *Halprin v. Prairie Single Family Homes*, 388 F. 3d 327, 330 (7th Cir. 2004)).

Additionally, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *RECAP*, 294 F.3d at 54 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).

Defendants do not dispute the first two elements of Plaintiffs' § 3617 claim. Rather, they argue that they are entitled to summary judgment on this claim because (a) "[t]here is no evidence that that the Defendants were motivated by an intent to discriminate or that they coerced, threatened, intimidated, or interfered with Gilead on account of activity protected by the

48

Fair Housing Act," Defs.' Mem. Summ. J. at 26; and (b) "the Defendants' actions were not the proximate cause of the closure of the program," *id.* at 30.

Plaintiffs argue that the evidence in the record could permit a reasonable jury to find that Defendants were motived by an intent to discriminate and that they "coerced, threatened, intimidated, or interfered" with Gilead based on activity protected by the Fair Housing Act. Pls.' Mem. Opp. at 20-24. Plaintiffs argue further that evidence exists in the record that could enable a reasonable jury to find that Defendants proximately caused Gilead's injuries. *Id.* at 24-26.

The Court agrees.

There is more than enough evidence for a reasonable jury to find that Defendants have taken adverse actions in the form of holding and publicizing a public forum with the intent of amplifying community opposition to the Reiman Drive residence,[12] promoting opposition by publishing statements and giving interviews expressing a preference that Gilead leave,[13] pursuing a petition to the Connecticut Department of Public Health in order to deny Gilead a license,[14]

---

[12] *See, e.g.*, Pls.' SOMF Ex. 21, ECF No. 77-21 (Press Release, Town of Cromwell, (Apr. 20, 2015)); Pls.' SOMF Ex. 7, ECF No. 77-7 (Faienza Dep. at 96:8-17); Pls.' SOMF Ex. 15, ECF No. 77-15 (Matus Dep. at 58:7-15); Pls.' SOMF Ex. 4, ECF No. 77-4 (Osborne Dep. at 255:11-17).

[13] *See, e.g.*, Pls.' SOMF Ex. 28, ECF No. 77-28 (Press Release, Town of Cromwell (Apr. 21, 2015)); Pls.' SOMF Ex. 30, ECF No. 77-30 (Jeff Mill, *Cromwell Citizens, Officials Adamantly Object to Group Home*, Middletown Press (Apr. 21, 2015)); Pls.' SOMF Ex. 34, ECF No. 77-34 (Jeff Mill, *Officials Fear Men's Transitional Home Will Affect Cromwell Families*, Middletown Press (Apr. 22, 2015)); Pls.' SOMF Ex. 4, ECF No. 77-4 (Osborne Dep. at 116:9-117:7); Pls.' SOMF Ex. 7, ECF No. 77-7 (Faienza Dep. at 167:11-17, 163:4-23, 164:15-17); SOMF Ex. 8, ECF No. 77-8 (Salvatore Dep. at 102:11-18).

[14] *See, e.g.*, Pls.' SOMF Ex. 39, ECF No. 77-39 (Press Release, Town of Cromwell (May 13, 2015)); Pls.' SOMF Ex. 40, ECF No. 77-40 (*Cromwell Petitions State about Gilead Group Home Location*, Middletown Press (May 14, 2015)); Pls.' SOMF Ex. 41, ECF No. 77-41 (E-mails between Rob Latulippe and Enzo Faienza re: "Fwd: Group Home Update" (May 15, 2015)); Pls.' Opp. SOMF Ex. 61, ECF No. 86-61 (June 22, 2015 Olson Memo).

issuing a Cease & Desist order regarding the property,[15] and denying tax exempt status to 5 Reiman Drive, despite having granted tax exempt status to similarly situated properties before.[16]

Additionally, and as already discussed with respect to the other Fair Housing Act claims above, a genuine issue of material fact exists as to whether the Defendants' actions caused Plaintiffs' injuries: Gilead's having to close its program at 5 Reiman Drive and to sell the house at a loss, as well as the damage to Gilead's reputation and to the livelihood of Gilead's clients; and the Connecticut Fair Housing Center's having to expend additional resources to re-educate the public and policymakers about housing discrimination against individuals with disabilities as a result of the Town of Cromwell's opposition to Gilead's operation of a program at 5 Reiman Drive. Plaintiffs also have present evidence creating a genuine issue of material fact regarding whether the Town of Cromwell retaliated against them for filing this lawsuit to enforce their rights under the Fair Housing Act, by denying tax exempt status to a property that had previously been granted tax exempt status.[17]

Finally, to the extent that Defendants argue that qualified immunity should apply, this argument fails, too.

Qualified immunity protects public officials from liability for civil damages when either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively

---

[15] *See, e.g.*, Pls.' Opp. SOMF Ex. 76, ECF No. 86-76 (E-mails among Kari Olson, Enzo Faienza, Anthony Salvatore, Re Matus re: "RE: Remain [sic] Dr." (June 25, 2015, 1:28pm)); Pls.' SOMF Ex. 45, ECF No. 77-45 (Massey Dep.).

[16] *See, e.g.*, Pls.' Suppl. SOMF Ex. 38, ECF No. 114-38 (E-mails between Shawna Baron and Anthony Salvatore re: "Group home" (July 14, 2015)); Pls.' Suppl. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow Housing Corp. (July 14, 2009, and June 13, 2013)); Pls.' Suppl. SOMF Ex. 24, ECF No. 114-24 (Baron Dep. at 9:13-16, 33:22-34:2, 58:2-5).

[17] *See, e.g.*, Pls.' Suppl. SOMF Ex. 38, ECF No. 114-38 (E-mails between Shawna Baron and Anthony Salvatore re: "Group home" (July 14, 2015)); Pls.' Suppl. SOMF Ex. 22; ECF No. 114-22 (Letters from Shawna Baron to Rainbow Housing Corp. (July 14, 2009, and June 13, 2013)); Pls.' Suppl. SOMF Ex. 24, ECF No. 114-24 (Baron Dep. at 9:13-16, 33:22-34:2, 58:2-5).

reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F. 3d 196, 211 (2d Cir. 2007).

While the Supreme Court has held that "the clearly established right must be defined with specificity," *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019), it is unnecessary for "the very action in question [to have] previously been held unlawful" in order to find a right clearly established. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741.[18]

Years ago, the Supreme Court held that "negative attitudes[ ] or fear . . . are not permissible bases for treating a home for [individuals with intellectual disabilities] differently from apartment houses, multiple dwellings, and the like. . . . [T]he City may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Pathways Psychosocial*, 223 F. Supp. 2d at 714 ("Under *Cleburne*, it was clearly established [by] 1997 that it is a violation of equal protection for government officials to take action against people with disabilities based on prejudice that the citizenry may harbor against them."). More recently, the Second Circuit held that plaintiffs presented evidence allowing a reasonable jury to find that the City of Middletown, Connecticut, and its officials violated the Fair Housing Act by denying a special use permit for residences intended to house people with

---

[18] The Supreme Court noted in *Emmons* that specificity as to a clearly established right "is particularly important in excessive force cases" under the Fourth Amendment, where "it is sometimes difficult for an officer to determine" how to apply legal doctrine regarding excessive force in specific factual circumstances. *Emmons*, 139 S. Ct. at 503 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). Yet, even in excessive force cases (which this is not), "there does not have to be a case directly on point." *Id.* at 504 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

disabilities (substance use recovery). *RECAP*, 294 F.3d at 48-52. The evidence in *RECAP*

revolved around numerous statements by city officials, including the mayor, opposing the

property because of the special needs of its intended residents and assumptions about those

individuals based on their disability. *Id.* at 50 (the mayor stating, "[A]t some point we have tried

to say to the different not for profit agencies that in regards to housing enough is enough. . . . I

told [the head of RECAP] . . . that he would have trouble getting that type of project through the

City; that this City has done more than its share;" another official stating that "the City had no

guarantee that 'these people [RECAP's clients] would or would not have criminal histories. . . .

[T]here seems to be a tremendous over-concentration of these types of facilities [i.e., halfway

houses] in this City.'").

      As to whether it was objectively reasonable for the Defendants to believe that their

actions did not violate the law, a genuine issue of material fact exists. And "[w]hile the qualified

immunity inquiry is generally an objective one, 'a defendant's subjective intent is indeed

relevant . . . . Where a factual issue exists on the issue of motive or intent, a defendant's motion

for summary judgment on the basis of qualified immunity must fail.'" *Hous. Works, Inc. v.

Turner*, No. 00CIV.1122 (LAK) (JCF), 2004 WL 2101900, at *26 (S.D.N.Y. Sept. 15, 2004)

(quoting *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003), *report and recommendation

adopted as modified*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005)). As the Second Circuit has stated:

"Indeed, it is difficult for us to see how conduct that is irrational (if so found by a jury) could

nevertheless be objectively reasonable." *Cobb v. Pozzi*, 363 F.3d 89, 112 (2d Cir. 2004).

      Because an unresolved factual dispute exists as to the Defendants' subjective intent, the

jury should be given special interrogatories. *See Lore*, 670 F.3d at 162 ("[Q]uestions as to what

situation confronted [the city's corporation counsel], what acts he performed, and his motivation

in performing those acts were questions of fact; they were to be–and were–answered by the factfinder." (citations and internal quotation marks omitted)); *Outlaw*, 884 F.3d 351, 368 (2d Cir. 2018) ("The jury may be asked to make its findings by answering special interrogatories.").

Once the jury determines factual issues regarding the Defendants' intent, this Court will determine the legal question of whether the individual Defendants are entitled to qualified immunity. *See Lore*, 670 F.3d at 162 ("[A]lthough the district court properly put the fact questions to the jury, it erred in having the jury decide the ultimate legal question, in light of the facts established, of whether [the official], in his personal capacity, was entitled to qualified immunity. That legal question should have been answered by the court.").

The Court therefore will not dismiss Plaintiffs' claims against the Defendants based on qualified immunity—at least not at this time.

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' § 3617 claim therefore will be denied.

### 4. Damages under the Fair Housing Act

The Fair Housing Act provides that "if [a] court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages" and "may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order." 42 U.S.C. § 3613(c).

In order to clarify the scope of this litigation, at the Court's request, the parties submitted supplemental briefing on two issues:

> whether (1) Mr. Faienza and Mr. Salvatore may be liable for damages under the Fair Housing Act separate and apart from any alleged damages against the Town of Cromwell, given the Supreme Court's decision in *Meyer v. Holley*, 537 U.S. 280 (2003); and (2) whether the Town of Cromwell may be liable for punitive damages.

Order, ECF No. 129 (Oct. 15, 2019).

Compensatory Damages

Defendants argue that the Town of Cromwell cannot be held vicariously liable for the acts of individual employees and therefore should not be liable for compensatory damages. Defs.' Suppl. Mem. at 7 (citing *Meyer*, 537 U.S. 280; *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978)). Defendants also argue that compensatory damages should not be available against the individual Defendants because they are entitled to qualified immunity. *Id.* at 4-6.

Plaintiffs argue that "each Defendant—the Town, Mayor Faienza, and Town Manager Salvatore—faces independent exposure on account of their own discriminatory actions against Plaintiffs." Pls.' Suppl. Mem. at 2 (citing *RECAP*, 294 F.3d at 53-54 (proper to sue city and individual Town officials and employees who took discriminatory actions)).[19] "In addition to holding the municipality accountable," Plaintiffs argue, "a plaintiff may also seek redress from individual defendants for actions they took in violation of the FHA. This is true even if the principal's liability is based purely on a theory of vicarious liability." *Id.* at 4. Plaintiffs contend that because they "have produced substantial evidence that Mayor Faienza and Town Manager Salvatore engaged in affirmative acts of discrimination against Gilead," a "jury could easily find that the Individual Defendants took those actions for discriminatory reasons," and therefore both Mayor Faienza and Town Manager Salvatore face exposure to damages as individuals. *Id.*

The Court agrees.

_____

[19] Because the Plaintiffs have not indicated, either before or after the Court requested supplemental briefing on damages, that they are seeking damages against Ms. Massey, the Court assumes that they are not.

The Supreme Court in *Meyer* recognized that corporations are liable under traditional vicarious liability principles for their employees' conduct which violates the Fair Housing Act. *Meyer*, 537 U.S. at 282 ("We conclude that the [Fair Housing] Act imposes liability without fault upon the employer in accordance with traditional agency principles."). The Court held further that individual officers or owners of the corporation are generally not vicariously liable for the illegal conduct of the corporation's employees.[20] *Meyer*, 537 U.S. at 286 ("[I]n the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." (internal citations omitted)).

*Meyer* did not, however, hold that the vicarious liability of the employer precludes damages liability against the employees whose conduct gives rise to that vicarious liability. Indeed, *Meyer* itself involved both the individual employee whose conduct gave rise to Fair Housing Act claims and the vicariously liable corporation as defendants. *Meyer*, 537 U.S. at 283 ("The Holleys brought a lawsuit in federal court against [Grove] Crank[, a salesman] and Triad[, the real estate corporation that employed Mr. Crank]. They claimed, among other things, that both were responsible for a fair housing law violation. The Holleys later filed a separate suit against David Meyer, the petitioner here. Meyer, they said, was Triad's president, Triad's sole shareholder, and Triad's licensed "officer/broker."); *Holley v. Crank*, 2:97-cv-8368 (DT) (SH), Notice of Appeal, ECF No. 101 at 11 (C.D. Cal. Aug. 25, 1999) (plaintiffs claiming that Mr.

---

[20] Defendants argue that the individual Defendants cannot be held liable for the conduct of other Town employees under *Meyer*. Defs. Suppl. Mem. at 3. Plaintiffs, however, have clarified that they "do not claim that the Town's actions are imputed to the Individual Defendants, or that the Individual Defendants participated in each Town action. Rather, Plaintiffs seek to hold the Individual Defendants [directly] accountable for the affirmative acts of discrimination that they themselves engaged in." Pls. Suppl. Mem. at 4. Thus, *Meyer*'s holding that owners or officers are not normally vicariously liable for other employees' Fair Housing Act violations is not applicable here.

"Crank's discriminatory acts are imputed to Triad"). The Supreme Court found that the Fair Housing Act did not permit Mr. Meyer to be held liable without fault for Mr. Crank's actions; but this holding did not address whether the plaintiffs could pursue claims against Mr. Crank, in addition to Triad, based on vicarious liability for Mr. Crank's actions.

As Plaintiffs point out, "[i]n multi-defendant FHA cases involving vicarious liability, joint liability attaches to co-defendants." Pls.' Suppl. Mem. at 6 (citing *United States v. Hylton*, 944 F. Supp. 2d 176, 192 (D. Conn. 2013) (citing *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1094, 1098 (7th Cir. 1992) (finding the agents and the principal jointly liable for agents' discrimination))), *aff'd*, 590 F. App'x 13 (2d Cir. 2014); *Whyte v. Alston Mgmt., Inc.,* No. 10-81041-CIV, 2012 WL 11789773, at *1–2 (S.D. Fla. Apr. 11, 2012) (citing cases). In these cases—decided after *Meyer*—claims have proceeded against individual defendants along with their vicariously liable employers. *See, e.g.*, *Space Hunters*, 429 F.3d at 420 n.2, 427–28 (affirming a district court's decision finding principal and agent both liable under vicarious liability theory, noting: "At his deposition, [the individual defendant] admitted that he was the individual at Space Hunters who spoke with the HUD investigator. In fact, McDermott is the sole employee of Space Hunters and has never denied that he was the Space Hunters representative on all the telephone calls at issue in this case.") Moreover, Defendants' contention that public entities cannot be held vicariously liable for the acts of individual employees belies the fact that courts have permitted Fair Housing Act claims for damages against municipalities based on vicarious liability for public officials' conduct. *See, e.g.*, *S. Middlesex Opportunity Council*, 752 F. Supp. 2d 85 (permitting the same claims to continue against both the Town of Framingham and city officials).

Plaintiffs also argue that while individual defendants may be sued in addition to an employer even where the employer's liability is based on the individual defendants' conduct, any compensatory damages liability here will be shared jointly among the individual Defendants and the Town. Pls.' Suppl. Mem. at 7. "The jury will . . . be asked to award an amount of damages that make each Plaintiff whole, and Defendants will be held jointly liable for those amounts." *Id.* Additionally, Plaintiffs argue that "the defendant who pays the judgment has a right to pursue contribution from the other defendants, but determining that allocation would not be the province of this Court." *Id.* at 7 n.5 (citing Restatement (Second) of Torts § 886A (1979)). Defendants do not contest—or address at all—this argument. Instead, they argue that the individual Defendants are shielded from compensatory damages by qualified immunity. Defs.' Suppl Mem. at 4-7; Defs.' Suppl. Response at 3-7.

The Court agrees with Plaintiffs.

In general, plaintiffs are not entitled to double recovery of compensatory damages for the same injuries. *See Meyer*, 537 U.S. at 285 ("[A]n action brought for compensation by a victim of housing discrimination is, in effect, a tort action. . . . And the Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related . . . rules and consequently intends its legislation to incorporate those rules." (citing *Curtis v. Loether*, 415 U.S. 189, 195-196 (1974))); *Restivo v. Hessemann*, 846 F.3d 547, 584 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 644 (2018) (where the amount lost by plaintiffs is clear and quantifiable, "federal common law barring double recovery . . . ensure[s] that the victim does not receive more than he or she lost"); *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004) ("At common law, joint and several liability does not permit double recovery," unless a statute explicitly abrogates the common law rule.); *Simuro v. Shedd*, No. 2:13-cv-00030, 2017 WL

57

3720766, at *8 (D. Vt. June 19, 2017) ("Th[e double recovery] rule clearly applies where the concern over double recovery centers on compensatory damages, which are intended to make a plaintiff whole for the injury he suffered." (citing *Ostano Commerzanstalt v. Telewide Sys.*, 880 F.2d 642, 649 (2d Cir. 1989)); *Parris v. Pappas*, 844 F. Supp. 2d 271, 285 (D. Conn. 2012) (finding that a plaintiff could not recover compensatory damages under both the Fair Housing Act and CUTPA for the same injuries).

Because Plaintiffs raise claims against Mayor Faienza and Town Manager Salvatore based on their individual conduct, and because the Court has found, *supra*, that they are not entitled to qualified immunity at the summary judgment stage, Mayor Faienza and Town Manager Salvatore face exposure for liability.

<u>Punitive Damages</u>

*Punitive Damages Against the Individual Defendants*

The Fair Housing Act provides that "if [a] court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages." 42 U.S.C. § 3613(c). Punitive damages are available in Fair Housing Act cases where a factfinder concludes that a defendant "has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Space Hunters*, 429 F.3d at 427 (internal quotations omitted); *see also Cameron v. City of N.Y.*, 598 F.3d 50, 69 (2d Cir. 2010) (finding, in a Section 1983 case, that the district court erred in not "instruct[ing] the jury that it could consider awarding punitive damages" where the plaintiffs had produced enough evidence "to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference. . . ." (quoting *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d

101, 122 (2d Cir. 2006))). Punitive damages are routinely assessed against individual defendants under the Fair Housing Act. *See, e.g.*, *Space Hunters*, 429 F.3d at 427 (finding error when district court failed to submit punitive damages question to jury); *see also Parris v. Pappas,* 844 F. Supp. 2d 271, 283 (D. Conn. 2012) (in disability discrimination Fair Housing Act case, awarding $150,000 in punitive damages against individual defendant); *Hylton,* 944 F. Supp. 2d at 198 (awarding $35,000 total in punitive damages against a defendant for engaging in discrimination under the Fair Housing Act).

Plaintiffs argue that they have produced enough evidence for a jury to find that Mayor Faienza and Town Manager Salvatore acted with malice or reckless indifference, if qualified immunity ultimately does not apply.

The Court agrees.

From the record evidence, a reasonable jury could find that Mayor Faienza and Town Manager acted with malice or reckless indifference toward intended residents who had disabilities. *See, e.g.*, Defs.' SOMF Ex. I-3, ECF No. 75-28 (E-mails between Enzo Faienza and Paula Talty re: "meeting" (Mar. 31, 2015) (Mayor Faienza acknowledging that the intended residents of Reiman Drive "are protected by state statute")); Pls.' SOMF Ex. 30, ECF No. 77-30 (Jeff Mill, *Cromwell Citizens, Officials Adamantly Object to Group Home*, Middletown Press (Apr. 21, 2015) ("The proposal [to have a residence for individuals with disabilities] 'is unfortunate and unfair, and we were caught totally off guard by it,' Faienza said")); Pls.' SOMF Ex. 7, ECF No. 77-7 (Faienza Dep. at 156:14-24 (suggesting that the idea of restricting group homes like package stores should be looked into)); Pls.' SOMF Ex. 35, ECF No. 77-35 (E-mails between Tina Mendes and Enzo Faienza re: "FW: Gilead Group Home" (Apr. 21, 2015) (Mayor Faienza stating, "Ideally I don't want [a residence for people with disabilities] in that

neighborhood or in town at all"); Pls.' Opp. SOMF Ex. 86, ECF No. 86-86 (Jeff Mill, *Gilead*

*Client Who Walked Away Prompts New Interest in Cromwell Group Home*, Middletown Press

(July 21, 2015) (quoting Acting Town Manager Salvatore as saying "[t]he town has been and

continues to be opposed to that residence being at that location as we did not feel that is an

appropriate site," and that he and the Mayor "still have no clearer explanation of the type of

issues" the intended residents are dealing with)). As a result, Court will not foreclose the

possibility of punitive damages being assessed against these individual Defendants at this time.

*Punitive Damages Against the Town of Cromwell*

Defendants argue that municipalities are immune from punitive damages under the Fair

Housing Act for the same reasons that the Supreme Court held that municipalities are immune

from punitive damages in suits brought under 42 U.S.C. § 1983 in *City of Newport v. Fact*

*Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e find that considerations of history and policy do

not support exposing a municipality to punitive damages for the bad-faith actions of its officials"

under 42 U.S.C. § 1983.). Defs.' Suppl. Mem. at 7-10. They argue that the Court's concern in

*Fact Concerts* applies in the Fair Housing Act context as well: that "an award of punitive

damages against a municipality 'punishes' only the taxpayers, who took no part in the

commission of the tort." *Id.* at 8-9 (citing 453 U.S. at 266-67). "[T]he traditional purposes of

punitive damages (punishment and deterrence) would not be served by imposing punitive

damages upon local governments, because taxpayers would foot the bill." *Id.* at 8 (citing Martin

A. Schwartz, 32nd Annual Section 1983 Civil Rights Litigation, at 552 (Practising Law Inst.

Vol. 3. 2015) (citing *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1342-43 (N.D. Okla. 2014))).

Defendants also argue that

> It would run contrary to common sense to allow a plaintiff to obtain
> punitive damages in a case brought pursuant to the Fair Housing
> Act, yet exclude a plaintiff from punitive damages for a case brought
> pursuant to § 1983. The Fair Housing Act is a federal statute, and
> claims brought pursuant to the FHA can also be enforced through
> 42 U.S.C. § 1983. It would strain logic to allow for punitive damages
> against municipalities when claims are pursued via the Fair Housing
> Act, and to simultaneously deny plaintiffs the ability to obtain
> punitive damages against a municipality when claims for the same
> rights are pursued via 42 U.S.C. § 1983.

*Id.* at 9.

Plaintiffs argue that *Fact Concerts* does not apply to the Fair Housing Act. Pls.' Suppl.

Mem. at 8-11. They argue that because Congress did not expressly prohibit punitive damages

against a municipality, and because "no court of appeal has exempted municipal defendants from

punitive damages exposure under the FHA," the Court should not foreclose the availability of

punitive damages against the Town in this case. *Id.* at 11. Plaintiffs distinguish the Fair Housing

Act from both the § 1983 and Title VII contexts, arguing that the differences in statutory text,

history, and policy purposes support a reading of the Fair Housing Act that permits punitive

damages against municipalities. *Id.* at 8-11. Finally, Plaintiff argues that,

> even if the Court determines that *Fact Concerts* should be extended
> to FHA claims, it would be error to dismiss punitive damages at
> summary judgment. *Fact Concerts* does not stand for a blanket ban
> against municipal punitive damages; to the contrary the Court
> explained that punitive damages may be appropriate, even for a §
> 1983 claim, "where the taxpayers are directly responsible for
> perpetrating an outrageous abuse of constitutional rights."

*Id.* at 11-12 (quoting *Fact Concerts*, 453 U.S. at 267 n.29; and citing *Ciraolo v. City of New*

*York*, 216 F.3d 236, 240 (2d Cir. 2000) (finding *Fact Concerts* to create an exception based on a

finding of a "connection between the taxpayers' behavior and the unconstitutional municipal policy")).

In response, Defendants argue that the Plaintiffs' "argument for a form of collective punishment against the taxpayers as a whole, who are not named defendants in this suit, strains logic." Defs.' Suppl. Reply at 12. They argue that "[a]ny actions of taxpayers of the Town of Cromwell may not be imputed to the Town." *Id.* Ultimately, if "the court determines that punitive damages are available against the Town of Cromwell, the [D]efendants respectfully request that the Court refrain from deciding the issue of a punitive damages instruction at this time." *Id.* at 13.

At the summary judgment stage, the Court will only clarify what damages may be available or may be precluded by law in order to focus issues for trial, not the scope of or the precise language of any particular jury instruction.

As to the availability of punitive damages against the Town of Cromwell, no Second Circuit decision squarely addresses the issue, few other Circuit Courts have addressed whether punitive damages are available against municipalities under the Fair Housing Act, and district court decisions go both ways on the issue.

"The general rule today is that no punitive damages are allowed unless expressly authorized by statute." *Cook Cty. v. United States ex rel. Chandler,* 538 U.S. 119, 129 (2003) (quoting *Fact Concerts,* 453 U.S. at 260 n.2 (internal quotation marks omitted)). The Second Circuit applied this rule in *Cross v. N.Y.C. Transit Authority* to determine whether liquidated damages, which "are punitive in nature," are available against municipalities under the Age Discrimination in Employment Act. 417 F.3d 241, 257 (2d Cir. 2005) (quoting *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 373 (3d Cir. 2004)). The Second Circuit concluded that

62

liquidated damages are available against government employers under the Age Discrimination in Employment Act because the statute does not explicitly exempt governmental entities from its liquidated damages provision, like Title VII does from punitive damages; government actors are explicitly included in the Age Discrimination in Employment Act's definition of employer; and the Age Discrimination in Employment Act incorporates a Fair Labor Standards Act "provision expressly providing for liquidated damages to be recovered from public entities." *Id.*

In dicta, the Third Circuit opined that it is unclear whether punitive damages may be available against municipalities, citing a *Fact Concerts* footnote which suggests that taxpayers' participation in an abuse of constitutional rights might, in "an extreme situation," warrant punitive damages against a municipality. *N.J. Coal. of Rooming & Boarding House Owners v. Mayor & Council of City of Asbury Park*, 152 F.3d 217, 225 (3d Cir. 1998) ("*N.J. Coalition*") (citing *Fact Concerts*, 453 U.S. at 267 n.29). The Third Circuit did not decide the issue in *N.J. Coalition*, noting that, even if punitive damages are available, "plaintiffs ha[d] not adduced evidence of the wide widespread and knowledgeable participation by the taxpayers sufficient to meet the Supreme Court's [*Fact Concerts*] exception." *Id.* (quoting *See Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist.,* 670 F.2d 1, 2 (1st Cir. 1982) (internal quotation marks omitted)).

The Seventh Circuit has affirmed a district court's punitive damages award against a housing association treated as a municipality where the punitive damages were awarded in a claim under the Fair Housing Act in addition to another statute. *See Phillips v. Hunter Trails Cmty. Ass'n*, 685 F.2d 184, 191 (7th Cir. 1982). Neither the court nor the parties in that case raised or addressed the argument that municipalities are immune from punitive damages under the Fair Housing Act. *Id.* ("[T]he Association has two theories about why, as a matter of law,

[punitive damages] should be unavailable. The first is that Section 3612(c) of the Fair Housing Act should restrict punitive damages to a token $1,000. There is some ambiguity about whether the ceiling in that Section applies to all suits brought under the Fair Housing Act, or only to suits brought under Sections 3603, 3604, 3605, and 3606. We need not resolve the issue, however, because there is no limit on the amount of punitive damages that can be awarded under . . . the other prong of this case.").

The few relevant district court decisions offer insufficient guidance. Recently, in a footnote without analysis, in a case where punitive damages were sought under multiple statutes including Section 1983, one court stated: "As a matter of law, Plaintiff's claim for punitive damages also fails because governmental entities are immune from punitive damages." *Ross v. Port Chester Hous. Auth.*, No. 17-cv-4770 (NSR), 2019 WL 4738941, at *8 (S.D.N.Y. Sept. 27, 2019) (citing *Fact Concerts*, 453 U.S. at 271). Another court, however, conversely found that punitive damages were available against a municipality under the Fair Housing Act. *Rehab. Support Servs., Inc. v. City of Albany, N.Y.*, No. 1:14-cv-0499 LEK/RFT, 2015 WL 4067066, at *11 (N.D.N.Y. July 2, 2015). That court reasoned that *Fact Concerts* applied narrowly to actions brought under § 1983 and noted the general rule "that no punitive damages are allowed unless expressly authorized by statute." *Id.* (citing *Fact* Concerts, 453 U.S. at 260 n. 21). Because "punitive damages are specifically authorized under the FHA," the *Rehabilitation Support Services* court found that the Fair Housing Act did not exempt municipalities from punitive damages. *Id.*[21]

---

[21] Other district courts across the country have reached conflicting decisions. *Compare Floyd v. City of Sanibel*, No. 2:15-cv-00795-SPC-CM, 2017 WL 78638, at *7 (M.D. Fla. Jan. 9, 2017) (permitting a punitive damages claim against multiple defendants, including a municipality, because "punitive damages are recoverable in a private civil action under the FHA"); *Dadian v. Vill. Of Wilmette*, No. 98 C 3731, 1999 WL 299887, at *3 (N.D. Ill. May 4, 1999) (permitting a punitive damages claim to proceed against multiple defendants, including a municipality);

In the end, there is no binding precedent or clear guidance from other courts, either from outside or within the Second Circuit. Ultimately, this Court will reserve judgment on this issue until after the jury has heard the evidence. At this stage, there are genuine issues of material fact which lend support to the awarding of punitive damages against the Town of Cromwell, which, if proven, provide a plausible basis for such liability, as discussed below.

In *Fact Concerts*, the Supreme Court found that punitive damages were not available against municipalities in suits brought under 42 U.S.C. § 1983 based on the text of the statute, its legislative history, the historical backdrop against which Congress passed the law, and considerations regarding the policy purposes which Congress intended Section 1983 to advance. 453 U.S. 247. Originally passed as § 1 of the Civil Rights Act of 1871, Section 1983 "created a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights." *Id.* at 258 (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)). In 1978,

*Hispanics United of DuPage Cty. v. Vill. of Addison, Ill.*, 958 F. Supp. 1320, 1331–32 (N.D. Ill. 1997) (explaining at summary judgment that the court "decline[s] to foreclose the possibility of awarding punitive damages" and allowing Plaintiffs to "develop evidence of residents' knowledge and participation at trial"); *with Jennings v. Hous. Auth. of Balt. City*, 2014 WL 346641, *9 (D. Md. 2014) ("[P]unitive damages are presumptively unavailable from municipalities for violations of federal law absent congressional authorization or compelling public policy reasons. . . . Neither the FHA, nor the Housing Act, explicitly authorize punitive damage awards against local governments, and [the plaintiff] has not identified any reason to depart from the general rule that local government entities are not liable for punitive damages." (citing *Fact Concerts*, 453 U.S. at 271)); *Brooker v. Altoona Hous. Auth.*, No. 3:11-cv-95, 2013 WL 2896814, at *27 (W.D. Pa. June 12, 2013) ("Although punitive damages are generally available in actions arising under the FHAA, the relevant statutory provision contains no language suggesting that Congress intended to disturb the settled common-law immunity from such damages enjoyed by governmental entities." (internal citations and quotation marks omitted)); *L & F Homes & Dev. v. City of Gulfport, Miss.*, No. 1:10-cv-387-HSO-JMR, 2011 WL 5563205, at *3 (S.D. Miss. Nov. 15, 2011) (finding that punitive damages were not available against a municipality under the Fair Housing Act because "where a statute does not specifically address the recovery of punitive damages, they are not ordinarily recoverable against a municipality;" but failing to note that the Fair Housing Act does, in fact, specifically provide for punitive damages); *Kennedy v. City of Zanesville, OH*, 505 F. Supp. 2d 456, 476 (S.D. Ohio 2007) (holding, in a case based on the Fair Housing Act as well as other civil rights statutes and where "[p]laintiffs do not present any argument otherwise," that punitive damages are not available against the county and city defendants); *Developmental Servs. of Neb. v. City of Lincoln*, 504 F. Supp. 2d 726, 737–38 n.20 (D. Neb. 2007) (holding in a Fair Housing Act case that punitive damages are not available against a municipal defendant); *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1158 (C.D. Cal. 2001) (concluding that because "Congress [did not] expressly authorize awards of punitive damages against municipalities" under the Fair Housing Act, as required by *Fact Concerts*, plaintiffs could not seek punitive damages against the city defendant).

nearly a century later, the Supreme Court held for the first time that a municipality qualifies as a "person" subject to suit under Section 1983. *Id.* at 249 (citing *Monell*, 436 U.S. 658). In 1980, the Supreme Court "held that neither history nor policy supported a construction of § 1983 that would allow a municipality to assert the good faith of its officers or agents as a defense to liability for [compensatory] damages." *Id.* at 259 (citing *Owen v. City of Indep.*, 445 U.S. 622 (1980)).

In *Fact Concerts*, the Supreme Court recognized that § 1983 incorporated tort liability principles understood at the time Congress passed the Civil Rights Act. *Id.* at 259.

> It was generally understood by 1871 that a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, but this understanding did not extend to the award of punitive or exemplary damages. Indeed, the courts that had considered the issue prior to 1871 were virtually unanimous in denying such damages against a municipal corporation.

*Id.* at 259-60. The Supreme Court observed that courts denying punitive damages to municipalities prior to 1871 routinely reasoned that punitive damages against a municipality would punish and burden "the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." *Id.* at 263. Given this background, the Supreme Court "proceed[ed] on the familiar assumption that Congress would have specifically [so] provided [for punitive damages against municipalities] had it wished to abolish the doctrine [against such damages]." *Id.* at 263 (internal citation and quotation marks omitted).

The Supreme Court noted that, during debates over the proposed Sherman amendment to the Civil Rights Act which considered explicitly extending compensatory damages liability to municipalities for injuries inflicted by mob violence, the notion of extending punitive damages liability to municipalities was raised and met with substantial resistance. *Id.* at 264-65. The

House floor debates suggested that Congress understood § 1 of the Civil Rights Act not to expose municipal bodies to punitive damages. *See id.* at 265 (quoting Representative Butler in response to "a critical inquiry" about the Sherman amendment: "We doubt that a Congress having no intention of permitting punitive awards against municipalities in the explicit context of the Sherman amendment would have meant to expose municipal bodies to such novel liability *sub silentio* under § 1 of the Act."); *id.* at 265-66 ("Notably, supporters as well as opponents of § 1 voiced concern that [the Sherman amendment's] extension of public liability might place an unmanageable financial burden on local governments. Legislators also expressed apprehension that innocent taxpayers would be unfairly punished for the deeds of persons over whom they had neither knowledge nor control. Admittedly, both these objections were raised with particular reference to the threat of the expansive municipal liability embodied in the Sherman amendment. The two concerns are not without relevance to the present inquiry, however, in that they reflect policy considerations similar to those relied upon by the common-law courts in rejecting punitive damages awards.").

"Finding no evidence that Congress intended to disturb the settled common-law immunity" of municipalities to punitive damages, the Supreme Court considered whether public policy considerations warranted a contrary result under Section 1983. *Fact Concerts*, 453 U.S. at 266. The Court reasoned that the primary purpose of punitive damages is punishment for malicious conduct, and that a "municipality . . . can have no malice independent of the malice of its officials." *Id.* at 267. The Court noted further that it had never previously "suggested that punishment is as prominent a purpose under [Section 1983] as are compensation and deterrence." *Id.* As a result, the Supreme Court concluded that "the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities." *Id.* at 268. "Neither reason

nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* at 267.

But the Supreme Court's analysis in *Fact Concerts* was specific to the statutory language, history, and purpose of § 1983 and is not dispositive here. Courts determining whether punitive damages are available against municipalities under other statutes draw their conclusions based on analyses specific to those statutes. *See, e.g.*, *Cross*, 417 F.3d at 254 (observing that the plain text of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981a(b)(1), explicitly excludes municipalities from punitive damages awards: "A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision). . . .").

In 1988, Congress amended the Fair Housing Act to, among other things, broaden the availability of punitive damages as an available remedy upon a finding of liability. *See* Pub. L. 100–430, 102 Stat 1619 (1988) (codified at 42 U.S.C. § 3613). Congress did not explicitly exclude municipalities—or any category of defendants at all—from punitive damages under the Fair Housing Act. 42 U.S.C. § 3613(c)(1) ("In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages."). Indeed, the House Committee on the Judiciary issued a Report on the Fair Housing Amendments Act of 1988 recommending that the bill pass and stating that, in removing the cap on punitive damages in the original Fair Housing Act, "[t]he Committee intends that courts be able to award all remedies provided under this section." H.R. REP. 100-711, 40, 1988 U.S.C.C.A.N. 2173, 2201.

The Fair Housing Act's broad and express provision of punitive damages without any articulated exception stands in contrast to both § 1983, which does not include any language

68

providing for punitive damages at all, and Title VII, which explicitly excludes municipalities from its punitive damages provision. Congress amended Title VII to provide for punitive damages in 1991, three years after Congress amended the Fair Housing Act to provide for punitive damages. Civil Rights Act of 1991, Pub. L. 102–166, 105 Stat 1071 (1991). Congress, thus, could have explicitly excluded municipalities from punitive damages under the Fair Housing Act, and it did not do so.

Courts also have interpreted and enforced the Fair Housing Act more broadly than other civil rights statutes, including § 1983 and Title VII, in other ways as well. For example, the Fair Housing Act permits claims to proceed against a wide range of defendants, including state agencies, *see, e.g.*, *Inclusive Communities Project*, 135 S. Ct. 2507; municipalities, *see, e.g.*, *Mhany Mgmt.*, 819 F.3d 581; *LeBlanc-Sternberg*, 67 F.3d 412; *S. Middlesex Opportunity Council*, 752 F. Supp. 2d 85; counties, *see, e.g.*, *Mhany Mgmt.*, 819 F.3d 581; *Clark Cty.*, 2007 WL 610640; public officials, *see, e.g.*, *Mhany Mgmt.*, 819 F.3d 581; *LeBlanc-Sternberg*, 67 F.3d 412; *S. Middlesex Opportunity Council*, 752 F. Supp. 2d 85; landlords, *see, e.g.*, *Jancik*, 44 F.3d 553; *Corey*, 719 F.3d 322; *Thurmond*, 211 F. Supp. 3d 554; *Smith*, 249 F. Supp. 3d 1194; apartment complexes, *see, e.g.*, *Hunt*, 2012 WL 11789772; non-profit housing corporations, *see, e.g.*, *Robbins*, 2012 WL 3940133; real estate agencies, *see, e.g.*, *Soules*, 967 F.2d 817; real estate developers, *see, e.g.*, *Vill. of Arlington Heights*, 429 U.S. 252; *Williams*, 499 F.2d 819; housing listings companies, *see, e.g.*, *Space Hunters*, 429 F.3d 416; individual agents of housing companies, *see, e.g.*, *Meyer*, 537 U.S. 280; *Space Hunters*, 429 F.3d 416; housing coop boards, *see, e.g.*, *Babul*, 2018 WL 2121556; and even local residents, *see, e.g.*, *S. Middlesex Opportunity Council*, 752 F. Supp. 2d 85; *Scott*, 788 F. Supp. 1555.

By contrast, under Title VII and the Age Discrimination in Employment Act, for example, claims may only proceed against a party that may be properly characterized as "the employer." *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) ("[W]e find that the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities with fifteen or more employees. A finding of agent liability . . . would lead to results that Congress could not have contemplated.); *Cherry v. Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002) ("[T]he ADEA precludes individual liability.").

Furthermore, to the extent that the policy considerations underlying the Supreme Court's decision in *Fact Concerts* are relevant to the availability of punitive damages against municipalities under the Fair Housing Act, they weigh in favor of allowing the issue to proceed to trial here, where there is evidence of taxpayer participation in the alleged Fair Housing Act violations. *See, e.g,*, Defs.' SOMF Ex. I-3, ECF No. 75-28 (E-mails between Enzo Faienza and Paula Talty re: "meeting" (Mar. 31, 2015) (Mayor Faienza stating: "There really is nothing we can do to stop this group home from coming to town. . . . [T]hey are protected by state statute. All we can do is try to ease any concerns the residents may have."); Pls.' SOMF ¶ 29-30 ("Over sixty audience members . . . spoke in opposition of the group home being located at" the Reiman drive address. "Two people spoke in support of the group home, but they were shouted over by the crowd."); Pls.' SOMF Ex. 34, ECF No. 77-34 (Jeff Mill, *Officials Fear Men's Transitional Home Will Affect Cromwell Families*, Middletown Press (Apr. 22, 2015)) ("I feel I owe the residents of Reiman Drive that I stand up and ask Gilead to consider another alternative site."); Pls.' SOMF Ex. 35, ECF No. 77-35 (E-mails between Tina Mendes and Enzo Faienza re: "FW: Gilead Group Home" (Apr. 21, 2015) ("I wanted to have this forum so the members of Gilead and DMHAS could see the outrage and concern first hand from our residents. Everyone did a

70

fantastic job.")); Pls.' SOMF Ex. 37, ECF No. 77-37 (E-mails between Rob Latulippe and Enzo

Faienza re: "Fwd: Safeguards" (May 4, 2015)) (responding to a resident who had sent a news

article about an incident at another group home); Pls.' SOMF Ex. 41, ECF No. 77-41 (E-mails

between Rob Latulippe and Enzo Faienza re: "Fwd: Group Home Update" (May 15, 2015))

(Mayor Faienza stating in an e-mail to a Town resident that "[w]e are pounding Gilead and DPH

is spinning right now. We will keep [the] pressure on, let's keep our fingers crossed;" and the

resident responding, "Not to sound like an ass. But – awesome."); Pls.' Suppl. Mem. Ex. 5, ECF

No. 131-5 ("Reiman Strong" Facebook group posts (Mar. 29, 2015 – Aug. 31, 2015) (discussing

efforts, including communications with Town officials, to oppose the Reiman drive residence));

Pls.' Opp. SOMF Ex. 97, ECF No. 86-97 (e-mails among Town residents forwarded to Mayor

Faienza, re: "Fwd: Re: Just for the nieghbors [sic] . . ." (July 27, 2015)); Pls.' Opp. SOMF Ex.

100, ECF No. 86-100 (e-mails among Town residents forwarded to Enzo Faienza re: "RE: Time

to make some phone calls and send some emails" (July 20, 2015)); Pls.' SOMF Ex. 68, ECF No.

77-68 (E-mails between Larry Callahan and Enzo Faienza re: "Thank you from Reiman Drive"

(Sept. 3, 2015) (Mayor Faienza stating to a constituent: "This was a long battle but it was a fight

this Town Council was ready to fight to [the] very end for. . . . [A]ll we could do is keep the

pressure on and pray for a positive outcome.")).

   While punitive damages against municipalities may punish the "very taxpayers and

citizens for whose benefit the wrongdoer was being chastised," *Fact Concerts*, 453 F.3d at 263,

"[i]t is perhaps possible to imagine an extreme situation where the taxpayers are directly

responsible for perpetrating an outrageous abuse of constitutional rights," *id.* at 267 n.29.

   Indeed, Congress passed the Fair Housing Act with at least a partial goal of dismantling

the discriminatory housing practices which were created and controlled by municipalities. *See*

71

*Inclusive Communities Project*, 135 S. Ct. at 2521–22 (recognizing that the Fair Housing Act's "central purpose" was to eradicate discriminatory housing practices, "includ[ing] zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification"); *see also* Rigel C. Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1, 59 (2008) ("During the mid-1960s, when Congress debated the various fair housing bills, the degree of segregation in residential housing was extraordinarily high, and discrimination in access to housing was rampant. Congress wanted to promote integration by eliminating the discrimination that confined African Americans to crumbling urban centers.").

And Fair Housing Act cases with municipal defendants often involve municipal acquiescence to community members' discriminatory views against some residents or prospective residents. *See, e.g., Hispanics United*, 958 F. Supp. at 1332 (acknowledging plaintiffs' argument that a *Fact Concerts* Footnote 29 exception "is not so unlikely in Fair Housing Act violations, because land use decisions are often the result of the discriminatory wishes of constituents"); *United States v. Borough of Audubon, N.J.*, 797 F. Supp. 353, 361 (D.N.J. 1991) ("Audubon cannot avoid [a finding that it was motivated by discrimination] by arguing that its actions were merely a response to community sentiment. . . . the [Fair Housing Act] was specifically intended to protect individuals against community perceptions of their handicaps"), *aff'd*, 968 F.2d 14 (3d Cir. 1992); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982) (finding that a municipal decision to terminate a housing project "resulted directly from the community's deeply-felt, intentional, invidious racial animus"); *Dailey v. City of Lawton, Okl.*, 425 F.2d 1037, 1038 (10th Cir. 1970) (affirming a district court's finding "that the actions of the Planning Commission and City Council were a direct result of the bias and

prejudice on the part of the owners of other property in [the housing project at issue], which feeling carried over to the members of those bodies"); *see also* Oliveri, *supra*, at 28 ("[L]ocal governments, perhaps because of their proximity to the individuals they govern, have a long history of housing discrimination.").

As a result, on this record and under the existing law, this Court cannot conclude that the Town of Cromwell is exempt from the potential imposition of punitive damages by a jury under the Fair Housing Act, at least at this stage of the case.

Accordingly, while the Court does not commit to any particular jury instruction at the summary judgment stage, the Court also will not foreclose the possibility that punitive damages may be assessed against the Town of Cromwell at trial. *See Hispanics United*, 958 F. Supp. at 1331–32 (explaining at summary judgment that the court "decline[s] to foreclose the possibility of awarding punitive damages" and allowing plaintiffs to "develop evidence of residents' knowledge and participation at trial").

**B. Americans with Disabilities Act and Section 504 of the Rehabilitation Act Claims**

As noted above, the legal analysis under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act is not substantially different from the analysis under the Fair Housing Act. *See Forziano v. Indep. Grp. Home Living Prog., Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) ("Because of similarities in the three statutes, intentional discrimination claims under the ADA, Rehabilitation Act, and FHA are considered in tandem"); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573–74 (2d Cir. 2003) (analyzing plaintiffs' Fair Housing Act and Americans with Disabilities claims together); *RECAP*, 294 F.3d at 48 (analyzing disparate treatment theories of discrimination under the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act together)).

Indeed, Defendants argue that Plaintiffs' claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act fail because the claims under the Fair Housing Act fail. Def. Mot. Summ. J. at 2; Defs.' Mem. Summ. J. at 31-32. Defendants also argue that "the individual [D]efendants are entitled to summary judgment for the additional reason that both Acts provide only for claims against public entities, not for individual capacity suits against individuals." Defs.' Mem. Summ. J. at 32.

In response, Plaintiffs argue that for the same reasons Defendants are not entitled to summary judgment on Plaintiffs' Fair Housing Act claims, they are also not entitled to summary judgment on Plaintiffs' Americans with Disabilities Act or Rehabilitation Act claims. Pls.' Mem. Opp. at 8-9 n.9. Plaintiffs also clarify in their opposition memo that they do not seek liability against Defendants in their individual capacities under the Americans with Disabilities Act. *Id.*

Accordingly, because the Court has already found that genuine issues of material fact exist as to Plaintiffs' Fair Housing Act claims for the reasons discussed above, Defendants' motion for summary judgment as to Plaintiffs' Americans with Disabilities Act and Rehabilitation Act claims also will be denied.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, ECF No. 75, is **DENIED**, Defendant's supplemental motion for summary judgment, ECF No. 110, is **DENIED**, and Plaintiffs' motion for partial summary judgment, ECF No. 76, is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of December, 2019.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE