# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| GILEAD COMMUNITY SERVICES, INC., ET AL | : | NO.: 3:17-CV-00627-VAB |
|---|---|---|
| v. | : | |
| TOWN OF CROMWELL, ET AL | : | March 23, 2018 |

## DISCLOSURE OF EXPERT WITNESS

Pursuant to Fed. R. Civ. P. 26 (a) (2), the defendants, Town of Cromwell, Enzo Faienza, Anthony Salvatore and Jillian Massey, hereby submit the following disclosure of expert witness:

**I.     Robert "Nick" Autorina**
       **WFN Consulting, LLC**
       **123 Church Street, Suite 200**
       **Marietta, GA 30060**

The following documents, which provide the information required by Fed. R. Civ. P. 26 (a) (2), are attached hereto and incorporated by reference:

(1)     Report of Robert "Nick" Autorina Dated March 22, 2018

(2)     Curriculum Vitae of Nick Autorina

(3)     A list of cases in which Nick Autorina provided testimony at trial or deposition.

The defendants reserve the right to supplement and/or amend this disclosure as may be necessary prior to trial.

DEFENDANTS,
TOWN OF CROMWELL, ENZO FAIENZA,
ANTHONY SALVATORE and JILLIAN
MASSEY

By /s/ Thomas R. Gerarde
   Thomas R. Gerarde
   ct05640
   Katherine E. Rule
   ct27360
   Winifred B. Gibbons
   ct29997
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114-11921
   Ph:  (860) 249-1361
   Fax:  (860) 249-7665
   E-mail: tgerarde@hl-law.com
   E-mail: krule@hl-law.com
   E-mail: wgibbons@hl-law.com

## **CERTIFICATION**

This is to certify that on March 23, 2018 a copy of the foregoing **DISCLOSURE OF EXPERT WITNESS** was served by electronic mail on the following counsel of record:

Greg J. Kirschner, Esq.
Connecticut Fair Housing Center
221 Main Street
Hartford, CT  06106
greg@ctfairhousing.org

Michael Allen, Esq.
Yiyang Wu, Esq.
Tara Ramchandani, Esq.
Relman, Dane & Colfax, PLLC
1225 19th Street, NW, Suite 600
Washington, DC  20036
mallen@relmanlaw.com
ywu@relmanlaw.com
tramchandani@relmanlaw.com


Kari L. Olson, Esq.
Murtha Cullina, LLP
CityPlace 1 – 185 Asylum Street
Hartford, CT 06103
kolson@murthalaw.com


                        /s/ Thomas R. Gerarde
                        Thomas R. Gerarde
                        Katherine E. Rule
                        Winifred B. Gibbons

| GILEAD COMMUNITY SERVICES, INC., et al. | : |
| --- | --- |
| Plaintiffs, | : |
| | : CIVIL CASE NO. |
| | : 3:17-cv-627-VAB |
| TOWN OF CROMWELL, et al. | : |
| Defendants | : |

## REPORT OF ROBERT "NICK" AUTORINA

### I. QUALIFICATIONS

Robert "Nick" Autorina is the President & CEO of W. Frank Newton, Inc. and WFN Consulting (a wholly-owned subsidiary of W. Frank Newton, Inc.). WFN Consulting is a full-service consulting firm that specializes in managing U.S. Department of Housing & Urban Development (HUD) grant portfolios for cities, counties, and states and has been providing these services for over 37 years.

Mr. Autorina has over 22 years' experience in the Community Development field and has been a featured speaker and educator at numerous national conferences regarding HUD Programs in addition to providing training programs on Fair Housing Act compliance for industry professionals and elected-officials. His presentations to cities and counties include: "*A Citizens Guide to the Fair Housing Act*", "*The Professionals Guide to the Fair Housing Act*", "*Fair Housing Basics*", and "*Navigating the Fair Housing Act*". Mr. Autorina has previously testified in federal court and has been deposed in state court for cases involving the improper use of HUD Grant funds. Mr. Autorina earned his bachelor's degree from Brenau University and his Juris Doctor degree from Taft University School of Law.

Mr. Autorina's *curriculum vitae* is listed as Attachment A.

## II. COMPENSATION FOR SERVICES

My fee for my work in this case is $175.00 per hour. No portion of this fee is dependent upon the nature of my findings or on the outcome of this case.

## III. SCOPE OF ISSUES FOR THIS REPORT

I have been asked to address the Town of Cromwell's compliance with the Federal Fair Housing Act requirements, its treatment of Gilead's Group Home at 5 Reiman Drive given the protections they are afforded under the Fair Housing Act, and to address the opinions of the plaintiff's expert, Ms. Patricia A. Rehmer.

## IV. DOCUMENTS REVIEWED FOR THIS REPORT

- Complaint – *Gilead Community Services, Inc. et al* v. *Town of Cromwell, et al* and exhibits, Case No.: 3:17 – cv- 627, April 17, 2017;
- Report of Ms. Patricia A. Rehmer, MSN, ACHE, and exhibits, January 19, 2018;
- Deposition of Ms. Patricia Rehmer, MSN, ACHE, and exhibits, February 23, 2018;
- Deposition of Ms. Shawna Baron and exhibits, January 8, 2018;
- Deposition of Mr. Daniel Osborne and exhibits, February 21, 2018;
- The Fair Housing Act, 42 U.S.C. §3601 et seq.;
- Connecticut General Statute §8-3 e and §§19 a – 507 (a) through 19 a – 507 (d);
- Housing Discrimination – Law and Litigation, Robert G. Schwemm, 2014;
- Joint Statement by HUD and DOJ: – *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, November 16, 2016
- 24 C.F.R. Part 100 – Discriminatory Conduct Under the Fair Housing Act

## V. THE FAIR HOUSING ACT, GROUP HOMES, AND NIMBY

The Fair Housing Act (FHA)[1], with few exceptions, governs nearly every type of housing and practically every aspect of a housing transaction. Specifically, the FHA prohibits discrimination by direct providers of housing, such as landlords and real estate companies as well as other entities, such as municipalities, whose discriminatory practices make housing unavailable based on a person's protected class status. Under the FHA, it is a violation to take adverse action due to a person's race, color, sex, national origin, religion, familial status, or disability.

Under the FHA's Disparate Impact rule[2], even if a city policy or practice (which is neutral on its face) has an unintended or adverse effect on a protected class, the city could be found liable under the FHA, regardless if no overt discriminatory act has occurred. The FHA also applies to land-use and zoning practices as it governs both behavior and actions that "*otherwise make unavailable or deny*" a dwelling.

### A. Group Homes

The protections extended for group homes became clear when handicapped persons were included in the 1988 Amendment to the FHA as group homes met the definition of a dwelling[3]:

> *"This provision (protecting handicapped persons) is intended to prohibit special restrictive covenants or other terms of conditions, or denials of services because of an individual's handicap and which have the effect of excluding, for example, congregate living arrangements for persons with handicaps...While state and local governments have authority to protect*

---

[1] The Fair Housing Act is codified at 42 U.S.C. §§3601-19
[2] 24 C.F.R. Part 100
[3] U.S House of Representatives, Committee on the Judiciary Report 100-711; The Fair Housing Amendments Act of 1988, 100th Congress, 2nd Session (1988)

3

*safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities."*

The 1988 Amendments to the FHA specifically targeted various land-use restrictions against group homes as the House Judiciary Committee's report stated: "the 1988 Amendments Act was intended to apply to state or local land-use...regulations, practices, and decisions, which discriminates against individuals with handicaps."[4]

Specifically, the Fair Housing Act makes it unlawful to[5]:

- utilize land-use policies or actions that treat groups of persons with disabilities less favorably than groups of non-disabled persons;
- take action against, or deny a permit, for a home because of the disability of individuals who live or would live there;
- refuse to make a reasonable accommodation in land-use and zoning policies and procedures where such accommodations may be necessary to afford persons or groups of persons with disabilities an equal opportunity to use and enjoy housing.

As a result of the 1988 Amendments to the FHA, a number of court challenges against group-home restrictions have been filed such as[6]:

- Single-Family Zoning;
- Zoning rules and classification that restrict group homes from operating in a particular dwelling;
- Spacing requirements;

---

[4] City of Cleburne, Texas v. Cleburne Living Center, 473, U.S. 432, 105 5. CT 3249, 87 L.Ed 2d 313 (1985)
[5] Discrimination in Housing Based Upon Disability Group Homes – HUD, December 31, 2017
[6] Housing Discrimination – Law and Litigation, Schwemm, §11d:5 (2014)

4

- Neighbor notification provisions; and
- Special health and safety rules unique to group homes only.

### B. "NIMBY"

NIMBY is an acronym which stands for "not-in-my-backyard". In many cases residents opposition to a proposed change in their community can provoke certain attitudes and fears such as decreased property values or the potential for an increase in crime. If residents do not share their opposition through Public Hearings, a more discrete approach may include[7]:

- Lobbying government officials to use or change zoning policies or other regulatory measures;
- Exerting pressure on funding sources such as state and local governments; or
- Resorting to the destruction of property or vandalism.

But, if residents of a community are afforded an opportunity under a local jurisdictions' public hearing or public forum process to openly discuss their concerns with the developer or non-profit housing provider, does the citizen opposition violate the Fair Housing Act?

A joint statement between HUD and the Department of Justice (DOJ) released on November 10, 2016 addressed this issue[8]:.

*Question:* *Does a state or local government violate the Fair Housing Act if it considers the fears or prejudices of community members when enacting or applying its zoning or land use laws respecting housing?*

*Answer:* *"When enacting or applying zoning or land use laws, state and local governments may not act because of the fears, prejudices, stereotypes, or*

---

[7] Identifying NIMBY Attitudes, https://www.hudexchange.info/resources/nimbyassessment
[8] HUD/DOJ Joint Statement regarding State and Local Land Use Laws, November 10, 2016

*unsubstantiated assumptions that community members may have about current or prospective residents because of the residents protected characteristics. Doing so violates the Act, even if City officials themselves do not personally share such bias...of course, a city council or zoning board is not bound by everything that is said by every person who speaks at a public hearing. It is the record as a whole that will be determinative."*

## VI. ADDRESSING THE OPINIONS OF PLAINTIFF'S DISCLOSED EXPERT, MS. PATRICIA REHMER

In Ms. Patricia Rehmer's report[9], dated January 19, 2018, in Section VII, (B), "Cromwell's Actions" (pages 10 – 14), Ms. Rehmer described five *"discrete Town acts"* that *"were inconsistent with basic practices a municipality should follow and exhibited hostility...that would not have been directed against a single-family home of related people"*.

The five acts were:

- Town's Involvement in Forum;
- Mayor's Press Release Requesting that Gilead Move Group Home;
- Town's Petition to Connecticut Department of Public Health;
- Town's Issuance of Cease and Desist Order related to Zoning; and
- Town's Denial of Gilead's Tax Exemption

---

[9] Based on Ms. Rehmer's 30-plus years in Social Services, her report focused primarily on how a municipality should act and what considerations a municipality should be aware of, given the complexities involved in operating a group-home in a residential setting. Ms. Rehmer's report does not specifically reference the requirements of the Fair Housing Act.

6

Act 1:   Town's Involvement in Forum

Ms. Rehmer's report raised three separate issues under this section. First, that *"the town failed in enacting certain measures that could have minimized (and maybe even prevented) the* discriminatory *rhetoric pervading the town forum..."* Second, *"that the town forum should have been an opportunity for the Town officials to allow for some basic mental health education...* And third, *"a statement from the Town about their obligations not to discriminate against people with disabilities and group homes... and that the Town had certain obligations with respect to those rights".*

*Did the Town's Involvement in the Public Forum Violate the Fair Housing Act?* No, the Town's involvement in the Public Forum did not violate the FHA and is supported on three independent grounds. One, as a public-forum (as opposed to a formal zoning-hearing or regularly scheduled city council meeting), the comments made by Town residents (however insensitive or inappropriate) were never *acted on* by Town officials *to deny* Gilead the opportunity to operate their group home. Gilead had complete autonomy on what information could be shared, given the limitations of legally what they could disclose concerning client's medical histories. Further, Gilead prepared an outline of their presentation (prior to the Public Forum) and internally discussed what the appropriate levels of disclosure should be.  Two, despite the animus displayed at the public forum, the Town's track-record of supporting group homes was indisputable. At the time of the Public Forum, a number of licensed community residences and group-homes were operational in the Town of Cromwell (one of which was owned and operated by Gilead). The Town of Cromwell's support for community residences and group homes is evidenced by the fact those entities still call Cromwell home to this day.

Three, a public forum was the appropriate means by which Gilead had to face residents who were concerned about the group-home's proximity to schools.  Public-input is

7

an important aspect of municipal decision-making and cities cannot waive this request for a public notice or hearing in all cases involving the handicapped[10].

Act 2: *Mayor's Press-Release Requesting Gilead Move Home*

*Did the Mayor's Press-Release (dated April 21st, 2015), violate the Fair Housing Act?* Even if the Mayor's press-release was perceived as "*unusual*" or the "*first-of-its-kind*", it did not violate the FHA as the Mayor was balancing the concerns of Town residents, the transparency surrounding those concerns, and the obligations of his office.

Further, the press-release did not *deny* Gilead's right to operate their group home at 5 Reiman Drive. The press-release *requested* that Gilead should *"consider"* relocating to a more suitable location. Considering the amount of public interest and media coverage the Public Forum generated, the Mayor's statements were consistent with the responsibilities of his office.

*It is important to note at the time of the Mayor's press-release, the Town of Cromwell was continuing to issue all building permits so the renovations for Gilead's group home on 5 Reiman Drive could move forward in a timely manner. In fact, permits were issued and subsequently approved as late as August 3, 2015.*

Acts 3 and 4: *Town's Petition to DPH and Issuance of Cease & Desist Order*

*Did the Town's petition to the Connecticut Department of Public Health (DPH) and Issuance of a Cease and Desist Order constitute a violation of the Fair Housing Act?* Under Connecticut General Statue (CGS) §19a-507a (3), a "community residence" is defined as *a facility which houses the staff of such facility and eight or fewer mentally ill adults which is licensed by the Commissioner of Public Health (CPH) and which provides supervised, structured group living activities...*

---

[10] U.S. v. Village of Palantine, Ill., 37F.3d 1230, 1234, 7. A.D.D. 543 (7 Cir. 1994)

And, at CGS §8-3e (a) (3), it states: *no zoning regulation shall treat in a manner different from a single-family residence, any community residence that houses six or fewer persons receiving mental health or addiction services…and that has been issued a license by the Department of Public Health, under the provisions of Section 19a-491, if a license is required."*

Based on the definition of a community residence at §19a-507a, the Gilead group home would not be considered a community residence. Accordingly, it fell outside of the provisions of CGS §8-3e which would require towns and municipalities to consider community residences as single-family. Based on this requirement, 5 Reiman Drive was considered a "rooming-house", which is not allowed in a residential zone.

Based on the Town's interpretation, they issued the Cease & Desist Order on July 1st, 2015. Upon receipt of the Cease & Desist Order, Gilead had two options at their disposal: One, they had the right to appeal the decision within 10 days to the Town's Zoning Board of Appeals or two, they could have requested a reasonable accommodation under the Fair Housing Act. Instead, Gilead chose to have their legal counsel formally contact the Town and offer their interpretation of the Connecticut General Statue.

On July 11, 2015, both attorneys agreed the Cease & Desist Order would be withdrawn and the number of residents would be limited to two persons while Gilead and the Town attempted to come to an agreement on differing interpretations of the statue. And despite both administrative actions, Gilead continued to operate their group-home located at 5 Reiman Drive. The Town raising both legal issues was proper and did not deny Gilead's right to operate their group home[11]. The Town's actions *did not* violate the Fair Housing Act.

---

[11] The Town of Cromwell continued to issue and approve all necessary building permits during this time Permit #23231 on July 1, 2015 and Permit #23515 on July 10th, 2015.

9

Act 5: *Town's Denial of Gilead's Tax Exemption*

*Did the Town's denial of Gilead's Tax-Exempt status violate the Fair Housing Act?* In the deposition of Ms. Shawna Baron, Tax Assessor for the Town of Cromwell, taken on January 8, 2018, Ms. Baron stated as the result of an "exemption-workshop" she attended "sometime" in the spring of 2015, a recommendation was made that assessors should look more closely at applications regarding organizations seeking tax-exempt status under CGS §12-81. Further, Ms. Baron stated after attending the workshop, the Town of Cromwell's Assessor's Office would analyze and review the exemption requests in more detail for all applications requesting tax-exempt status with the 2017 application cycle.

On July 16, 2015, Ms. Baron contacted Rainbow Housing Corporation requesting additional information regarding a 2014 Tax Exempt Supplemental Return for an exemption for taxes on the 5 Reiman Drive Property. On August 7, 2015, Ms. Baron notified Gilead that the information previously requested was not sufficient and as such, their application for tax exempt status was denied.

In doing so, the Town's actions did not violate the Fair Housing Act. Although Gilead's tax-exempt status was denied, it did not stop Gilead from continuing to operate their group home at 5 Reiman Drive. The Assessor's Office was operating within their full legal authority and while Gilead's legal counsel disagreed with the Town's decision, the Town was raising a legal issue whether Gilead's tax-exempt status is proper and in doing so, did not deprive or deny Gilead the right to occupy their group home at 5 Reiman Drive. Gilead was given notice of their right to appeal the Town's decision and Gilead chose not to pursue this option.

## VII. CONCLUSION

It is my expert opinion the actions taken by the Town of Cromwell were consistent with a municipalities' obligation under the Fair Housing Act and did not discriminate against persons with disabilities. The basis for my conclusion rests on four independent grounds:

One, the Town of Cromwell *never denied* Gilead the right to operate their group home located at 5 Reiman Drive. Gilead *did operate* their group home on 5 Reiman Drive and the decision to cease operations at 5 Reiman Drive was made by Gilead, not the Town of Cromwell.

Two, the remarks made by residents at the Public Forum, even if perceived as "distasteful" or "insensitive", were constitutionally protected as the animus did not encourage or incite violence, nor did the remarks persuade Town officials to deny Gilead their right to operate the group home located at 5 Reiman Drive[12].

Three, a number of licensed community residences and group homes currently operate in the Town of Cromwell (one of which is owned and operated by Gilead). The Town has a history of supporting group homes and *does not* have a history of discriminatory practices toward any of the protected classes.

Four, the legal issues raised by the Town (Petition to DPH, Issuance of a Cease & Desist, and Denial of Tax-Exempt status) were proper and was not a denial of Gilead's right to occupy and operate their group home located at 5 Reiman Drive.

---

[12] White v. Lee, 227 F. 3d 1214 (2000)

My opinions are offered with a reasonable degree of certainty given my education and professional experience in the Community Development field.

Dated: March 22, 2018

Robert "Nick" Autorina