# EXHIBIT

# 1

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

GILEAD COMMUNITY SERVICES, )
INC., et al.,              )
         Plaintiffs,       )   Civil Case No.
     vs.                   )   3:17-cv-627-VAB
TOWN OF CROMWELL, et al.,  )
         Defendants.       )

DEPOSITION OF

ROBERT G. AUTORINA

April 23, 2018

8:36 a.m.

Oconee Boardroom

1031 Virginia Avenue

Atlanta, Georgia

Reported by:

F. Renee Finkley, RPR, RMR, CRR, CLR, CCR-B-2289

```
1        Q.    Okay.
2        A.    And then I left when Clinton
3   Administration came on, Les Aspin was Secretary of
4   Defense, I had gotten out of the military at that
5   point.
6        Q.    And fair to say we've covered all of your
7   professional experience that would pertain to
8   disability discrimination?
9        A.    Within the context my 20-some odd years
10  working with WFN, yes.
11       Q.    What is your primary field of expertise?
12       A.    Community development practitioner and --
13  under HUD programs, and that encompasses not only all
14  of the -- well, it's the big three, as I call it:
15  Community Development Block Grant, Home Investment
16  Partnership Act, and Emergency Solutions Grant.  And
17  within the context of those programs, there is what
18  HUD calls crosscutting requirements.  And these are
19  additional requirements that are unique to all of
20  these programs such as procurement, such as, you
21  know, Fair Housing, Equal Opportunity, Section 3.  It
22  spans -- environmental -- environmental review,
23  regulations.  It spans a wide -- you know, a wide
24  swath of just everything that is required under the
25  law as it pertains to those programs.  You know,
```

1   Housing Community Development Act.  So that is -- a
2   majority of the formative years of my professional
3   career have been spent in that arena.
4        Q.   Would you consider yourself to be an
5   expert on -- I understand you definitely consider
6   yourself to be an expert on the community block
7   grants and the various grants that you just listed,
8   but you also consider yourself an expert on the
9   crosscutting requirements?
10       A.   I do, yes.  But, you know, expert is all
11  relative.  I deal with it every day.  I mean,
12  having -- clients have to comply with it.  And when
13  you have clients that are monitored by HUD and those
14  clients are in compliance year after year after year
15  after year, there is a certain process.  There is a
16  certain approach that you become to -- you know, you
17  get recognized for.  And that's a system that, you
18  know, we utilize with our company.  We train, you
19  know, new employees.  It's a system, and it's been a
20  successful one.
21       Q.   So let's focus for a second on the Fair
22  Housing aspect.
23       A.   Sure.
24       Q.   How have you developed your understanding
25  of the Fair Housing Act?

1      A.    Well, our clients -- and I'll just use,
2  you know, our full-time -- our Cobb and Gwinnett
3  clients.  They have to certify annually that they
4  will affirmatively further Fair Housing, chief
5  elected official does, because every year there are
6  grant agreements.  There's a whole host of
7  certifications that a HUD entitlement community must
8  certify that they will be in compliance with.
9            And in the context of that, our office, we
10 have a number of checklist as it relates to not only
11 looking at zoning, but looking at how organizations
12 who apply for funding, that the jurisdiction has
13 adequate infrastructure to ensure that they are in
14 compliance with Fair Housing, whether it be looking
15 at setback requirements, looking at the process by
16 which a jurisdiction handles complaints.  You know,
17 it just -- it can run the gamut.  But that process is
18 something that we have to validate, okay.
19           I mean, we have to validate it because a
20 chief elected official is certifying that they will
21 affirmatively further Fair Housing.  And then within
22 the context of that, having to do these analysis of
23 impediments to Fair Housing for our clients, we
24 understand -- we understand what the housing is like
25 in our jurisdiction, right.  We know where there's a

1  disconnect.  We know where there needs to be more
2  focus on.  So those analyses, if you will, give us a
3  realtime understanding of those issues.  And it's
4  nothing that -- I mean, these CPD checklists,
5  Community Planning and Development checklists, are
6  basically the baseline by which we implement all of
7  our policies and procedures, how we approach what we
8  do because that's how we are graded or monitored by
9  HUD.  So if we are in compliance with those
10 checklists -- and oftentimes, we take it to another
11 level because we try to go ahead and ensure that our
12 clients are adequately protected under the Fair
13 Housing Act.
14      Q.    If one of the jurisdictions that you guys
15 do the compliance for gets sued or in trouble with
16 HUD, is that something that your organization will
17 deal with or will outside counsel deal with that?
18      A.    We would deal with it.  Typically, we
19 would deal with it; and then we would also work with
20 in-house counsel or we would be the liaison with
21 outside counsel.  But, no, we would certainly be
22 involved.
23      Q.    Okay.  And how -- in your time at WFN, how
24 many times has incidences like that happened?
25      A.    Twice.  And both instances were a group

1    understand enough to keep my clients out of trouble.
2         Q.    Okay.
3         A.    I am very certain about that.
4         Q.    I'll ask it one other way:  Do you hold
5    yourself out today to be an expert on the Fair
6    Housing Act as it pertains to group home law?
7              MR. GERARDE:  Objection to the form.
8              THE WITNESS:  I do not advertise as a
9         group home law expert.
10        Q.    (By Ms. Wu) Okay.
11        A.    But certainly, group homes do -- are part
12   of Fair Housing Act overall.
13        Q.    I understand.  I understand the
14   distinction you're trying to make.  Thank you for
15   that.
16        A.    Yes, ma'am.
17        Q.    Similar to the questions with respect to
18   zoning laws.  Do you -- first of all, let's start
19   with Connecticut.  Do you hold yourself out to be an
20   expert on Connecticut zoning laws?
21        A.    No, I do not.
22        Q.    Do you hold yourself out to be an expert
23   on zoning law as they pertains group homes in the
24   states that you do work in?
25        A.    Well, that is simply at the moment the

1   expert, but I've seen plenty of them 22 years in the
2   business to know if it's legit or not.
3       Q.   So the experience that you've had working
4   with tax exemptions are with the federal tax
5   exemption?
6       A.   That is correct, ma'am.  That's an
7   accurate statement.
8       Q.   So do you have any experience working with
9   like local tax exemption laws?
10      A.   Not particularly, no.
11      Q.   Have you taken any classes regarding
12  zoning laws?
13      A.   No, ma'am.
14      Q.   Prior to this report, how many times had
15  you worked with Connecticut state or local statutes?
16      A.   This is the first case that I've worked in
17  the state of Connecticut.
18      Q.   When was the first time you read
19  Connecticut general statute 8-3e?
20      A.   It would have -- yeah, I'm working on this
21  case, so just a few months ago.
22      Q.   So in connection to this --
23      A.   Yes, ma'am, that is correct.
24      Q.   And same for Connecticut general statute
25  19a-507?

```
 1         A.    That's correct.
 2         Q.    And have you reviewed any corollary
 3   statutes from other states or municipalities that are
 4   similar to 8-3e?
 5         A.    No, I have not.
 6         Q.    And have you reviewed any legislative
 7   history that correlates to Connecticut general
 8   statute 8-3e?
 9         A.    Other than what was provided in some of
10   the materials that I had received; but in terms of
11   outside research or doing it on my own, no, I have
12   not done anything.
13         Q.    Do you remember -- what do you remember
14   receiving?  What type of legislative history?
15         A.    Actually, it's -- I believe it was -- I
16   believe it was a -- either it was an article written
17   by -- it was a practitioner had written an article.
18   It was either an attorney who wrote an article or
19   something of that nature.  But it was -- it was -- it
20   kind of discussed historically, you know, how
21   Connecticut had gotten to that point, but that was
22   it.
23         Q.    Okay.  And how about the same set of
24   questions for 19a-507, have you reviewed any statutes
25   from other states or municipalities that are similar
```

132

1   to 19a-507?
2       A.   No.
3       Q.   And have you reviewed any legislative
4   history related to 19a-507?
5       A.   I have not.
6       Q.   Do you consider yourself an expert on
7   statutory interpretation?
8       A.   As it relates to what?
9       Q.   As it relates to -- well, let's just start
10  generally.  Do you consider yourself an expert on
11  statutory interpretation?
12           MR. GERARDE:  Objection to the form.
13           THE WITNESS:  I wouldn't -- in general, I
14      probably would not hold out myself to be an
15      expert.  I think I know what my -- as I've said
16      to you before, I think I know where my expertise
17      lays.  So any statutory interpretations, I limit
18      it to the community development field.
19      Q.   (By Ms. Wu)  I see.  So do you consider
20  yourself an expert on the statutes we just discussed,
21  8-3e and 19a-507?
22      A.   Well, no.  Because, again, I mean, they
23  are unique to the state of Connecticut, and that's --
24  you know, that's not my -- I don't live there.  I
25  mean, if this situation was a little different and

1   our company was in Connecticut, I might have a
2   different answer for you; but, no, I wouldn't say I
3   am.
4        Q.    Okay.  Have you ever assisted with
5   developing or passing legislation?
6        A.    I'm hesitating on that because when I was
7   with in NACCED we did write -- we did write some
8   enabling legislation for -- drafted that we presented
9   to NACO, but this is many years ago.  I'm trying to
10  remember exactly what it was.  It was something
11  regarding economic development activities under
12  Community Development Block Grant.  I don't know -- I
13  don't think it went anywhere, but I do -- I do recall
14  we had a committee that worked on it pretty
15  vigorously and turned it over to NACO.
16       Q.    So other than this economic activities,
17  development activities attempted legislation,
18  anything else?
19       A.    No, ma'am.
20             (A recess was taken.)
21              (Exhibit 4 was marked for
22       identification.)
23       Q.    (By Ms. Wu)  So earlier you testified that
24  you consider yourself an expert in the jurisdictional
25  compliance with respect to the Fair Housing Act.

1     **A.    No.  My report addresses specifically what**
2  **the Town of Cromwell did in regards to these five**
3  **actions.**
4     Q.    And what is your conclusion with respect
5  to what the Town of Cromwell did in those five
6  discrete town actions?
7          MR. GERARDE:  Objection to form.
8          THE WITNESS:  My conclusion is, is that
9     the Town of Cromwell did not violate the Fair
10    Housing Act based on these actions because of
11    the ultimate issue at play, which was the fact
12    that Gilead was able to operate their group
13    home.  And their decision to close that group
14    home despite unfortunate circumstances that did
15    occur was a decision that Gilead made.
16          They were not shut down.  The town did not
17    stop them from operating.  And, again, there's
18    unfortunate circumstances that played out that
19    I'm assuming led to Gilead deciding to close
20    their doors.
21    Q.    (By Ms. Wu)  Let's start with act one:
22 Town's involvement in forum.  So that's page 7 of
23 your report.
24    **A.    Yes, ma'am.**
25    Q.    Okay.  So the first section of your report