## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| GILEAD COMMUNITY SERVICES, INC., et al., <br>      *Plaintiffs*, <br><br>      v. <br><br> TOWN OF CROMWELL, <br>      *Defendant*. | No. 3:17-cv-00627 (VAB) |

## RULING ON PENDING MOTIONS AND ORDER

Gilead Community Services, Inc. ("Gilead"), Rainbow Housing Corp. ("Rainbow

Housing"), and the Connecticut Fair Housing Center, Inc. ("CFHC") (collectively, "Plaintiffs")

sued the Town of Cromwell (the "Town" or "Defendant")[1], claiming violations of the Fair

Housing Act, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act" or "FHA"), and its implementing

regulations, 24 C.F.R. Part 100, and the Americans with Disabilities Act, 42 U.S.C. § 12131 *et*

*seq.* ("ADA"), and its implementing regulations, 28 C.F.R. Part 35.[2] Compl. ¶ 1, ECF No. 1

(Apr. 17, 2017) ("Compl."); First Am. Compl. ¶ 1, ECF No. 57-1 (June 22, 2018) ("First Am.

Compl.").

---

[1] Plaintiffs originally brought this suit against the Town of Cromwell; Vincent "Enzo" Faienza and Anthony Salvatore individually and in their official capacities; and Jillian Massey in her official capacity. Compl., ECF No. 1 (Apr. 17, 2017). On May 8, 2020, the parties jointly stipulated to voluntarily dismiss claims against Mr. Faienza and Mr. Salvatore. Joint Stipulation of Voluntary Dismissal, ECF No. 164 (May 8, 2020). On September 17, 2021, the Court found that "[c]onsistent with the representations of both parties at [the] status conference [held on the same day], and consistent with the Court's finding in its . . . Order Denying Motion for Summary Judgment that the Plaintiffs are not seeking damages against Jillian Massey, Ms. Massey should be dismissed from the case." Order, ECF No. 210 (Sept. 17, 2021).

[2] Plaintiffs originally also brought a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and its implementing regulations, 24 C.F.R. Part 8. Compl. ¶ 1; First Am. Compl. ¶ 1. Plaintiffs did not pursue this claim at trial.

Following a six-day trial, which included testimony from fifteen witnesses, and the admission of 190 exhibits, the jury unanimously found that the Town of Cromwell violated the Fair Housing Act and the Americans with Disabilities Act, and awarded compensatory damages of $181,000 and punitive damages of $5,000,000. Verdict Form at 2–3, ECF No. 239 (Oct. 15, 2021) ("Verdict"). The jury also unanimously concluded that the Connecticut Fair Housing Center did not prove any compensatory damages. *Id*. at 2.

The parties have filed three post-trial motions since the jury reached its verdict.

Plaintiffs filed a motion for nominal damages under Federal Rule of Civil Procedure 59(e), or in the alternative, Federal Rule of Civil Procedure 60(b). Pls.' Mot. for Nominal Damages Under Fed. R. Civ. P. 59(e), or in the Alternative, Fed. R. Civ. P. 60(b), ECF No. 255 (Dec. 2, 2021) ("Pls.' Mot.").

The Town of Cromwell filed a renewed motion for judgment under Federal Rule of Civil Procedure 50(b) and, in the alternative, a motion for a new trial under Federal Rule of Civil Procedure 59. Def.'s Renewed Mot. for J. Pursuant to Fed. R. Civ. P. 50(b), and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, ECF No. 249 (Nov. 12, 2021) ("Def.'s JMOL"); Def.'s Mem. of Law in Supp. of Renewed Mot. for J. Pursuant to Fed. R. Civ. P. 50(b), and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, ECF No. 249-1 (Nov. 12, 2021) ("Def.'s JMOL Mem."). The Town of Cromwell also filed a motion for stay of execution of the judgment. Mot. for Stay of Execution of J. Without Bond or Other Security, ECF No. 254 (Dec. 2, 2021) ("Def.'s Mot. for Stay"); Def.'s Mem. of Law in Supp. of

Mot. for Stay of Execution of J. Without Bond or Other Security, ECF No. 254-1 (Dec. 2, 2021) ("Def.'s Mem. for Stay").[3]

On April 14, 2022, the Court held a hearing on the parties' post-trial motions. Min. Entry, ECF No. 271 (Apr. 14, 2022).

For the reasons outlined below, the motion for nominal damages under Federal Rule of Civil Procedure 59(e) and 60(b) is **GRANTED**; the renewed motion for judgment under Federal Rule of Civil Procedure 50(b) and, in the alternative, motion for a new trial under Federal Rule of Civil Procedure 59 is **DENIED**; and the motion for stay of execution of judgment is **DENIED**.

## I.    FACTUAL BACKGROUND

The Court assumes familiarity with the facts of the case.

Based on the testimony, and other evidence admitted at the trial, the jury reasonably could have determined the following happened:

On March 26, 2015, Gilead purchased the home at 5 Reiman Drive, with the intention of turning it into a group home. Trial Tr. vol. 1, 76: 6–7.

Days later, on or about March 29, 2015, residents of the Town of Cromwell created a Facebook group called Reiman Strong. Members used this Facebook group to share updates concerning Gilead's plan to convert the home at 5 Reiman Drive into a group home. Pls.' Ex. 102 (capturing all posts on the Facebook page from March 29, 2015 through May 10, 2016). Members of the Facebook group openly shared their hopes that Gilead would abandon its plans

---

[3] The parties filed amended briefs on May 10, 2022, after the Court issued a text order indicating its preference that briefs cite only to official transcripts. Order, ECF No. 272 (Apr. 18, 2022); *see* Pls.' Updated Brief in Opp'n to Def.'s Renewed Mot. for J. Pursuant to Fed. R. Civ. P. 50(b), and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, ECF No. 279 (May 10, 2022); Def.'s Am. Mem. of Law in Supp. of Renewed Mot. for J. Pursuant to Fed. R. Civ. P. 50(b), and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, ECF No. 280 (May 10, 2022). This Order cites to the original briefs but takes notice of citations to the official trial transcripts.

for 5 Reiman Drive. *See, e.g.*, Pls.' Ex. 52 (comments in response to a Facebook post, including a comment where Diane Uccello, an administrator of the Facebook group, said she hoped to soon "see a For Sale sign" at 5 Reiman Drive).

Toward the end of March 2015, Daniel Osborne, the Chief Executive Officer of Gilead, spoke with Town Manager Anthony Salvatore, to inform Mr. Salvatore that Gilead had purchased the home at 5 Reiman Drive. Trial Tr. vol. 1, 83:7–23, 84:13–21. Town Manager Salvatore noted having already received calls from concerned residents. *Id.* Mr. Osborne also met with several members of Town of Cromwell leadership, including the Mayor, the Town Manager, and a representative from the school system, among others. A public forum was recommended at this meeting. *Id.* at 84:13–25, 85:22–86:6.

On April 20, 2105, even before Gilead moved residents into 5 Reiman Drive in Cromwell, key Town of Cromwell officials, including the Mayor Vincent Faienza, Town Manager Salvatore, members of the Town of Cromwell Council, the Chief of the Police Department, the Chief of the Fire Department, the Town's Planning Director, the head of the Building Department, and the Superintendent of Schools, as well as numerous Town of Cromwell residents voiced opposition to the opening of the group home. Trial Tr. vol. 1, 89:11–13, 94:1–7, 94:23–100:19 (Mr. Osborne's testimony concerning the comments made by Town of Cromwell officials and residents at the April 20, 2015 public forum); Trial Tr. vol. 2, 335:1–14, 338:6–341:6 (the moderator of the forum explaining that all of the town leaders spoke at the forum before Gilead presented, and also noting that residents shouted questions out of order); Trial Tr. vol. 3, 542:14–20 (examination of Town Manager Salvatore, "Q: Do you recall at the town forum the mayor stating that the number of group homes in town should be limited the way that package stores are limited? A: I recall something like that, but that was kind of like an

analogy of how the number of package stores are decided for a jurisdiction."); Trial Tr. vol. 3, 626:12–17 (examination of Mayor Faienza, "Q: . . . did you say at the . . . public forum, 'yes' or 'no,' 'Where does this end? How many group homes are going to be established in Cromwell?' A: Yes, at some point in there I did."); Pls.' Ex. 23 (remarks of Diane Uccello—a resident who publicly spoke against the 5 Reiman Drive group home—prepared for the forum, in which she states "[h]ow will it be for your clients—in a neighborhood where [they] will not feel accepted nor wanted?").

On April 21, 2015, the day after the public forum, Mayor Faienza issued a press release requesting that Gilead consider abandoning the home. Trial Tr. vol. 3, 543: 1–19 (Town Manager Salvatore identifying the press release and agreeing that it "communicates a preference from the [M]ayor's office that Gilead locate somewhere besides 5 Reiman"); Pls.' Ex. 30 (April 21, 2015 Town of Cromwell press release which states that "[b]ecause of the lack of information provided by Gilead and [D]HMAS based on the concerns by those in attendance, Mayor Enzo Faienza is officially and public[ly] requesting, on behalf of the citizens of the Town of Cromwell, that Gilead consider relocating to a more suitable location"). The press release also was posted to the Reiman Strong Facebook group, which the Facebook members celebrated and commented on with praise for the Mayor and Town Manager. Pls.' Ex. 52 (including a comment which says "[h]ats off to all who have contributed to this effort, especially the Mayor and Town manager. Sticking together for 'Reiman Strong' works").

Several weeks later, in May 2015, Gilead learned that the Town of Cromwell had petitioned the Department of Public Health to reject Gilead's license for the home, which Gilead did not believe it needed. Trial Tr. vol. 1, 109:22–110:12 (Mr. Osborne testifying that Gilead later learned that the Town of Cromwell "petitioned to deny a license for a program that didn't

need a license"); Pls.' Ex. 51 (May 13, 2015 press release from the Office of the Town Manager

of the Town of Cromwell, stating that "[a]s result of Gilead Community Services attempting

to install another community residence in the Town of Cromwell, Acting Town Manager

Anthony Salvatore, with the support of Mayor Enzo Faienza and the Town Council, petitioned

the Commissioner of Public Health to deny Gilead . . . authority to install another community

residence in the Town of Cromwell"). On May 29, 2015, the Department of Public Health wrote

to Gilead stating that it did not require a license to run its group home. Pls.' Ex. 59. On June 29,

2015, Town Manager Salvatore filed a motion for reconsideration requesting that the Department

of Public Health reconsider its decision to not require a license to operate in the Town of

Cromwell. Def. Ex. 561.

After the Department of Public Health petition failed, the Town sent Gilead a cease-and-

desist letter. In this July 1, 2015 letter, the Town of Cromwell claimed that the 5 Reiman Drive

home "appears to be in violation of the Town of Cromwell Zoning Regulations" and that the

property should not be used "without first obtaining all necessary zoning permits," or else Gilead

would incur a fine of $150 per day. Pls.' Ex. 75. On July 8, 2015, the Town withdrew the cease

and desist on the condition that Gilead did not move in more than two residents into the 5

Reiman Drive property. Pls.' Ex. 84.

On July 16, 2015, Gilead received a letter from the Cromwell Town Assessor stating that

Gilead's tax exemption application could not be approved without additional documentation.

Pls.' Ex. 132. According to Mr. Osborne, this was "highly irregular," as Gilead had never been

asked for additional information when applying for tax exemption for its other homes. Trial Tr.

vol 1, 127:14–24. After Gilead provided the documents, the Town Assessor denied Gilead's tax

exemption application on August 7, 2015. Pls.' Ex. 132.

On July 19, 2015, one of the two residents occupying the group home at 5 Reiman Drive left unannounced to visit his conservator of finance. Trial Tr. vol. 1, 129 (Mr. Osborne explaining that the resident left to visit his conservator of finance, "which is a person who manages his money"). Gilead staff called the Town of Cromwell police to assist in looking for the resident, because of concerns for the resident's health and safety. Trial Tr. vol. 1, 130:2–4 (Mr. Osborne explaining why the police were contacted). Gilead later learned that information shared with the Town of Cromwell police about the resident, including private health information, had been released to the media. *Id.* at 130:2–9. The Town of Cromwell police again responded to a call at 5 Reiman Drive on August 1, 2015, when they were called because a "for sale" sign had been removed from another house and thrown against the home at around 1:25 AM. Pls.' Ex. 93 (Gilead's incident report stating that a staff member heard a loud noise at 1:25 AM); Trial Tr. vol. 1, 130:14–133:18 (Mr. Osborne's account of what happened on August 1, 2015). The police department then failed to fully investigate the incident, closing the case within one hour from when they were initially called to the scene. Pls.' Ex. 94 (case incident report showing that police were called at 8:34 AM and that the report was typed and the case closed at 9:31 AM).

On August 24, 2015, Gilead decided to close the home after deciding that it was not a safe place for the intended residents. Trial Tr. vol. 1, 136:3–137:16 ("[A]t this point, with everything that had happened, we had information leaking from the police department, we've had vandalism, things are escalating no matter what we are trying to do. We made a decision, and the board supported the decision, that this was just not a safe place for these men."); *see also* Pls.' Ex. 97 (letter from Gilead to the Connecticut Department of Mental Health and Addiction Services indicating that Gilead would be discontinuing its services at 5 Reiman Drive). The news

was received warmly by Town of Cromwell leaders, who celebrated the decision. *See* Pls.' Ex. 99 (press release from the Town Manager and Mayor stating that "Town Manager Anthony Salvatore and Mayor Enzo Faienza applaud Gilead's decision to relocate the Group Home and thank them for listening to the concerns of Town Officials and the residents of Reiman Drive, that this was not the most favorable neighborhood for them to establish a community residence").

After closing the home, sometime around May 2016, Mr. Osborne met with Town Manager Salvatore, who advised Mr. Osborne that "it may not be in [Gilead's] best interest to push the non-profit status to Cromwell as they may take that status away from Gilead or have [Gilead] begin to pay property taxes on [its] other Cromwell property." Pls.' Ex. 117.

On January 5, 2018, the Town of Cromwell Assessor's Office denied Gilead a renewal on its other property's tax exemption. Pls.' Ex. 146 (denial and appeal documents). The Town of Cromwell ultimately was overturned and required to reinstate the exemption. Trial Tr. vol. 1, 171:11–18 (Mr. Osborne explaining that Gilead "hired lawyers and ultimately the town was required to reinstate [Gilead's] tax exemption").

## II.   STANDARD OF REVIEW

Rule 59(e) of the Federal Rules of Civil Procedure allows a party to move to "alter or amend a judgment" no later than 28 days after the entry of the judgment. Fed. R. Civ. P. 59(e). Courts consider a motion made under Rule 59(e) of the Federal Rules of Civil Procedure a motion for reconsideration. *See Krohn v. N.Y. City Police Dep't.*, 341 F.3d 177, 179 (2d Cir. 2003) (noting that a party timely filed for reconsideration under Fed R. Civ. P. 59(e)). "The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court

overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *Lora v. O'Heaney*, 602 F.3d 106, 111 (2d Cir. 2010). "A motion for reconsideration is committed to the sound discretion of the court." *Nygren v. Greater N.Y. Mut. Ins. Co.*, No. 3:07-CV-462 (DJS), 2010 WL 3023892, at *2 (D. Conn. Aug. 2, 2010) (internal citation and quotation marks omitted); *see also Lesch v. United States*, 372 F. App'x 182, 182 (2d Cir. 2010) (summary order) ("The standard of review of a district court order granting or denying a motion for [reconsideration under both Rule 59(e) and Rule 60(b)] is whether the order constituted an abuse of discretion." (citing *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 132 (2d Cir. 1999))).

Federal Rule of Civil Procedure 60(b) allows the Court to "relieve a party . . . from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1); *see also Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012) ("The decision whether to grant a party's Rule 60(b) motion is committed to the 'sound discretion' of the district court, and appellate review is confined to determining whether the district court abused that discretion.").

The standard governing a motion for judgment as a matter of law under Federal Law of Civil Procedure 50 is "appropriately strict." *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988). The motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

The Court must deny the motion "'unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (quoting *Nadel v. Isaksson*, 321 F.3d 266, 272 (2d Cir. 2003)); *see also Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) ("'[T]he same standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50.'" (quoting *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998))).

A district court may order a new trial under Federal Rule of Civil Procedure 59 if an erroneous evidentiary ruling affected a substantial right of the moving party. *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) ("[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'" (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007))). The standard governing a motion for a new trial is "less stringent" than the standard governing a motion for judgment as a matter of law, in that (1) the court may order a new trial even if there is substantial evidence supporting the jury's verdict, and (2) the Court may weigh the evidence and need not view it in the light most favorable to the party that prevailed at trial. *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). Still, the Court may only grant a motion for a new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (internal citations and quotation marks omitted).

Federal Rule of Civil Procedure 62(a) allows for a 30-day stay of execution on judgment and proceedings to enforce judgment. Fed. R. Civ. P. 62(a). Rule 62(b) provides that, after judgment is entered, "a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). "The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security." *Id.* "The purpose of the rule is to ensure 'that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed.'" *In re Nassau County Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (quoting *Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123, 125 (7th Cir. 1997)).[4] "A district court . . . may, in its discretion, waive the bond requirement 'if the appellant provides an acceptable alternative means of securing the judgment.'" *Id.* (quoting *FDIC v. Ann-High Assocs.*, No. 97-6095, 1997 WL 1877195, at *1 (2d Cir. Dec. 2, 1997) (per curiam)). In deciding whether to waive the bond requirement, courts in this district consider the following, non-exclusive list of factors: "(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position." *Id.* at 417–18.

## III.   DISCUSSION

The Court will address each of the three post-trial motions in turn.

---

[4] Second Circuit caselaw cites to Federal Rule of Civil Procedure 62(d), which formerly contained the provisions now "carrie[d] forward in modified form" in Rule 62(b) since the 2018 amendments. Fed. R. of Civ. P. 62 advisory committee's note to 2018 amendments.

### A. Motion for Nominal Damages

Plaintiffs move under Federal Rules of Civil Procedure 59(e) and 60(b) for the Court to amend the Judgment to award the Connecticut Fair Housing Center $1 in nominal damages. Pls.' Mot. at 3. Plaintiffs claim "[i]t is well-established that '[a] plaintiff who has proven a civil rights violation[,] but has not proven actual compensable injury, is entitled to an award of nominal damages.'" *Id*. at 3 (citing *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995); *Cabrera v. Jakabovitz*, 24 F.3d 372, 391 (2d Cir. 1994)). The Connecticut Fair Housing Center should have been awarded nominal damages, Plaintiffs argue, because they proved the Town of Cromwell's civil rights violations. *Id*. at 3–4.

Plaintiffs claim that they are entitled to nominal damages despite not raising the issue previously because "neither Plaintiffs nor Defendant sought any instruction related to nominal damages." *Id*. at 5. In support, Plaintiffs points to the Second Circuit's decision in *Gibeau v. Nellis*, 18 F.3d 107, 110–11 (2d Cir. 1994), where the court awarded nominal damages because it was "'not discretionary' when 'a substantive constitutional right [or civil right] has been violated,' [and thus] it was 'plain error' for the court not to issue that jury instruction or provide a corresponding verdict form." *Id*. at 5–6 (citing *Robinson v. Cattaraugus Cnty.*, 147 F.3d 153, 162 (2d Cir. 1998)).

The Town of Cromwell argues that the Connecticut Fair Housing Center is not entitled to any nominal damages for four reasons. First, it argues that the Connecticut Fair Housing Center "was not a civil rights plaintiff in the sense that it[s] fair housing rights were violated." Def.'s Mem. in Opp'n to Pl. Connecticut Fair Housing Center's Claim for Nominal Damages [255] at 1, ECF No. 262 (Jan. 14, 2022). Second, it emphasizes that the jury did not find the Connecticut Fair Housing Center to have proven the incidental and consequential damages that the

Connecticut Fair Housing Center claimed to have suffered "as a result of Gilead's Fair Housing rights being violated." *Id.* Third, it points out that the Connecticut Fair Housing Center "did not make a request for nominal damages in the [C]omplaint, or to the jury, or to the Court at trial." *Id.* Finally, it argues that the Connecticut Fair Housing Center does not have rights to nominal damages because it was "required to prove not only that Gilead's civil rights were violated, but also that the violation of Gilead's civil rights proximately caused . . . the [Connecticut Fair Housing Center] damages," and "[t]here was ample evidence that the Town['s] conduct toward Gilead, found by the jury to be a civil rights violation, did not proximately cause[] [the Connecticut Fair Housing Center] any damages; in fact that was the jury's finding." *Id.* (emphasis omitted).

In reply, Plaintiffs note that the Town of Cromwell did not cite to any supporting case law. Pls.' Reply in Supp. of Their Mot. for Nominal Damages Under Fed. R. Civ. P. 59(e), or in the Alternative, Fed. R. Civ. P. 60(b) at 1, ECF No. 263 (Jan. 21, 2022). They note that the Verdict Form "makes clear that both Gilead and [the Connecticut Fair Housing Center] 'prove[d] by a preponderance of the evidence' that Defendant violated the Fair Housing Act . . . and the Americans with Disabilities Act . . . ." *Id.* at 2 (quoting Verdict at 1–3) (emphasis omitted). As to the Town of Cromwell's argument that the Connecticut Fair Housing Center was not a civil rights plaintiff, Plaintiffs note that in *Cabrera*, the Second Circuit upheld an award of nominal damages to a fair housing organization and did not require the organization to prove it was a "civil rights plaintiff" even though it did not prove compensatory damages and the jury had declined to award compensatory or nominal damages. *Id.* at 2–3 (citing *Carbrera*, 24 F.3d at 391).

As to the argument that the Connecticut Fair Housing Center did not previously request nominal damages, Plaintiffs point to the case law cited in their motion and further note that the Amended Complaint requested "'such other relief as this Court deems just and equitable.'" *Id.* at 3 n.2 (quoting Am. Compl. at 26, ECF No. 57-1 (June 22, 2018)). As to the Town's final argument, that the Connecticut Fair Housing Center did not prove damages resulting from a violation of Gilead's civil rights, Plaintiffs note first that there is no proximate cause requirement for nominal damages. *Id.* at 4 (citing *Gibeau*, 18 F.3d at 110). To be entitled to nominal damages, a plaintiff "need only establish defendant's civil rights violations." *Id.* (citing *LeBlanc-Sternberg*, 67 F.3d at 431). Plaintiffs also argue that the jury's decision to not award compensatory damages does not mean that the Connecticut Fair Housing Center failed to prove its case, because, as the Second Circuit has noted, "'it is not unheard of for juries to find a violation of a right yet decline to award any damages.'" *Id.* at 4 (quoting *Cabrera*, 24 F.3d at 391).

The Court agrees.

The Second Circuit has clearly stated that "[a] plaintiff who has proven a civil rights violation but has not proven actual compensable injury, is entitled to an award of nominal damages." *LeBlanc-Sternberg*, 67 F.3d at 431. The question before the Court is not whether the jury found actual damages, but whether the Connecticut Fair Housing Center is due nominal damages as a "plaintiff who has proven a civil rights violation." *Id*. Indeed, the Second Circuit has noted that "it is not unheard of for juries to find a violation of a right yet decline to award any damages." *Cabrera*, 24 F.3d at 391 ("We have said that in such a case, instead of throwing out the verdict of liability against the defendant, the trial court can direct the jury to enter an award of nominal damages.").

14

As to the Town of Cromwell's argument that the Connecticut Fair Housing Center is not a civil rights plaintiff, as noted above, the Second Circuit has found fair housing centers like the Connecticut Fair Housing Center to be entitled to nominal and actual damages. *See, e.g.*, *Cabrera*, 24 F.3d at 377–78, 380, 391 (awarding nominal damages to a not-for-profit organization that pursued a Fair Housing Act claim against landlords).

The Court did not instruct the jury on nominal damages and neither party sought instructions related to nominal damages. *See* Attachment D to Joint Trial Mem., ECF No. 204-4 (Sept. 3, 2021) ("Attachment D") (Plaintiffs' proposed jury instructions and Defendants' objections); Attachment E to Joint Trial Mem., ECF No. 204-5 (Sept. 3, 2021) ("Attachment E") (Defendants' proposed jury charges and Plaintiffs' objections); Post-Trial Jury Instrs., ECF No. 233 (Oct. 14, 2021). But this error does not preclude the Court from now granting the motion to amend the judgment to award nominal damages. *LeBlanc-Sternberg*, 67 F.3d at 431 ("It is plain error for the trial court to instruct a jury only that, if the jury finds . . . a [civil rights] violation, it 'may' award [nominal] damages, rather than it must do so."). In fact, the Court must make this correction. *Id*. ("Where a trial court has committed such an error, and the plaintiff has been awarded no actual damages, we will remand for the award of nominal damages."); *cf*. *Cattaraugus*, 147 F.3d at 162 ("In failing to inform the jury that if it found a constitutional violation established the jury must award at least nominal damages, the instructions contained plain error. An appropriate remedy for that error, however, is for the court itself to enter judgment awarding the claimant nominal damages.").

The Town of Cromwell's proximate cause argument also is inapplicable. There is no proximate causation requirement for finding that a civil rights plaintiff is due nominal damages. *See Gibeau*, 18 F.3d at 110 (finding that the jury should have been instructed to award nominal

15

damages if it found a constitutional violation, even if it did not find any injury caused); *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir. 1978) ("If the wrong complained of is a mere technical violation of the plaintiff's constitutional rights and she is unable to prove actual damage, she would nonetheless be entitled to a recovery of nominal damages."). The Town of Cromwell has not cited any caselaw to support its argument.

Accordingly, Plaintiff's motion for nominal damages will be granted.

### B.  Renewed Motion for Judgment

At a charge conference held on October 13, 2021, the parties both raised oral motions for judgment as a matter of law. Min. Entry, ECF No. 236 (Oct. 13, 2021). On November 4, 2021, the Court denied these motions without prejudice to renewal. Order, ECF No. 247 (Nov. 4, 2021). On November 12, 2021, the Town of Cromwell filed a renewed motion for judgment under Federal Rule of Civil Procedure 50(b) and, in the alternative, a motion for new trial under Federal Rule of Civil Procedure 59. Def.'s JMOL at 1.

In its renewed motion for judgment as a matter of law, the Town of Cromwell argues that the Court should either grant judgment as a matter of law or order a new trial because of: (1) failure to instruct the jury on the but-for causation standard, Def.'s JMOL Mem. at 4–15, (2) failure in charging the jury to allow punitive damages, *id.* at 15–21, (3) an excessive punitive damages award that violates Defendant's due process rights, *id.* at 21–24, (4) failure in charging the jury on respondeat superior liability in civil rights claims against the Town of Cromwell, *id.* at 24–28, (5) error in not instructing the jury that municipal liability can only be found if a municipal policy violated civil rights, *id.* at 28–30, (6) error in allowing the jury to consider speech by municipal officials and employees of the Town of Cromwell as a basis for liability, *id.* at 30–36, (7) failure to instruct the jury that the Town of Cromwell's petition to the Connecticut

Department of Public Health could not be considered as a basis for liability under the Fair

Housing Act or the American with Disabilities Act because it was protected by the First

Amendment, *id*. at 36–41, and (8) insufficient evidence for the jury to have found that the Town

of Cromwell's conduct caused Gilead damages, *id*. at 41–44.

The Court will address each of these arguments in turn.

### 1. Causation Standard

As to the causation standard, the Town of Cromwell argues that the Court incorrectly

allowed the jury to find liability for violation of the Fair Housing Act and the Americans with

Disabilities Act under a "mixed-motive" standard for causation

> rather than a 'but-for' causation standard, notwithstanding the
> holding of the United States Supreme Court in *Comcast* . . . . that
> 'but for' causation is the default standard in all civil rights statutes,
> and that there is no language in either the [Fair Housing Act] or [the
> Americans with Disabilities Act] that removes application of the
> default standard of 'but for' causation.

Def.'s JMOL Mem. at 4 (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140

S. Ct. 1009 (2020)). Under a but-for standard, the Town of Cromwell argues, no reasonable jury

would have found it liable under the Fair Housing Act and the Americans with Disabilities Act.

Alternatively, it argues, a new trial should be held and the jury instructed that but-for is the

correct standard.

In furtherance of their view, the Town of Cromwell, after acknowledging that *Comcast*

*Corp.* decided the standard in a § 1981 case, *id*. at 5, argues that the "[t]ext, [h]istory, and

Supreme Court [p]recedent of § 3604 and § 3617 [of the Fair Housing Act] [i]ndicate a [b]ut-

[f]or [c]ausation [s]tandard," *id*. at 7. The applicable Fair Housing Act section, they argue, "are

now, like all other civil rights statutes, subject to *Comcast*'s determination that the but-for

standard supplies 'the default or background rule against which Congress is normally presumed to have legislated.'" *Id*. at 8 (quoting *Comcast Corp.*, 140 S. Ct. at 1014).

The Town of Cromwell notes that the text of § 3604 outlaws discrimination "because of" a disability and § 3617 outlaws certain treatment "'on account of' an individual's exercising of rights under earlier sections of the [Fair Housing Act]." *Id*. at 8–11. These two terms "have well established legal definitions" which the Town of Cromwell adopts from *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), a suit against an employer under the Age Discrimination in Employment Act of 1967 ("ADEA"). *Id*. at 8. The Town of Cromwell notes that the Age Discrimination in Employment Act of 1967 outlaws discrimination against an individual "'because of such individual's age,'" *id*. at 8 (quoting 29 U.S.C. § 623(a)(1)), and that the *Gross* court concluded that claims under the "because of" or "on account of" language require, "by the plain meaning of that language, a showing of 'but-for' causation," *id*. at 9 (citing *Gross*, 557 U.S. at 176).

"The plain meaning, and by extension, the legal meaning, of 'because of' and 'on account' is so well established," the Town of Cromwell argues, "that Justice Gorsuch, in the *Comcast* opinion, offered a single sentence to the analysis of that language." *Id*. Justice Gorsuch said that "'[t]o prove a violation, then the [plaintiff] had to show that the defendant's challenged actions were taken 'on account of' or 'by reason of' race—terms we have often held indicate a but-for causation requirement.'" *Id*. (quoting *Comcast Corp.*, 140 S. Ct. at 6 (citing *Gross*, 557 U.S. at 176–77)). According to the Town of Cromwell, § 3604 and § 3617 therefore indicate a but-for causation standard through the use of "because of" and "on account of," and also because "*Comcast* specifically defined them as such in the context of civil rights statutes." *Id*. at 10.

The Town of Cromwell notes that Congress amended Title VII to allow plaintiffs to prove liability if discrimination was a motivating factor, "but did not similarly amend the [Fair Housing Act], [Age Discrimination in Employment Act of 1967], or a number of other civil rights statutes to include the same defining language." *Id.* at 11 (citing *Gross*, 557 U.S. at 177). Finally, the Town of Cromwell claims that the common law of torts supports the view that the but-for causation should apply because, as the *Comcast* court stated, "'[t]his ancient and simple but-for common law causation test, we have held, supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action.'" *Id.* at 11–12 (quoting *Comcast Corp.*, 140 S. Ct. at 1010).

If the but-for standard had been provided, according to the Town of Cromwell, the jury would have yielded a different verdict, because the Town of Cromwell's agents "testified to numerous legitimate, non-discriminatory factors at trial." *Id.* at 13. Among these alleged legitimate, non-discriminatory factors, were advice received about a legal basis for denying Gilead's license, disruption to the community, and inconsistencies in Gilead's assurances to the Town of Cromwell. *Id.* at 13–14. The Town of Cromwell further claims that Gilead closed its home "because of its own mismanagement . . . and the potential sequelae of the investigation of Gilead begun by the Connecticut Department of Mental Health and Addiction Services." *Id.* at 14. Under these circumstances, they argue, a jury charged with a but-for standard "would have found for the Defendant on all claims brought under the [Fair Housing Act] and the [Americans with Disabilities Act.]" *Id.* at 14. As a result, they conclude, the Court should enter judgment in favor of the Town of Cromwell under Rule 50 of the Federal Rules of Civil Procedure or find the Town of Cromwell entitled to a new trial with a jury charged on a but-for causation standard as to all Fair Housing Act and Americans with Disabilities Act claims. *Id.* at 14–15.

Plaintiffs argue that the Court did not erroneously instruct the jury on the causation standard because it adhered to Second Circuit precedent applying the mixed-motive standard to Fair Housing Act claims, Pls.' Br. in Opp'n to Def.'s Renewed Mot. for J. Pursuant to Fed. R. Civ. P. 50(b) and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59 at 10–11, ECF No. 258 (Dec. 17, 2021) ("Pls.' JMOL Opp'n"); the Town of Cromwell "solely relies on its flawed interpretation" of *Gross* and *Comcast*, *id.* at 9, 11–15; and, in any event, the evidence supports a finding of liability under a but-for standard, *id.* at 15–16. As a result, Plaintiffs argue that the Court did not erroneously instruct the jury to apply a mixed-motive standard.

In their reply, the Town of Cromwell argues that case law predating *Comcast* has "little bearing on the post-*Comcast* interpretation of the [Fair Housing Act] causation standard." Def.'s Reply to Pls.' Br. in Opp'n [258.00] to Def.'s Renewed Mot. for J. [254.00] Pursuant to Fed. R. Civ. P. 50(b) and, in the Alternative, Mot. for New Trial Pursuant to Fed. R. Civ. P. 59 at 1, ECF No. 260 (Jan. 14, 2022) ("Def. JMOL Reply"). The Town of Cromwell reiterates that the ruling of *Comcast* should not be limited to Age Discrimination in Employment Act and § 1981 claims, and should also be applied to Fair Housing Act cases within the Second Circuit.

The Court disagrees.

At the outset, the Court notes that it heard arguments on and addressed this question at the October 13, 2021 charge conference. The Court also considered arguments from both parties on this question in their proposed post-trial jury instructions and their objections to the proposed instructions. Attachment D at 34–37; Attachment E at 6–8.

The Court, in its summary judgment order, already laid out the applicable mixed-motive framework as applied in the Second Circuit. *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 71–73, 77 (D. Conn. 2019) (citing *Reg'l Econ. Cmty. Action Prog., Inc. v. City of*

20

*Middletown ("RECAP")*, 294 F.3d 35, 53–54 (2d Cir. 2002); *LeBlanc-Sternberger*, 67 F.3d at

425). Courts within this Circuit are still bound by the mixed-motive framework. *See MHANY*

*Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016) (finding that the argument that

*Gross*, a case which held that the use of "because of" in the Age Discrimination in Employment

Act meant plaintiffs needed to show age was the but-for cause of an employer's decision, "runs

headlong into Circuit precedent" holding that a mixed-motive standard applies to Fair Housing

Act cases (citing *Cabrera*, 24 F.3d at 383)).

The Town of Cromwell fails to cite any case law that has changed the standard applied in

Fair Housing Act cases, either in the Second Circuit or other Circuits. The Town of Cromwell

insists that the Supreme Court's recent decision in *Comcast* changed the standard in Fair

Housing Act cases when it clarified that a but-for standard applies in § 1981 cases. Yet, Fair

Housing Act cases have cited to *Comcast* only to clarify that the Supreme Court's decision

applies only to § 1981 cases. *See, e.g.*, *Madawala v. Struga Mgmt.*, No. SA-19-CV-00635-JKP,

2021 WL 2981196, at *3 (W.D. Tex. July 15, 2021) (applying the but-for standard to a § 1981

claim and the burden shifting framework to a Fair Housing Act claim); *Whiting v. Albek*, ED CV

19-1542-DMG (SHKx), 2020 WL 7382777, at *5 n.5 (C.D. Cal. Oct. 30, 2020) (in a case

concerning a 42 U.S.C. § 3604(b) Fair Housing Act discrimination claim, noting that the

applicable "motivating factor" standard was unchanged, because "[w]hile recent Supreme Court

decisions have replaced mixed motive causation for discrimination claims arising under the Age

Discrimination in Employment Act . . . and 42 U.S.C. section 1981 with a but-for causation

standard, the Ninth Circuit's use of the mixed motive standard in [Fair Housing Act] Section

3604 discrimination claims remains undisturbed" (citing *Comcast Corp.*, 140 S. Ct. 1009; *Gross*,

557 U.S. 167)).

21

As a result, the Supreme Court's *Comcast* decision clearly did not hold that the but-for standard applies to Fair Housing Act cases. First, the case dealt with an alleged § 1981 violation. Second, the Supreme Court was careful to distinguish between claims under § 1981 and claims under Title VII of the Civil Rights Act of 1964, the burdens of which are "fully applicable to Title VIII housing discrimination cases." *Cabrera*, 24 F.3d at 383. The Supreme Court also distinguished the "distinct histories" of Title VII and § 1981 before refusing to "consult, tinker with, and then engraft" the Title VII test onto the § 1981 test. *Comcast Corp.*, 140 S. Ct. at 1017.

## 2. Punitive Damages

The Town of Cromwell claims that the Court should not have charged the jury on punitive damages against it, because "punitive damages are not recoverable against a local municipality under either the [Fair Housing Act] or the [Americans with Disabilities Act]." Def.'s JMOL Mem. at 15. In support, the Town of Cromwell makes many of the same arguments that it made in its summary judgment motion. *See* Supp. Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 4–10, ECF No. 130 (Nov. 1, 2019). It again argues that it "cannot be held liable for punitive damages on a theory of vicarious liability" because of the Supreme Court's opinions in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and *Meyer v. Holley*, 537 U.S. 280 (2003). Def.'s JMOL Mem. at 15. And it again notes that "[i]n the 42 U.S.C. § 1983 context, local governments are immune from punitive damages," and attempts to apply the same reasoning in the Fair Housing Act context, which it claims "numerous courts" have done. *Id.* at 16 (citing *City of New Port v. Fact Concerts*, 453 U.S. 247 (1981)).

The Town of Cromwell also restates its argument that punitive damages should not be allowed because it would punish "'blameless or unknowing taxpayers'" who "'presumably were unaware of the entire controversy.'" *Id.* at 18 (quoting *Heritage Home of Attleboro, Inc. v.*

*Seekonk Water Dist.*, 670 F.2d 1, 2 (1st Cir. 1982) (internal quotation marks omitted)). "To punish the entirety of Cromwell for the bad-faith actions of one or more elected officials . . . and the actions of an aggressive and vocal, but small bloc of voters . . . would fly in the face of the very concerns voiced by the *Fact Concerts* Court[.]" *Id.* at 19.

The Town of Cromwell acknowledges the Court's ruling on this question in the Summary Judgment Order, where the Court noted that "[w]hile punitive damages against municipalities may punish the very taxpayers and citizens for whose benefit the wrongdoer was being chastised . . . [i]t is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights." *Id.* at 19–20 (quoting *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 91). The Town of Cromwell further quotes the Court's order, which said that, "[t]o the extent that the policy considerations underlying the Supreme Court's decision in *Fact Concerts* are relevant to the availability of punitive damages against municipalities under the Fair Housing Act, they weigh in favor of allowing the issue to proceed to trial . . . where there is evidence of taxpayer participation in the alleged Fair Housing Act violations." *Id.* at 20 (quoting *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 90).

Despite these statements, the Town of Cromwell argues, the Court did not provide the jury instructions "that matched this [C]ourt[']s formulation of the circumstances where punitive damages might be awarded against a municipality." *Id.* Specifically, the Town of Cromwell notes that the jury "did not receive any instructions on *Fact Concerts*, nor were there any instructions related to 'widespread knowledgeable participation by taxpayers.'" *Id.* at 20. Instead, the Town of Cromwell notes, the jury was provided "a seven bullet point list which includes the following relevant bullet point: (5) the level of taxpayer or constituent knowledge, participation,

and influence on the Town of Cromwell's decision to take action against Gilead Community Services and the Connecticut Fair Housing Center." *Id*. at 20.

In response, Plaintiffs reiterate the points made in the Court's lengthy discussion of the punitive damages question in its Summary Judgment Order. *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 84–92. Plaintiffs argue that the Supreme Court's decision in *Fact Concerts*, where the Court held that municipalities are immune from punitive damages as a matter of law in § 1983 cases, is inapplicable to this case. Pls.' JMOL Opp'n at 27–31. They further argue that the "public policy considerations" on which the Town's arguments hinge "actually strengthen, not weaken, Plaintiffs' position." *Id*. at 29–30. Unlike the "miscreant public official" who makes a one-off decision violative of § 1983 that was "unknown" to "blameless" taxpayers, Fair Housing Act cases target discriminatory practices. *Id*. at 30 (citing *Fact Concerts*, 453 U.S. at 267). They argue that the jury "heard literally hours of testimony and reviewed dozens of exhibits that illuminated the close relationship between the taxpayers and the Town officials, and the direct causal chain between the taxpayers' advocacy and the Town's actions." *Id*.

Plaintiff also argues that the Town of Cromwell waived any objection to the jury language because they "did not provide the Court a proposed jury instruction regarding punitive damages, and it did not at any point in trial (at charging conference or otherwise) indicate that it objected to the taxpayer knowledge language." *Id*. at 32.

In reply, the Town of Cromwell admits that *Fact Concerts* "sp[oke] to a [Section] 1983 claim, [but] the reasoning behind the holding remains on solid ground when applied to the [Fair Housing Act]." Def. JMOL Reply at 5. Additionally, they note, "[t]he Town of Cromwell will likely face a significant increase in the tax burden on citizens to meet the outsized punitive

damages award levied against them." *Id.* at 6. Therefore, the Town of Cromwell argues, punitive

damages should not be allowed against a municipality.

The Court disagrees.

The Court first notes that the Town of Cromwell did raise its objection to punitive

damages against a municipality at the charge conference. The Town of Cromwell's motion,

therefore, is not denied on that basis.

The Summary Judgment Order discusses at length the Court's reasoning for allowing the

jury to consider punitive damages in a Fair Housing Act case. *Gilead Cmty. Servs.*, 432 F. Supp.

3d at 84–92. The Order also explains why *Fact Concerts* is not binding precedent and why the

Supreme Court's analysis in *Fact Concerts*, which "was specific to the statutory language,

history, and purpose of § 1983 . . . is not dispositive here." *Id.* at 89. The Summary Judgment

Order also discusses the history of the Fair Housing Act, its "broad and express provision of

punitive damages," and the history of courts interpreting and enforcing the Fair Housing Act

"more broadly than other civil rights statutes." *Id.*

In the Summary Judgment Order, the Court also concluded that to the extent the policy

considerations from *Fact Concerts* were relevant to the Fair Housing Act, they "weigh[ed] in

favor of allowing the issue to proceed to trial here, where there is evidence of taxpayer

participation in the alleged Fair Housing Act violations." *Id.* at 90–91. The trial revealed

significant taxpayer involvement with the efforts to deny Gilead's rights under the Fair Housing

Act, ranging from vociferous—and near unanimous—opposition at public meetings, Trial Tr.

vol. 1, 98:11–21 (explaining that the forum "was extremely negative, contentious;" that attendees

were "yelling over people;" and that comments such as "[w]e don't want you here" and "[w]hy

do you want to be somewhere where you are not wanted" were yelled at Gilead representatives),

to defiant e-mail correspondence to Town of Cromwell public officials, urging them to prevent the placement of the Gilead home, Trial Tr. vol. 3, 534:24–535:5 (examination of Town Manager Salvatore, "Q: And prior to that public forum the town is receiving a number of contacts from residents via calls, emails, visits to town hall expressing concern and opposition to the home in March and April; is that right? A: There was a lot of concern being expressed, yes."); *see also, e.g.*, Pls.' Ex. 21 (e-mail from a resident to Mayor Faienza expressing concern about the plan to open a group home at 5 Reiman Drive).

A Town of Cromwell resident, running for the Town of Cromwell Council, even described "opposition to the group home [as] a popular issue for the voters." Trial Tr. vol. 2, 351:15–17 (examination of Edward Wenners, "Q: Okay. Was opposition to the group home a popular issue for the voters? A: Absolutely"). Town of Cromwell taxpayers created a Facebook page called "Reiman Strong," to keep residents informed about the group home's plans, Pls.' Ex. 102 (capturing all posts on the Facebook page from March 29, 2015 through May 10, 2016); Trial Tr. vol. 2, 380:15–16 (examination of Diane Uccello, "That Facebook page was just to keep everyone informed as to what was happening."), and took other steps to organize opposition to the group home, *id*. at 384:1–5 (examination of Diane Uccello, "I definitely led the charge with the neighborhood. So I would say to my neighbors, okay, it's time to email this particular person or call this particular person so that we could sort of keep the buzz on about what was happening."); *id*. at 384:12–13 (examination of Diane Uccello, "[I] made the decision that we will go after their source of money."); *id*. at 384:25–385:5 (examination of Diane Uccello, "A: This is an email sent just to the neighbors. Just as it says, just to the neighbors about the efforts to impact their ability to raise money. Q: When you say 'their,' you mean Gilead? A: Gilead. . . .").

Indeed, the Town of Cromwell acknowledges—as it must—that "an aggressive and vocal, but small bloc of voters" spoke out against the group home. Def.'s JMOL Mem. at 19. But there is nothing in the record to support its claim of opposition to the group home being limited to a "small bloc of voters." Instead, everything in this record suggests—and the jury reasonably could have concluded—that the Town of Cromwell, along with every Town official, from the Mayor, the Town Manager, the Chief of Police, the Fire Chief, the Town Assessor, the Town Planner, the Superintendent of Schools, as well as a significant number of its taxpayers, wanted to drive the planned Gilead group home out of town. Trial Tr. vol. 2, 391:25–392:9 (examination of Diane Uccello, "Q: And here you state the town leaders remain committed to preventing the group home from opening here. Do you see that? A: I do. Q: Was that your impression of what the town was doing? A: I think my impression was that they were using the resources they had to explore those legal avenues that we couldn't[.]"); Trial Tr. vol. 3, 534:24–535:5 (examination of Town Manager Salvatore, "Q: And prior to that public forum the town is receiving a number of contacts from residents via calls, emails, visits to town hall expressing concern and opposition to the home in March and April; is that right? A: There was a lot of concern being expressed, yes."); Trial Tr. vol. 3, 598 (Town Manager Salvatore acknowledging that he signed a petition, dated May 6, 2015, to deny the proposed residence at 5 Reiman Drive); Trial Tr. vol. 3, 689–709 (tax assessor for the Town of Cromwell detailing the denial of Gilead's tax exemption applications in 2015 and 2017); Trial Tr. vol. 4, 807:13–808:12 (examination of Richard Newton, member of Town of Cromwell Council "Q: And the town council supported paying legal fees for the town attorney to [petition DPH]? A: Yes. Q: And support, for instance, the DPH petition? The council did so because of the controversy about the property, right? A: I think that's true, sure."); Def. Ex. 561 (motion for reconsideration from the Town of Cromwell,

through Town Manager Salvatore, asking that the Department of Public Health reconsider its decision to not require Gilead to obtain a license to operate a community residence in the Town of Cromwell); Pls.' Ex. 21 (e-mail from a resident to Mayor Faienza expressing concern about the plan to open a group home at 5 Reiman Drive); Pls.' Ex. 30 (April 21, 2015 Town of Cromwell press release which states that "[b]ecause of the lack of information provided by Gilead and [D]HMAS based on the concerns by those in attendance, Mayor Enzo Faienza is officially and public[ly] requesting, on behalf of the citizens of the Town of Cromwell, that Gilead consider relocating to a more suitable location"); Pls.' Ex. 51 (May 13, 2015 press release from the Office of the Town Manager of the Town of Cromwell, stating that "[a]s as result of Gilead Community Services attempting to install another community residence in the Town of Cromwell, Acting Town Manager Anthony Salvatore, with the support of Mayor Enzo Faienza and the Town Council, petitioned the Commissioner of Public Health to deny Gilead . . . authority to install another community residence in the Town of Cromwell"); Pls.' Ex. 75 (cease-and-desist letter from the Town of Cromwell claiming that the 5 Reiman Drive home "appears to be in violation of the Town of Cromwell Zoning Regulations" and that the property should not be used "without first obtaining all necessary zoning permits," or else Gilead would incur a fine of $150 per day); Pls.' Ex. 132 (letters from the Cromwell Town Assessor requesting additional documentation for Gilead's tax exemption application and then later denying the application); Pls.' Ex. 99 (press release from the Town Manager and Mayor stating that "Town Manager Anthony Salvatore and Mayor Enzo Faienza applaud Gilead's decision to relocate the Group Home and thank them for listening to the concerns of Town Officials and the residents of Reiman Drive, that this was not the most favorable neighborhood for them to establish a

community residence"); Pls.' Ex. 102 (capturing all posts on the "Reiman Strong" Facebook

page from March 29, 2015 through May 10, 2016).

Accordingly, the Court did not err in not including jury instructions on *Fact Concerts*, a

legal standard not applicable to Fair Housing Act cases, where the relevant case law amply

supports allowing juries to consider "evidence of residents' knowledge and participation at trial."

*Hispanics United of DuPage Cnty. v. Vill. of Addison, Ill.*, 958 F. Supp. 1320, 1331–32 (N.D. Ill.

1997).

### 3.   The Amount of the Punitive Damages Award

The Town of Cromwell also argues that the jury's $5,000,000 punitive damages award

violates the Due Process Clause's protections against excessive punitive damages awards,

"particularly in light of the fact that compensatory damages were assessed at $181,000." Def.'s

JMOL Mem. at 21. They argue that the Supreme Court has said courts "must consider 'the ratio

between the plaintiff's compensatory damages and the amount of punitive damages' when

assessing whether a jury's award of punitive damages is excessive in violation of the Fourteenth

Amendment." *Id.* at 21 (quoting *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 560 (1996)).

The Town of Cromwell also argues that while the Supreme Court said it would not establish a

bright line rule or "'mathematical formula,'" it stated that "'few awards exceeding a single-digit

ratio . . . will satisfy due process,'" *id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

U.S. 408, 424–25 (2003)), and that punitive damages must have a "'reasonable relationship'" to

the compensatory damages awarded, *id.* at 21–22 (quoting *Gore*, 517 U.S. at 580).

Considering this allegedly excessive award, the Town of Cromwell argues that the Court

should grant a new trial under Federal Rule of Civil Procedure 59 and order a remittitur of the

punitive damages award "that the Plaintiffs can either accept or choose to proceed with a new

trial." *Id*. at 21. They cite to various cases within the Second Circuit that have "entered remittitur in order to provide the defendants [D]ue [P]rocess." *Id*. at 22–23. In this case, the Town of Cromwell argues, "the jury award of punitive damages is grossly disproportionate to the compensatory damages awarded," because these two amounts have a ratio "of approximately 27 to 1," which is excessive to the point of violating the Town of Cromwell's Due Process rights. *Id*. at 23–24.

Plaintiffs respond that the $5,000,000 punitive damages award does not "'enter the zone of arbitrariness' that violates due process" when considering the three "guideposts" that the Supreme Court has established for determining whether a punitive damages award is reasonable: "(1) 'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the available civil penalties." Pls.' JMOL Opp'n at 34–35 (quoting *Gore*, 517 U.S. at 568, 575).

Plaintiffs note that the Supreme Court has enumerated five factors to consider when evaluating the degree of reprehensibility of the defendant's conduct, which is the "most important" guidepost: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id*. at 34–35 (citing *Gore*, 517 U.S. at 575; *Campbell*, 538 U.S. at 419).

All of the factors, they argue, "strongly support a substantial award of punitive damages." *Id*. at 35. The harm caused through intentional discrimination, they argue, is particularly

reprehensible and warrants a high punitive award. *Id.* (citing *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) ("[C]ourts have noted the relative reprehensibility of intentional discrimination as distinguished from some other forms of purely economic injury[.]")). Likewise, the Town's actions—including the Town of Cromwell police's "leak[ing] the intended residents' sensitive medical diagnoses to the local paper . . . . [a]ffected the mental health of the intended residents." *Id.* at 36. Instead of assisting the residents, town officials "celebrated" when the home closed. *Id.* This conduct, Plaintiffs claim, was "highly reprehensible." *Id.* (citing *Parris v. Pappas*, 844 F. Supp. 2d 262, 282 (D. Conn. 2012); *Broome v. Biondi*, 17 F. Supp. 2d 211, 229 (S.D.N.Y. 1997)).

A substantial penalty is also warranted, they argue, because Plaintiffs were in a financially vulnerable position and their financial vulnerability was "take[n] advantage of" in order to imperil their ability to provide services to "uninsured or underinsured individuals with mental health disabilities." *Id.* at 37 (citing *Gore*, 517 U.S. at 576). As to the fourth factor, Plaintiffs argue that the conduct is likely to be repeated "as evidenced by Ms. Baron's testimony that her decision to deny Gilead's application was 'justified' and that the Supreme Court's decision did not change her mind." *Id.* at 37 (citing Trial Tr. vol. 3, 704–07). Regarding the final factor, Plaintiffs argue that "[m]ultiple high-level officials knew that the [Fair Housing Act] applied to protect individuals with disabilities from housing discrimination" but continued to act nonetheless. *Id.* at 37–38 (citing *Parris*, 844 F. Supp. 2d at 282; *Broome*, 17 F. Supp. 2d at 229).

As to the second guidepost, Plaintiffs argue that the 27-to-1 ratio between punitive damages and compensatory damages is "amply supported by the case[]law." *Id.* at 39. They note first that the Second Circuit recently affirmed a 21-to-1 ratio in an employment case, *Kennedy v. Supreme Forest Prods., Inc.*, 761 F. App'x 72 (2d Cir. 2019) (summary order), in which the

31

district court had noted that the ratio fell "far short of the 'breathtaking' ratio of 500-to-1 that was struck down in *Gore*, . . . , or the 145-to-1 ratio that was struck down in *State Farm*[,]" *Kennedy v. Supreme Forest Prods., Inc.*, 295 F. Supp. 3d 113, 122 (D. Conn. 2017). They also argue that "the nature of civil rights violations often justifies high ratios," and that "[t]he Second Circuit has noted that 'violations of civil rights may very well be particularly egregious acts that result in . . . injuries whose monetary value is difficult to determine.'" *Id*. at 40 (quoting *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996)). In support, they note that "the 27-to-1 ratio between punitive damages and compensatory damages awarded in this case is far below the ratios upheld in other civil rights cases." *Id*. at 41 (citing *Blackledge v. Carlone*, 126 F. Supp. 2d 224, 230 (D. Conn. 2001) (finding a 40-to-1 ratio not excessive in an unnecessary force case); *Lee*, 101 F.3d at 805 (reducing the punitive award to a 75-to-1 ratio in an excessive force case)). Plaintiffs argue that these higher ratios are reasonable "in civil rights cases with particularly egregious conduct but low compensatory damages." *Id*. at 41. In this case, Plaintiffs claim, the jury's compensatory damages award "accounted for Plaintiffs' out-of-pocket damages and did not compensate Plaintiff for any of its mission-related damages," and so the ratio allowed should be higher. *Id*. at 42.

Regarding the third guidepost, Plaintiffs argue that in Fair Housing Act cases, "courts in this circuit have looked to whether the [Fair Housing Act] sets a limitation on the amount of damages available," and the fact that it does not supports the punitive damages award. *Id*. at 44 (citing *Parris*, 844 F. Supp. 2d at 282; *Broome*, 17 F. Supp. 2d at 229).

In reply, the Town of Cromwell argues that its actions were not reprehensible because it "acted in good faith on the advice of its attorney." Def. JMOL Reply at 6. It also attempts to distinguish the cases Plaintiffs cite to by noting that in those cases "the compensatory damages

were either difficult to determine or otherwise extremely low and thus, a high ratio between compensatory and punitive damages awards was justified." *Id.* at 8. Moreover, they argue, the cases cited to in the opposition brief "warranted the higher punitive damages" because they were police brutality cases. *Id.* They maintain that the punitive damages awarded by the jury are therefore excessive.

The Court disagrees.

"Judicial review of the size of punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 421, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). Courts must ensure that punitive damages awards "conform, insofar as reasonably practicable, to the prevailing norms of the legal system and are not excessive." *Stampf*, 761 F.3d at 209 (internal quotation marks and alteration omitted).

But "even where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three *Gore* guideposts," the Court must "review punitive awards for excessiveness . . . . [which] requires comparison with awards approved in similar cases . . . [and] determin[ing], as with compensatory awards, whether the punitive award is so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries*, 121 F.3d 808, 816–17 (2d Cir. 1997) (internal citation and quotation marks omitted); *accord Payne v. Jones*, 711 F.3d 85, 97 (2d Cir. 2013) (federal courts need not find that an award violated Due Process to set it aside as excessive).

The jury found the Town of Cromwell's conduct to be "highly reprehensible," for the reasons stated in Plaintiffs' opposition, and there is no basis for this Court to disagree. As discussed above, the Town of Cromwell hosted a public forum where town officials spoke out

33

against the group home at 5 Reiman Drive, petitioned to the Department of Public Health, denied

Gilead tax exemption, issued a cease-and-desist letter for alleged zoning violations, and issued

various press releases speaking out against the group home. *See supra* Section I. The Town of

Cromwell additionally exhibited indifference toward the health and safety of the 5 Reiman Drive

residents when its police officers disclosed a resident's private health information to the media,

Trial Tr. vol. 3, 574–75 (Town Manager Salvatore acknowledging that police officers are

required to redact personal information from reports provided to the public, and that the article

published about an incident at 5 Reiman Drive included private health information about a

resident, whichs was allegedly obtained from the police). The Town of Cromwell police also

demonstrated indifference toward the residents of 5 Reiman Drive when it failed to fully

investigate the incident where a "for sale" sign was thrown against the property in the early hours

of August 1, 2015. Pls.' Ex. 94 (case incident report showing that police were called at 8:34 AM

and that the report was typed and the case closed at 9:31 AM); Trial Tr. vol. 1, 132:12–16.

According to witnesses presented at trial, all of these activities "negatively impacted" the mental

health of the residents at 5 Reiman Drive. Trial Tr. vol. 4, 762 (Fran Ludwig, an emeritus

member of the Gilead board of directors, stating that the board voted to close the program at 5

Reiman Drive because they "understood from staff that the clients who were living in the home

were not doing well, that their mental health was being negatively impacted by the

environment"). This conclusion is therefore consistent with other Fair Housing Act cases where

the records contained evidence of willful, malicious, and/or reckless disregard for Fair Housing

Act rights and the defendants inflicted non-economic harms upon the plaintiffs. *See Parris*, 844

F. Supp. 2d at 282 ("In examining the *Gore* factors, the Court finds that punitive damages are

warranted here. First, defendants' conduct toward [the plaintiff] was highly reprehensible. The

record contains evidence that defendants acted willfully, maliciously and/or with reckless disregard for plaintiff's [Fair Housing Act] rights when they failed to accommodate her disability."); *Broome*, 17 F. Supp. 2d at 229 (finding that "substantial punitive damages were warranted in this case" where "[t]he record contains evidence from which the jury could find that the . . . defendants acted willingly or maliciously when they discriminated against the plaintiffs on the basis of their race, and retaliated against [the third-party defendant] for trying to oppose the Board's actions").

In *Parris*, the district court found reasonable a ratio where punitive damages amounted to "one and one half times the compensatory damages award," or 3-to-1. *Parris*, F. Supp. 2d at 283. In *Broome*, the Court found appropriate punitive damages amounting to almost twice the compensatory damages. *Broome*, 17 F. Supp. 2d at 229. Of relevance to this case, both were cases where the defendants' actions were found to be "highly reprehensible." *Parris*, 844 F. Supp. 2d at 282; *Broome*, 17 F. Supp. 2d at 229. *Broome* also considered that the Supreme Court had previously held that "a punitive damage award 'of more than 4 times the amount of compensatory damages . . . does not cross the line into the area of constitutional impropriety.'" *Broome*, 17 F. Supp. 2d at 229 (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). This observation also comports with the Supreme Court's later pronouncement that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the Sate's goals of deterrence and retribution[.]" *Campbell*, 538 U.S. at 425.

But greater ratios "may comport with due process," where "'a particularly egregious act has resulted in only a small amount of economic damages.'" *Campbell*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582). "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."

*Gore*, 517 U.S. at 582; *see, e.g.*, *Lee*, 101 F.3d at 813 (upholding a 75-to-1 ratio where the jury had awarded $1 in nominal and compensatory damages); *Kennedy*, 761 F. A'ppx at 72 (affirming a 21-to-1 ratio where the lower court had awarded $11,900 in compensatory damages and $250,000 in punitive damages).

In this case, in addition to the specifically identified damages of $180,161.22 in out-of-pocket damages to Gilead, an amount found to be compensable by the jury's $181,000 compensatory damages award, Gilead had to forfeit a yearly contract worth over $800,000, a loss estimated at trial to result in nearly $5 million dollars in losses. Trial Tr. vol. 1, 184 (Mr. Osborne testifying that the contract with the Department of Mental Health and Addiction Services provided Gilead with $866,152 in funding per year). In addition, this case involved not easily calculated and significant non-economic harm, such as the significant diversion of time of Daniel Osborne, the Chief Executive Officer of Gilead, to this one group home, Trial Tr. vol. 1, 182 (Mr. Osborne testifying to spending "at least 30 percent" of his time on the 5 Reiman Road home in 2015 and 2016), one of eight residential programs managed by the organization, Trial Tr. vol. 1, 55 (Mr. Osborne stating that Gilead has eight residential programs), as well as the loss of housing by residents desperately in need of these services, as indicated by the testimony of witnesses, such as Patricia Rehmer, Trial Tr. vol. 4, 828 ("People with mental health disabilities, again one in four in this nation, have the right to live in the communities in the least restrictive environment possible. Without housing services . . . many individuals may stay in hospitals for extended period of times receiving care that they don't really require any longer."), and Fran Ludwig, Trial Tr. vol. 4, 768–69 (testifying that Gilead "had such a profound impact on [her] son's life and on [her] family's life" because it "gave [her family] a son [they] almost never knew" through its services), and Russell Hassman, Trial Tr. vol. 4, 873–74 (explaining that his

36

brother "has suffered with mental illness since he was in his mid-teens" and had been at "a number of different program in New Jersey" but that it was not "until his role at Gilead where he really received the care that he needed"). *See also* Trial Tr. vol. 1, 186:2–21 (examination of Daniel Osborne, "[I]t impacts our ability to actually offer these services to those six men, which is our mission, which is the reason Gilead exists . . . . [I] think about the success stories that [individuals in our other residential programs have] had over those years. The reconnected relationship with a sister in one case that has, you know, changed a person's life. The new job that someone had aspired to for years that they now have—that has changed the course of their life. Those six men never got the opportunity to have those stories and I think that's the most impactful piece which relates to the mission of Gilead Community Services.").

As a result, while $5 million dollars is a substantial award by any measure, when the Court "compares actual *and potential* damages to the punitive award," *Gore*, 517 U.S. at 582 (emphasis in original)—as this Court must—this punitive damages award cannot be considered "grossly excessive."[5]

Finally, as to the third guidepost, the Fair Housing Act does not limit punitive damages. "In 1988, Congress amended the Fair Housing Act to, among other things, broaden the availability of punitive damages as an available remedy upon a finding of liability." *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 89 (citing Pub. L. 100–430, 102 Stat 1619 (1988) (codified at 42 U.S.C. § 3613)). Comparatively, for example, Title VII cases limit punitive and compensatory damages to $300,000. 42 U.S.C. § 1981a(b)(3)(D).

Accordingly, the Town of Cromwell's motion for a remittitur will be denied.

---

[5] Notably, this sum also cannot be considered "grossly excessive," when compared to the Town of Cromwell's overall financial condition. Def.'s Mem. for Stay at 3–4 (noting that as of June 30, 2021, the Town of Cromwell has total net assets of $113,164,816, and that it can borrow against its total assets if it were not able to cover its obligation through "unrestricted liquid assets," which, as of June 30, 2021, totaled $11,399,241).

### 4.  Respondeat Superior Liability

The Town of Cromwell claims that the Court instructed the jury,

> that the actions and statements of the Defendant's employees and officials taken within the scope of employment or duty could be considered the actions and statements of the Defendant municipality, when there is no municipal liability under the doctrines of master/servant, principal/agent or respondeat superior liability.

Def.'s JMOL Mem. at 24. The Town of Cromwell reiterates that, under *Monell*, it "cannot be held vicariously liable for compensatory or punitive damages" or liable "for violation of civil rights because [an] employee is a tort-feasor." *Id*. at 24–25. They further note that in *Monell*, the Supreme Court overruled precedent which held that local governments are wholly immune from suit under § 1983 but noted that it upheld the precedent "'insofar as it holds that the doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees.'" *Id.* at 25 (quoting *Monell*, 436 U.S. at 663).

Under § 1983, the Town of Cromwell notes, Plaintiffs "must show they were denied a constitutional or federal statutory right and that the deprivation of that right occurred under color of state law." *Id*. (citing 42 U.S.C. § 1983). Moreover, it argues, in *Meyer v. Holley*, 537 U.S. 280 (2003), the Supreme Court "indicated that traditional rules of agency and vicarious liability apply with respect to claims brought pursuant to the Fair Housing Act, even when the defendant is a private corporation and not a municipality, as in this case," *id*. at 25 (citing *Meyer*, 537 U.S. 280), and the traditional rule in lawsuits against municipalities, as established in *Monell*, is "that there may be no claims of vicarious liability against a municipality," *id*. (citing *Monell*, 436 U.S. 658).

The Town of Cromwell argues *Monell* held that municipalities cannot be held liable for violations of civil rights "solely because [an] employee is a tort-feasor" nor under the Civil

Rights Act of 1871 on a respondeat superior theory. *Id.* at 26–27 (citing *Monell*, 436 U.S. 658). To hold a municipality liable after *Monell*, they argue, a plaintiff must show that a municipality's conduct "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [or is] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.'" *Id.* at 27 (quoting *Monell*, 436 U.S. at 690–91). They argue that "[t]he comments of the Town Manager and Mayor which were entered into evidence, are not the policy of the Town of Cromwell. There was no evidence of a policy of the Town of Cromwell to discriminate against persons with disabilities." *Id.* at 28.

Plaintiffs respond that *Monell* is inapplicable because this case was brought "under the [Fair Housing Act] and the [Americans with Disabilities Act], not under § 1983." Pls.' JMOL Opp'n at 17. It further notes that the Court already stated, in its Summary Judgment Order, that *Meyer*, which "'recognized that corporations are liable under traditional vicarious liability principles for their employees' conduct which violates the Fair Housing Act,'" controls. *Id.* at 17 (quoting *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 81). Plaintiffs argue that the Town of Cromwell's argument that *Meyer* "meant to carry over to the [Fair Housing Act] the Supreme Court's holding in *Monell*" when it referred to "traditional agency principles" is unavailing because *Monell* concerns § 1983, not the Fair Housing Act. *Id.*

The application of *Monell*, Plaintiffs argue, does not hold because "*Monell*'s holding that a municipality is only liable for its own customs and practices (and not under a vicarious liability theory) relies on its particularized assessment of Section 1983's legislative intent and context and is therefore 'confined to the peculiar characteristics of that statute.'" *Id.* at 17 (quoting *Patton v. Dumpson*, 498 F. Supp. 933, 942 (S.D.N.Y. 1980)). Moreover, they state, "*Monell*'s holding is

not the traditional rule." *Id*. (citing *Valley Hous. LP v. City of Derby*, 802 F. Supp. 2d 359, 385 (D. Conn. 2011) (holding a municipality vicariously liable under the Fair Housing Act for the actions of a municipal employee)). And the Second Circuit has clearly held municipalities vicariously liable for the acts of municipal officials and employees. *Id*. at 18 (citing *Cabrera*, 24 F.3d at 385; *RECAP*, 294 F.3d at 53–54; *LeBlanc-Sternberg*, 67 F.3d at 428). The Court's jury instructions were therefore proper, according to Plaintiffs, and the Town of Cromwell's argument should be rejected. *Id*.

The Court agrees.

First, the Court notes that the Town of Cromwell preserved this argument at the October 13, 2021 charge conference.

The Court has already discussed the application of *Meyer* and *Monell*, and concluded that *Meyer* allows for vicarious liability based on the actions of an employee or public official. *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 81–82. The Town of Cromwell's latest arguments do not change the Court's analysis, as courts have continued to find defendants vicariously liable for their agents' actions post-*Meyer*, despite the Town of Cromwell's claim that *Meyer* meant to apply the "traditional rule" of *Monell* to municipalities. *See, e.g.*, *United States v. Hylton*, 944 F. Supp. 2d 176, 192 (D. Conn. 2013) (citing *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1094, 1098 (7th Cir. 1992) (finding the agents and the principal jointly liable for the agents' discrimination)), *aff'd*, 590 F. App'x 13 (2d Cir. 2014); *Whyte v. Alston Mgmt., Inc.*, No. 10-81041-CIV, 2012 WL 11789773, at *1–*2 (S.D. Fla. Apr. 11, 2012) (citing cases); *Valley Housing LP*, 802 F. Supp. 2d at 385 (finding that an individual's "status as a municipal employee is sufficient to create [the municipality's] liability for discriminatory actions

by him based on plaintiff's Rehabilitation Act, [Fair Housing Act][,] and [Americans with Disabilities Act] claims").

### 5. Municipal Liability in Civil Rights Cases

The Town of Cromwell also argues that the Court failed to instruct the jury that the municipality could only be found guilty of violating the Fair Housing Act or the Americans with Disabilities Act if it determined that "an official municipal policy, pervasive municipal practice, or the single act of a final municipal policy maker caused the violation." Def.'s JMOL Mem. at 28. In support of this argument, the Town of Cromwell reiterates many of the same arguments discussed above.

Notably, the Town of Cromwell argues that "[a]bsent the alleged discriminatory comments of the Town Mayor, and Town Manager, the record is devoid of evidence to support the jury's conclusion." *Id*. at 30. The Town of Cromwell claims that "no conduct on the part of the Town could be seen by any reasonable jury or juror as an 'official municipal policy, pervasive municipal practice, or the single act of a final municipal policy maker' in the context of *Monell* liability." *Id*. at 30.

Plaintiffs respond that the Town of Cromwell's argument here is a "repackaging of its *Monell* argument and must be rejected." Pls.' JMOL Opp'n at 18. In addition to the arguments advanced above, Plaintiffs argue that there can be no reversible error because of the "ample trial evidence that the conduct taken by the Town constituted official policy to support the jury's verdict under either standard." *Id*. at 19 (citing *Lombard v. Louisiana*, 373 U.S. 267, 273–74 (1963)). Plaintiffs therefore argue that the Town's argument should be rejected.

The Court agrees.

41

For the reasons described above and in the Summary Judgment Order, the Court denies

the Town of Cromwell's attempt to apply the holding of *Monell*, a § 1983 case, to a Fair Housing

Act case, when the Supreme Court squarely recognized in *Meyer*, a Fair Housing Act case, that

vicarious liability applies. *See Gilead Cmty. Servs.*, 432 F. Supp. 3d at 81–82.

### 6.   Speech by Municipal Officials and Town Employees

The Town of Cromwell argues that the Court "erroneously allowed the jury to consider

speech by municipal officials and/or employees on matters of public concern as a basis for

liability under the [Fair Housing Act] and [the Americans with Disabilities Act], when such

speech is protected by the First Amendment and cannot be a basis for a finding of liability."

Def.'s JMOL Mem. at 31. In support of this argument, the Town of Cromwell asserts that all

citizens have a protected right to speak out on matters of public concern, including public

officials, *id*. at 32 (citing *Tri-Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir.), *cert

denied*, 137 S. Ct. 592 (2016)); that public employees' speech is protected when they are

speaking as a citizen addressing matters of public concern, *id*. at 33–34 (citing *Garcetti v.

Ceballos*, 547 U.S. 410, 417 (2006); *Specht v. City of New York*, 15 F. 4th 594, 602 (2d Cir.

2021)); and that Mayor Faienza, as a taxpaying citizen, "had every right" under the First

Amendment to make statements, "including those contained in the press release," and as such the

jury should not have been allowed to consider his statements, *id*. at 35–36.

In response, Plaintiffs argue that certain actions—such as the cease-and-desist order, the

denial of Gilead's tax exemption application, and the failure to investigate known harassment—

cannot be considered speech. Pls.' JMOL Opp'n at 20. They also emphasize that: (1) the actions

claimed to be protected speech were "'evidence of their intent to discriminate more generally,'"

*id*. at 20 (quoting *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 75), and (2) *Tri-Corp* is not binding on

this Court and is distinguishable because it involved an individual "who . . . lobbied for certain rulings in administrative proceedings, but who himself had no power to affect the plaintiff's housing." *Id*. at 22. Plaintiffs further argue that the Town did not provide any evidence "to support a finding that any of the speech in question was made outside of Town officials' official duties." *Id*.

      The Court agrees.

      In its Summary Judgment Order, the Court addressed the Town of Cromwell's *Noerr-Pennington* doctrine argument. Principally, as Plaintiffs argue in opposition, *Tri-Corp* is not binding on this Court, and "in any event, even if the Defendants could not be liable for their petitions to the Connecticut Department of Public Health, these actions could still be considered as evidence of their intent to discriminate more generally." *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 75–77; *see, e.g.*, *Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 710 (D. Md. 2002) ("[The council member] has a right not to be held liable for his speech, but is not free from having his speech be considered as evidence of his actions; here as evidence of his intent in casting the vote against the council's resolution. Accordingly, it was not error for the court to deny Defendants' proposed First Amendment instruction.").

### 7.  Town of Cromwell's First Amendment Right

      The Town of Cromwell argues that the Court should not have allowed the jury to consider the Town's petition to the Connecticut Department of Public Health as a basis for liability under the Fair Housing Act or the Americans with Disabilities Act, because the petition was protected by the First Amendment right to petition for redress. Def.'s JMOL Mem. at 36. The Town of Cromwell claims that the right to petition extends to all departments of the government, and to a petition to the Department of Public Health under the *Noerr-Pennington*

doctrine. *Id*. at 36–37 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508

(1972); *New West, L.P. v. City of Joliet*, 491 F.2d 717, 721–22 (7th Cir. 2007)). The Town of

Cromwell's petition to the Department of Public Health was "clearly protected under the *Noerr-*

*Pennington* doctrine" because it "was made in good faith and was clearly not a sham." *Id*. at 38.

   The Town of Cromwell argues that "'[e]ven if the seeking of relief is animated by

malevolence or self-interest, the [F]irst [A]mendment protects the right to petition of the person

whose activities are genuinely aimed at procuring favorable government action.'" *Id*. at 39

(quoting *LeBlanc-Sternberg v. Fletcher*, 781 F. Supp. 261, 266 (S.D.N.Y. 1991)). The right to

petition, they argue, is "unprotected only where the petition is 'undertaken in order to harass

others or to obstruct others' ability to seek relief.'" *Id*. at 39–40 (quoting *LeBlanc-Sternberg*, 781

F. Supp. 266). The Town of Cromwell notes that other circuits have held that public officials'

activities opposing certain housing projects are "'protected by the right to petition the

government for a redress of grievances . . . and by a government official's right to seek to affect

government action.'" *Id*. at 40 (quoting *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d

1182, 1193 (9th Cir. 2006); citing *New West, L.P.*, 491 F.3d at 721–22; *White v. Lee*, 227 F.3d

1214, 1231–33 (9th Cir. 2000); *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1093–

94 (9th Cir. 2000)).

   Plaintiffs oppose the Town of Cromwell's claim that the Court erred in its jury

instructions regarding the Town of Cromwell's petition to the Connecticut Department of Public

Health. They first note that the Court instructed the jury that it could not find the petition to be a

violation of the Fair Housing Act or the Americans with Disabilities Act if it concluded that the

petition was not a sham. Pls.' JMOL Opp'n at 23 (citing Post-Trial Jury Instrs. at 24, ECF No.

233 (Oct. 14, 2021)). Second, they note that the Town of Cromwell's argument appears to be that

no reasonable jury could have found the petition to be a sham, which Plaintiffs reject because they showed evidence that Town officials filed the petition in response to neighbors' reactions to news stories regarding a group home in another town, and the Town officials filed the petition despite knowing that the petition was not likely to be successful. *Id.* at 24.

The Court agrees.

In its Summary Judgment Order, the Court already rejected and explained why the *Noerr-Pennington* doctrine did not prohibit the Town's petition from being considered as probative of whether Defendants violated the Fair Housing Act. *Gilead Cmty. Servs.*, 432 F. Supp. 3d at 75–77 ("[E]ven if the Defendants could not be liable for their petitions to the Connecticut Department of Public Health, these actions could still be considered as evidence of their intent to discriminate more generally."). The Town of Cromwell's latest argument appears to be that no reasonable jury could have concluded that the petition was undertaken to harass or obstruct others' ability to seek relief. In support, they cite to, among other things, the Seventh Circuit's decision in *New West, L.P.*, and the Ninth Circuit's decisions in *Affordable Housing Development Corporation* and *Manistee Town Center*.

Leaving aside the fact that the Town of Cromwell has not cited to any relevant and binding Second Circuit precedent, even the cases cited by the Town of Cromwell are not instructive here. In *New West, L.P.*, the Seventh Circuit explicitly considered whether the municipality's lawsuit was a "sham" and concluded that it was not. *New West, L.P.*, 491 F.3d at 722. *Manistee Town Center* is not instructive because, though it deals with a real estate transaction, it has nothing to do with fair housing issues or civil rights violations. *Manistee Town Center*, 227 F.3d at 1091 (affirming the dismissal of "[the plaintiff's] § 1983 claim on the ground that [the plaintiff] failed to plead a racial or class-based discriminatory animus").

Finally, the Ninth Circuit's decision in *Affordable Housing Development Corporation* actually supports affirming the jury's decision here, not overturing it. There, the Ninth Circuit upheld a jury's decision that a housing project had been "opposed on account of the impact of a large rental unit on neighboring property values and because of an arguable lack of need for the project . . . . [and that the plaintiff] did not demonstrate that these reasons were a sham or were pretextual." *Affordable Hous. Dev. Corp.*, 433 F.3d at 1196. In other words, that jury considered and rejected the argument that there had been some improper motive behind the housing project's denial. *See id.* ("The response by the jury establishes a defense to disparate impact.").

Here, the jury considered evidence showing that the petition was just one part of a much larger effort to force Gilead and its clients to leave the residence. *See, e.g.,* Pls.' Exs. 28, 30, 51, 99 (Town of Cromwell press releases regarding concerns raised by Town of Cromwell officials). The Court thus cannot conclude that, viewing the evidence in the light most favorable to Plaintiffs, the evidence is such that only one conclusion could have been reached by a reasonable jury. *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004).

Accordingly, the motion for judgment as a matter of law on this basis must be denied

### 8.  Damage Caused to Gilead

The Town of Cromwell requests that judgment be entered in their favor or that a new trial be ordered because there was insufficient evidence for a jury to have found that it caused Gilead damages. Def.'s JMOL Mem. at 43–44. According to the Town of Cromwell, "the record has made it clear that Gilead and Mr. Osborn[e]'s choice to abandon the Gilead home was just that, the choice of Gilead and Mr. Osborn[e]." *Id.* at 42.

The Town of Cromwell points to the testimony of Mr. Osborne and "multiple others," including Gilead board members, which would cause "[a]ny reasonable jury looking at the

46

fact[s] presented in the record [to] see clear[ly] that Gilead left the program at 5 Reiman Drive of

their own volition," and that the Town of Cromwell forum and all instances of alleged

discrimination "did not deter them in the slightest." *Id*. at 43. Specifically, they note that

testimony shows Gilead had no intention of abandoning the home "in spite of the alleged

discrimination of the Town" and in spite of the public forum where residents voiced strong

opposition. *Id.* at 43. It notes that Gilead closed after becoming concerned about losing funding

after the incident where a resident left the home unannounced. *Id*. at 43.

Plaintiffs first respond by noting that closure of the home was only one form of damage,

in addition to "diversion of resources, out-of-pocket costs attributable to the tax exemption issue,

and the loss of Gilead's tax-exempt status," that the jury could have considered. Pls.' JMOL

Opp'n at 45. Second, they argue that the witnesses—specifically, Mr. Osborne, Ms. Ludwig, and

Mr. Hassman—provided testimony confirming that the actions the Town took after the public

forum caused Gilead to change its mind about keeping the home open. *Id*. at 46. Plaintiffs point

to witness testimony and documents which they claim support the conclusion that the Town's

actions caused the closure of the home. *Id*. at 47.

The Court agrees.

The Town of Cromwell calls into question only the damage caused to Gilead from the

closure of its home, but, as Plaintiffs point out, they discussed other damages at trial. Regarding

the closure of the home, based on the evidence at trial, a reasonable jury could conclude that the

Town of Cromwell's actions caused the closure. As Plaintiffs note, the witnesses testified that

the Town of Cromwell's actions caused Gilead to change course, including by eventually closing

the home. Even besides the witness' testimonies, the exhibits presented show that the Town of

Cromwell took credit for the closure of Gilead's home, which shows that even the Town thinks it is reasonable to find causation. Pls.' Exs. 98, 99, 100, 105 109, 175.

Accordingly, the Town's request for a judgment as a matter of law or new trial will be denied.

### C.  Motion for Stay of Execution of Judgment

The Town of Cromwell additionally moves, under Federal Rule of Civil Procedure 62(b), for a stay of proceedings to execute the judgment against it, without being required to post a bond or other security, until post-trial motions and appeals are concluded. Def.'s Mot. for Stay.

The Second Circuit has enumerated five factors that district courts shall consider "in determining whether to waive the bond requirement under Federal Rule of Civil Procedure 62(d)":

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Nassau County*, 783 F.3d at 417–18.

The Town of Cromwell argues that its "financial solvency" addresses *Nassau County* factors 3, 4, and 5—regarding the degree of confidence the Court has in the availability of funds, whether the ability to pay the judgment is so apparent that the cost of a bond would be a waste of money, and whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors in an insecure position—and weigh in favor of waiving the requirement of a security. Def.'s Mem. of Law in Supp. of Mot. for Stay of Execution of J. Without Bond or Other Security at 3, ECF No. 254-1 (Dec. 2, 2021) ("Def.'s

Mem. for Stay"). Specifically, they note that, as of June 30, 2021, the Town of Cromwell has

total net assets of $113,164,816, and that it can borrow against its total assets if it were not able

to cover its obligation through liquid assets, which, as of June 30, 2021 totaled $11,399,241. *Id.*

at 3–4. They further argue that "[t]here is no question that the Town . . . has the availability of

funds to pay the judgment and . . . to require the Town to pay for a *supersedeas* bond would be

an unnecessary waste of funds." *Id*. The Town of Cromwell keeps "an amount equal to 1/6 of its

total budget in unrestricted liquid funds," which "will be double the amount needed to pay any

judgment to the Plaintiffs[.]"

The Town of Cromwell also agrees "to keep that amount (1/6 of total budget) of liquid

funds in place as a condition of a stay to be ordered by this Court, and will further agree to

provide advance notice to the Plaintiffs or any attempts to alter or modify its liquidity policy." *Id*.

at 4. The Town of Cromwell also agrees to "a periodic reaffirmation of its financial condition

and ability to pay any judgment against it, or other reaffirmation or 'check-in' ordered by this

Court[.]" *Id*. at 5.

The Town of Cromwell argues that the first two *Nassau County* factors—the complexity

of the collection process and the amount of time required to obtain a judgment after it is affirmed

on appeal—also weigh in favor of waiving a *supersedeas* bond because a payment obligation

"can be met with the scheduling of Town meetings over two weeks' time." *Id*. at 5.

Plaintiffs counter that the Town of Cromwell has failed to establish why this case

represents an "extraordinary" circumstance meriting a departure from requiring a bond or

security. Pls.' Br. in Opp'n to Def.'s Mot. for Stay of Execution of J. Without Bond or Other

Security at 2, ECF No. 261 (Jan. 14, 2022) (citing *Rand-Whitney Containerboard Ltd. P'ship v.*

*Town of Montville*, No. 3:96-CV-413 (HBF), 2007 WL 9754714, at *2 (D. Conn. Jan. 23, 2007)).

Specifically, they argue that the Town of Cromwell failed to show that it appropriated funds to pay the judgment, as the county did in *Nassau County*, thus failing to satisfy factors 3 and 4. *Id.* at 3.

Plaintiffs argue that *Nassau County* "does not stand for the proposition that a general showing of 'ample resources' is sufficient to justify a waiver of the required bond," *id.* at 3 (quoting *Nassau County*, 783 F.3d at 417), because in that case the Second Circuit found the County's showing sufficient where an ordinance was passed requiring immediate payment of the judgment, *id.* Instead, they believe *Conte v. County of Nassau* is instructive because in *Conte* the district court declined to waive bond where the county reportedly had unencumbered funds but failed to show they had set up a fund to pay the judgment. *Id.* at 4 (citing *Conte v. County of Nassau*, No. 06-CV-4746 (JFB) (ARL), 2017 WL 9478355, at *4 (E.D.N.Y. May 4, 2017)).

Plaintiffs also argue that factors 1 and 2—complexity of the collection process and amount of time to obtain judgment—do not weigh in the Town of Cromwell's favor because it will have to undergo a long process in order to approve and make payment on the judgment. *Id.* at 5–6. The process includes calling for a special meeting and vote to approve payment, a special meeting of the Board of Finance, and a Town meeting to vote to approve payment. *Id.* at 6. Thus, Plaintiffs argue, while a Town Meeting may be convened in five days, approval is subject to the referendum and requires that Town officials, who may be influenced by taxpayers' advocacy, cooperate. *Id.* at 6–7. Plaintiffs argue that the Town of Cromwell has failed to show why the same taxpayers who advocated against the group home, and the Town officials who were influenced by that advocacy, can be trusted to "diligently authorize payment." *Id.* at 7.

As to the fifth *Nassau County* factor, Plaintiffs argue that the Town of Cromwell "must show an 'inability to pay other creditors [stemming] from the bond itself.'" *Id.* at 7 (citing *John*

*Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 650 (S.D.N.Y. 2018)).

Instead, Plaintiffs argue, they have done the opposite by emphasizing their financial solvency

and ability to borrow against assets. *Id.*

In reply, the Town of Cromwell claims that requiring it to set aside $5,000,000 until post-

trial motions and appeals have concluded would be "tantamount to requiring the Defendant to

post a cash bond." Def.'s Reply to Pls.' Br. in Opp'n to Def.'s Mot. for Stay of Execution of J.

Without Bond or Other Security at 2, ECF No. 264 (Jan. 21, 2022). Furthermore, they argue, the

Town of Cromwell "has a legislative mandate that there will always be far more than the full

amount of the judgment in unrestricted cash in its general fund" and also "has the power to tax,"

so it will have the funds. *Id.*

As to the process for satisfying judgment, the Town of Cromwell argues that Plaintiff has

not provided any evidence to support the concern that the Town of Cromwell may choose to not

pay, and that the same argument could be raised in other cases where bonds have been waived.

*Id.* They note that even in *Nassau County*, "there was still a final step involved of a Town official

agreeing to write the check[.]" *Id.*

The Court disagrees.

In *Nassau County*, the Second Circuit stayed payment of judgment because the county

had "demonstrated the existence of appropriated funds, available for the purpose of paying

judgments without substantial delay or other difficulty." *Nassau County*, 783 F.3d at 418

(internal citation and quotation marks omitted). The Second Circuit noted that plaintiffs' only

argument in opposition had been the failure to pass an ordinance or bond resolution to provide

immediate payment, which the county had then adopted such that final approval would be a

"formality." *Id.* Likewise, in *Conte*, the district court found that it could not grant the stay where

51

it could not conclude that defendants would be able to pay the judgment "without substantial delay or other difficulty" because although the county had "ample assets," it had not provided proof that the exact judgment amount had been placed in a litigation fund or "that adequate funds ha[d] been specifically allocated to satisfy the . . . judgment." *Conte*, 2017 WL 9478355, at *4 (internal citation and quotation marks omitted).

While the Town of Cromwell argues that requiring it to set aside funds to satisfy judgment would be "tantamount to requiring the Defendant to post a cash bond," they provide no caselaw indicating that such a requirement is prohibited. Moreover, the use of alternatives such as ordinances, in cases like *Nassau County*, show that it is possible to appropriate funds and make processing easier without having to set funds aside.

The Town of Cromwell correctly notes that any case runs the risk that judgment may not be paid. "[C]ourts[, however,] have refused to waive the bond requirement where the payment process was complex and the time for collection of the judgment after appeal would be lengthy." *Rand-Whitney Containerboard Ltd. P'ship*, 2007 WL 9754714, at *2. Moreover, in similar cases with "history and political sensitivity," courts have considered the possibility of voters refusing to approve payment in their analysis. *See id.* at *3 (noting that defendants had not allocated funds to pay the judgment and "[could []not provide adequate assurances that a referendum [to issue municipal bonds] w[ould] result in approval, and, in fact, based on the history and political sensitivity of this litigation, it is uncertain that the voters will approve this authority"). The possibility of voters refusing to approve payment in this case is not farfetched. Indeed, the Town itself has acknowledged that "an aggressive and vocal, but small bloc of voters" spoke out against the group home. Def.'s JMOL Mem. at 19.

The Court also does not find the fifth factor to weigh in favor of a stay. The Town of Cromwell has not established that posting a bond would place other creditors in an insecure position. The Town of Cromwell has actually made clear that it keeps sufficient unrestricted liquid assets to operate for 60 days and to cover 1/6 of its total budget, and holds even more in total net assets—$113,164,816 as of June 30, 2021. Def.'s Mem. for Stay at 4.

Accordingly, after balancing the *Nassau County* factors, the Court denies the Town of Cromwell's motion to stay and orders that execution of judgment be stayed for ninety (90) days from the date of this order without bond in order to allow the Town to provide evidence that funds have been allocated or unencumbered specifically to ensure that the judgment will be paid within thirty days of the Second Circuit's decision, should the Town appeal.

## IV.   CONCLUSION

For the reasons stated above, the motion for nominal damages under Federal Rule of Civil procedure 59(e) and 60(b) is **GRANTED**; the renewed motion for judgment under Federal Rule of Civil Procedure 50(b) is **DENIED**; and the motion for stay of execution of judgment is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of May, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE